IN THE MATTER OF

# Rodriques

## VS

# Delta Air Lines, Inc.

Transcript of Deposition of
# Barbara A. Franz

Volume I
On December 11, 2014

_Reported by_ Joel P. Moyer
_Certified Court Reporter_



## DONOVAN REPORTING
### & VIDEO CONFERENCING
237 Roswell Street   Marietta, GA 30060
770.499.7499   800.547.1512   FAX: 770.428.5801
‹www.donovanreporting.com›

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN


JERRICK J. RODRIQUES,
        Plaintiff,

        vs.         CASE NO. 1:14-cv-12707-BAF-DRG

DELTA AIR LINES, INC.,
        Defendant.

                    – – –

        Deposition of BARBARA A. FRANZ,

        Taken by Felicia Duncan Brock,

            Before Joel P. Moyer,
         Certified Court Reporter,

             At the Offices of
        Delta Air Lines General Offices,
             Atlanta, Georgia,

        On Thursday, December 10, 2014,
Beginning at 8:53 a.m. & ending at 1:44 p.m.

                    – – –

Electronically signed by Joel Moyer (501-161-376-4513)                       0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

2

```
 1    APPEARANCES OF COUNSEL

 2   For the Plaintiff:

 3           FELICIA DUNCAN BROCK
             IAB Attorneys At Law PLLC
 4           25447 Plymouth Road
             Redford, MI  48239
 5           313.318.3180

 6   For the Defendant:

 7           RICHARD M. TUYN
             Ogletree, Deakins, Nash, Smoak &
 8             Stewart PC
             Suite 300
 9           34977 Woodward Avenue
             Birmingham, MI 48009
10           248.593.6400

11           KELLY K. GIUSTINA
             RYAN D. LANGEL
12           Delta Air Lines Inc.
             1030 Delta Boulevard, Dept. 981
13           Atlanta, GA 30320
             404.773.6520

14

15

16

17

18

19

20

21

22

23

24

25
```

Donovan Reporting, PC                                                          770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

3

```
 1                    INDEX TO PROCEEDINGS
 2                     EXAMINATION INDEX
 3
    BARBARA A. FRANZ
 4
        Examination by Ms. Brock            7
 5      Examination by Mr. Tuyn           183
        Re-Examination by Ms. Brock       184
 6
    Certificate Page                      190
 7      _____
 8                     EXHIBIT INDEX
 9  Plaintiff's Exhibit
10      1   Final Corrective Action Notice    52
            Regarding Performance to Jason
11          Conover dated 11-21-2012 (DEF-000174
            - DEF-000175)
12
        2   Corrective Action Notice Regarding   62
13          Performance to Christopher Culpepper
            dated 11-21-2012 (DEF-000166 -
14          DEF-000167)
15      3   Written Coaching Notice Regarding   68
            Performance to Christopher Culpepper
16          dated 11-21-2012 (DEF-164 - DEF-165)
17      4   Delta policy excerpt (DEF-000093)  78
18      5   Confidential - Excerpt from the    82
            Human Resources Practices Manual
19          titled Personnel Conduct Standards
            and Appearance Guidelines dated
20          8-25-2011 (DEF-000132 - DEF-000136)
21      6   Confidential - Excerpt from the    90
            Personnel Practices Manual titled
22          Reliability dated 3-30-2005
            (DEF-000121 - DEF-000123)
23
        7   Confidential - Delta document      91
24          entitled Reliability (DEF-000124 -
            DEF-000129)
25
```

Donovan Reporting, PC                                                            770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

4

```
1        8    Document titled Topics Discussed      93
              with Agent, Agent Jerrick Rodriques
2             (DEF-000054)
3        9    Confidential – E-mail thread ending   95
              with e-mail from James C. Kriksciun
4             to Mohammad Sarsour dated 12-11-2012
              (DEF-000234 – DEF-000236)
5
        10    Confidential – E-mail from Domingo     98
6             DeLaTorre to Barbara Franz dated
              12-17-2012 (DEF-000324)
7
        11    Notice to File regarding Jerrick       99
8             Rodriques dated 12-18-2012
              (DEF-000057)
9
        12    Internal Memorandum dated 12-18-2012  101
10            to Tyesha Gray from Barbara Franz
              (DEF-000041)
11
        13    ACS/CGO Operation Checklist           104
12            Recommendation for Termination of
              Employment (RFT) (DEF-000044)
13
        14    Confidential – E-mail thread ending   107
14            with e-mail from Barbara Franz to
              Nhia Francis dated 12-18-2012
15            (DEF-000210 – DEF-000211)
16       15    Confidential – E-mail thread ending   109
              with e-mail from Barbara Franz to
17            Domingo DeLaTorre dated 12-18-2012
              (DEF-000193)
18
        16    Confidential – Memo to Mohammad        111
19            Sarsour from Domingo De La Torre
              dated 12-15-2012 (DEF-000335)
20
        17    Confidential – Memo to Mohammad        112
21            Sarsour from Domingo De La Torre
              dated 12-15-2012 (DEF-000042)
22
        18    Confidential – Support Document.pdf    113
23            (DEF-000337)
24
25      (Continued on next page)
```

Donovan Reporting, PC                                                        770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                    0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                 Rodriques v Delta Air Lines, Inc.                 December 11, 2014

5

```
 1      19    Confidential - E-mail from Barbara    121
              Franz to Tyesha M. Gray dated
 2            12-18-2012 (DEF-000176)

 3      20    Confidential - E-mail from Barbara    123
              Franz to Mohammad Sarsour dated
 4            12-21-2012 (DEF-000181)

 5      21    E-mail from Lisa Ali to Domingo De    123
              La Torre and Mohammad Sarsour dated
 6            1-9-2013 (DEF-000055)

 7      22    Confidential - E-mail thread ending   125
              with e-mail from Barbara Franz to
 8            James Kriksciun dated 1-9-2013
              (DEF-000231 - DEF-000232)
 9
        23    Confidential - E-mail thread ending   125
10            with e-mail from Barbara Franz to
              Lisa Ali and others dated 1-10-2013
11            (DEF-000234 - DEF-000238)

12      24    Confidential - E-mail thread ending   126
              with e-mail from Barbara Franz to
13            Kelley Nabors dated 4-5-2013
              (DEF-000226 - DEF-000227)
14
        25    Confidential - E-mail thread ending   128
15            with e-mail from Barbara Franz to
              Kelley Nabors dated 4-8-2013
16            (DEF-000222 - DEF-000224)

17      26    Document regarding Employee:          138
              Jerrick Rodriques with the first
18            block dated 1-28-2013 (DEF-000058 -
              DEF-000062)
19
        27    Confidential - E-mail thread ending   152
20            with e-mail from Barbara Franz to
              Cassandra LeeAustin dated 1-9-2013
21            (DEF-000196 - DEF-000197)

22      28    Confidential - Delta Air Lines Inc.   156
              Ethics and Compliance Reporting
23            report number ending in 311 dated
              1-3-2013 (DEF-000095 - DEF-000096)
24

25      (Continued on next page)
```

Donovan Reporting, PC                                                    770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                    0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                Rodrigues v Delta Air Lines, Inc.                December 11, 2014

6

| 1 | 29 | Confidential – ACS/CGO Compliance Call Report (DEF-000097 – DEF-000098) | 164 |
| 3 | 30 | Confidential – E-mail thread ending with e-mail from Sheandra R. Clark to Deborah Kircher dated 2-11-2013 (DEF-000368) | 165 |
| 6 | 31 | Confidential – Delta Air Lines Inc. Ethics and Compliance Reporting report number ending in 660 dated 1-3-2013 (DEF-000099 – DEF-000100) | 175 |
| 8 | 32 | Confidential – ACS/CGO Compliance Call Report (DEF-000101 – DEF-000102) | 177 |
| 10 | 33 | Confidential – Delta Air Lines Inc. Ethics and Compliance Reporting report number ending in 716 dated 1-8-2013 (DEF-000364 – DEF-000365) | 178 |
| 13 | 34 | Confidential – Delta Air Lines Inc. Ethics and Compliance Reporting report number ending in 159 dated 1-9-2013 (DEF-000103 – DEF-000104) | 179 |
| 15 | 35 | Confidential – ACS/CGO Compliance Call Report (DEF-000105 – DEF-000106) | 179 |
| 17 | 36 | Confidential – Delta Air Lines Inc. Ethics and Compliance Reporting report number ending in 421 dated 1-9-2013 (DEF-000107 – DEF-000108) | 180 |
| 19 | 37 | Confidential – ACS/CGO Compliance Call Report (DEF-000109 – DEF-000110) | 181 |
| 22 | 38 | Confidential – Delta Air Lines Inc. Ethics and Compliance Reporting report number ending in 995 dated 1-31-2013 (DEF-000111 – DEF-000112) | 182 |
| 24 | 39 | Confidential – ACS/CGO Compliance Report (DEF-000113) | 182 |

Donovan Reporting, PC                                                            770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                    0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

7

1          December 11, 2014
2          8:53 a.m.
3      (Whereupon the reporter provided a written
4      disclosure to all counsel pursuant to
5      Article 8.B. of the Rules and Regulations
6      of the Board of Court Reporting.)
7  BARBARA A. FRANZ,
8      being first duly sworn, was examined and
9      testified as follows:
10 EXAMINATION
11 BY MS. BROCK:
12     Q    Now, Ms. Franz, if you can begin by
13 stating your name for the record, please.
14     A    Barbara Franz, F-R-A-N-Z.
15     Q    And I am Felicia Brock. I am the
16 attorney for Jerrick Rodriques in an action
17 that's been brought against Delta, and I'll be
18 taking your deposition today. And for
19 housekeeping purposes, today's deposition is
20 being taken pursuant to notice and will be used
21 for all reasons as allowable under the Federal
22 Rules of Civil Procedure and the Federal Rules
23 of Evidence.
24         Ms. Franz, have you ever been
25 deposed before?

8

1      A    No, I have not.
2      Q    Very good. Just to let you know how
3  things are going to go, I'm sure Attorney Tuyn
4  has spoken with you a little bit about that, I
5  am going to ask you a series of questions this
6  morning. I just ask that you do your very best
7  to answer those questions.
8          As you do so, the court reporter
9  will take down everything that you say,
10 everything I say, everything that Attorney Tuyn
11 says, and create a written record for us. And
12 because he is creating a written record for us,
13 it is very important that you give verbal
14 responses.
15         So you can't nod your head up and
16 down and side to side. You have to say yes or
17 no. I'll also ask that you stay away from
18 sounds like uh-huh and huh-uh, because although
19 we understand in the room what you mean, in a
20 couple weeks when we see the transcript we will
21 have no idea what your actual answer was to the
22 question. Okay?
23     A    Okay.
24     Q    So one of the things I will do
25 because most witnesses tend to give nonverbal

9

1  responses at some point is I will try to prompt
2  you to get you to give a verbal response. So
3  if I notice that you're nodding and the court
4  reporter is not picking up your nod, I will say
5  something like, okay, to get you to actually
6  verbalize yes or no.
7      A    Understand.
8      Q    Thank you. Also, your counsel from
9  time to time may help if I overlook or miss a
10 nonverbal response because it's just as
11 important to him that the record is accurate
12 and that we're able to decipher what took place
13 in the room when we see the record later.
14     A    Okay.
15     Q    Thank you. Although we are working
16 towards making flights, this is not a marathon
17 or a race. If at any point you need a break,
18 please let me know. I want to keep you as
19 comfortable as I can throughout this process.
20 All I would ask is that if there's a question
21 on the table that you answer the question prior
22 to taking a break. And then that way we will
23 be able to proceed as orderly as we can this
24 morning.
25     A    Okay.

10

1      Q    Ms. Franz, what is your race?
2      A    I'm white.
3      Q    Ms. Franz, did you meet with your
4  counsel prior to today's deposition?
5      A    Yes.
6      Q    And when did you meet with -- was it
7  Attorney Tuyn?
8      A    Yes, as well as Kelly Giustina.
9      Q    And how long did you meet with the
10 two of them?
11     A    About two-and-a-half hours.
12     Q    And when did you meet with them?
13     A    Yesterday.
14     Q    Ms. Franz, are you a high school
15 graduate?
16     A    Yes.
17     Q    When did you graduate from high
18 school?
19     A    1997.
20     Q    I forgot to tell you that if I ask
21 you a question that makes no sense at all to
22 you, ask me to clarify it for you. Because
23 recognize that I'm working here, and sometimes
24 the way I'm thinking things in my head is not
25 quite how it comes out of my mouth. Okay?

Donovan Reporting, PC                                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

8 (Pages 11 to 14)

---

**11**

1    So if you don't understand it, let
2 me know.  I will not take offense.  But if you
3 answer it, I'm going to presume you understood
4 what I was asking you.  Okay?
5    A    Yes.
6    Q    And what high school did you
7 graduate from in '97?
8    A    Howell High School.
9    Q    Is that in Michigan?
10    A    Yes, it is.
11    Q    Did you pursue any post-high school
12 education?
13    A    Yes.
14    Q    Where did you attend?
15    A    Grand Valley State.
16    Q    My daughter's at Saginaw Valley, so
17 she wouldn't be happy to hear that.
18    A    As well as Eastern Michigan
19 University.
20    Q    What years did you attend Grand
21 Valley?
22    A    '97 to 2001.
23    Q    And what area of study were you
24 pursuing?
25    A    It was a bachelor in business with

---

**12**

1 emphasis in HR.
2    Q    Did you graduate from Grand Valley?
3    A    Yes.
4    Q    Back during that '97-to-2001 time
5 frame, did your course of study in human
6 resources at Grand Valley include how to
7 conduct investigations?
8    A    Oh, I don't recall.
9    Q    And then at some later point, you
10 attended Eastern Michigan?
11    A    That's correct.
12    Q    What years were you at Eastern?
13    A    2001 to 2003, I believe.  It might
14 be 2004.
15    Q    And what program were you in?
16    A    I received an MBA from Eastern.
17    Q    And what year did you graduate?
18    A    Either 2003 or 2004.
19    Q    Was your MBA degree focused in any
20 way on human resource management?
21    A    It was not.  It was a general
22 business degree.
23    Q    Are you a certified human resource
24 professional?
25    A    Used to be.

---

**13**

1    Q    And that was through SHRM?
2    A    Yes.
3    (Whereupon Mr. Langel enters the
4    deposition.)
5    Q    For the record, SHRM, acronym.  So
6 you had your PHR.  Did you ever go for your
7 SPHR?
8    A    I did not.
9    Q    And at this point, you have not
10 maintained your PHR certification?
11    A    Unfortunately, it expired.
12    Q    I'm sure mine has as well.  Did you
13 take any special training courses in
14 preparation for your PHR, or did you
15 self-study?
16    A    I did take a three-day training
17 through SHRM in Chicago.
18    Q    How long ago was that?
19    A    That would have been -- it's been a
20 while.  I would -- I would -- I don't want to
21 guess.  It's probably been at least five
22 years.  It's been quite some time.
23    Q    Did that three-day training through
24 SHRM in Chicago contain training in how to
25 conduct investigations?

---

**14**

1    A    I don't believe so.  It was more
2 law-focused --
3    Q    That's what I thought.
4    A    -- process, yeah.
5    Q    I just wanted to ask.  Outside of
6 the training that you received for your PHR
7 certification, have you had any other
8 specialized human resource training?
9    A    When you say "specialized," can you
10 elaborate on what you mean by that?
11    Q    Sure.  Just training in HR, in
12 HR-related subjects?
13    A    So I would receive that here at
14 Delta, yes.
15    Q    Let's talk about the training that
16 you've received here at Delta.  First of all,
17 when did you begin working for Delta?
18    A    Well, to be honest, I was actually
19 Northwest, so kind of a tricky question.  So I
20 began in April of 2005.  The merger took place
21 in 2009.  So technically, that's when I became
22 Delta, if you will.
23    Q    So let's talk about from the merger
24 forward --
25    A    Okay.

---

Donovan Reporting, PC                                               770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                                  0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

---

15

1    Q   -- as far as your training.  Can you
2  tell me about the human resource training
3  you've received from 2009 forward?
4    A   So when I became Delta, we had an HR
5  training.  It was a two-day training to learn
6  about how Delta handles HR issues.  That would
7  have included everything from the policy manual
8  to leaves of absence to benefits, open
9  enrollment, conducting investigations,
10  basically a big-picture overview of everything
11  that we do from an HR perspective.
12      Following that, we have updated our
13  training, if you will, since then.  And I have
14  received formal, specifically, investigation
15  training, and that's facilitated by our law
16  department as well as our equal opportunity
17  department.
18    Q   When did you receive that specific
19  investigation training?
20    A   I would say it was around about say
21  March of 2010.  That would have been when we
22  merged our performance development process
23  between Northwest and Delta.
24    Q   Has that investigation training been
25  repeated for you since March of 2010?

---

16

1    A   I would be present during that being
2  facilitated to leaders, but I haven't been a
3  participant again.
4    Q   Were you a teacher or presenter?
5    A   Not of that section, no.
6    Q   And how often have you been present
7  for the presentation of how to conduct
8  investigations for the leaders?
9    A   I would say -- let's see.  We do it
10  on a quarterly basis, and I probably attend
11  once a year since 2010.
12    Q   Was the way that you were trained in
13  your individualized or specialized
14  investigation training different from how the
15  leaders are being trained on how to conduct
16  these investigations?
17    A   The process, no.
18    Q   What about them is different?
19  Because you sound as if something is different,
20  but it's not the process.  What is different?
21    A   The resources available and when to
22  bring others in the investigation.  So for
23  example, if it is theft related, to involve
24  corporate security.  So we're trained as HR
25  professionals of that.  We don't necessarily

---

17

1  train the leaders to that level.  They get a
2  much higher level view of that.
3    Q   So is it safe to say the training
4  that you would get as an HR professional is
5  more in-depth than the training that the
6  leaders are given on how to conduct those
7  investigations?
8    A   Not in how to conduct it.
9    Q   Not the process?
10    A   Correct.
11    Q   But more in-depth as to the next
12  levels of the investigation?
13    A   I wouldn't even say next levels.  I
14  would just say who would review it and/or who
15  would be involved.  But they're aware of that.
16  It's just our -- we're the ones who have the
17  contact information.
18      MS. BROCK:  We had an extra person
19  join us.  Who do we have?
20      MS. GIUSTINA:  This is Ryan Langel.
21  He's been in our law department for, what,
22  about two years?
23      MR. LANGEL:  Two years.
24      MS. GIUSTINA:  And he's sort of a
25  brand new lawyer, and so he doesn't get to see

---

18

1  this often, and I invited him.  I hope that's
2  okay with everybody.
3      MS. BROCK:  It is okay.  I just was
4  curious.  There's other attorneys that do this
5  way better than I do, so do not put this in
6  your book of how to take depositions.
7      MR. LANGEL:  Well, you're doing fine
8  by my book, so.
9    Q   Let's talk about the process for
10  conducting the investigation.  Now, is the
11  process for conducting an investigation the
12  same for a situation that would occur for theft
13  as it would be for a discrimination complaint?
14    A   Yes.
15    Q   Tell me the process for conducting
16  these investigations.
17    A   So the process would be first to
18  speak to the person who has the complaint or
19  the concern and get as much detail as possible.
20  We do ask employees to write a written
21  statement typically.
22      Following that, we're going to look
23  to see if there's any evidence to collect
24  related to the incident, whether it's, you
25  know, computer records or what -- oh, gosh,

---

Donovan Reporting, PC                                              770.499.7499

Barbara A. Franz                 Rodriques v Delta Air Lines, Inc.                 December 11, 2014

---

19

1    whatever else we have that we can obtain.
2            Following that, we would interview
3    any witnesses related to the incident.  And
4    then we would look to see what potential policy
5    is potentially violated.
6            Once we have collected all that
7    information, we would make a decision based
8    upon what we could substantiate throughout the
9    investigation and take the appropriate action.
10   Q    So you would speak to the
11   complainant typically to get additional detail,
12   perhaps get a written statement from that
13   individual, and then you would determine
14   whether there was any evidence to be collected.
15   And in particular, you mentioned like from the
16   computer system and the like.
17           And then any witnesses that may have
18   been present, you would conduct interviews of
19   those witnesses.  Then you would determine
20   whether there was a policy violated.  And then
21   you would determine what could be substantiated
22   and what couldn't be.  And then you would
23   determine what action is taken.  Did I get that
24   correct?
25   A    You did.

---

20

1    Q    As to the interviewing of witnesses,
2    are there instances where interviewing a
3    witness is not necessary?
4    A    Yes.
5    Q    Can you explain to me what
6    circumstances would lead you to believe that
7    interviewing a witness is not necessary?
8    A    If the person who brings forth the
9    complaint and the person who is alleged to have
10   violated the policy, if their recollections are
11   exactly the same, we would not go forth and
12   interview witnesses.  We would bring in the
13   witnesses only if there was discrepancy between
14   those two employees.
15   Q    Let's talk about your employment
16   history a little bit.  What is your current
17   position?
18   A    I'm a senior human resource
19   manager.
20   Q    And how long have you been employed
21   with Delta as a senior HR manager?
22   A    Since September of 2014.
23   Q    And what position did you hold prior
24   to September of 2014?
25   A    Human resource manager.

---

21

1    Q    Since becoming a senior HR manager,
2    have you been located here in Georgia?
3    A    That's correct.
4    Q    And over what period of time were
5    you an HR manager?
6    A    Since April of 2005.  The title
7    changed a few times, but the role was the same.
8    Q    So from April 2005 through about
9    September of 2014?
10   A    Correct.
11           MR. TUYN:  And I assume your
12   question's taken into account her prior
13   testimony that she was Northwest in 2005.
14           MS. BROCK:  Well, yeah, because I'm
15   getting ready to --
16           MR. TUYN:  So you're not limiting it
17   to Delta?
18           MS. BROCK:  No, because I'm getting
19   ready to probe a little bit to break that up,
20   and I know the title changed when the merger
21   happened.
22           THE WITNESS:  Yes.
23           MS. BROCK:  So I was going to get
24   that on the record.
25   Q    And so as an HR manager, were you

---

22

1    located in Detroit during that time?
2    A    Yes.
3    Q    As counsel mentioned, you are one of
4    the individuals that have affectionately come
5    to be known as a Northwest person.  So you
6    would have been a Northwest employee prior to
7    becoming a Delta employee; correct?
8    A    That's correct.
9    Q    What was your title prior to the
10   merger?
11   A    It was a human resource generalist.
12   Q    And when did your employment with
13   Northwest begin?
14   A    April of 2005.
15   Q    So when you were hired in at
16   Northwest, you were hired in as an HR
17   generalist?
18   A    That's correct.
19   Q    And you remained an HR generalist
20   until after the merger or somewhere around the
21   merger?
22   A    Thereafter.  The HR manager title is
23   relatively new.  It's not really merger
24   related.
25   Q    So you remained an HR generalist

---

Donovan Reporting, PC                                              770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

11 (Pages 23 to 26)

23

1  after the merger.  And then at some later
2  point, the title became HR manager?
3      A    Correct.
4      Q    Do you recall when the title changed
5  to HR manager?
6      A    I believe it was 2013.  It's fairly
7  recent.
8      Q    If you could tell me, what were the
9  job duties that you performed when you were an
10  HR generalist/HR manager in Detroit?
11      A    So I would have had oversight of
12  everything HR related for the airport customer
13  service employees in Detroit.  That would have
14  included all of the customer service agents as
15  well as all of the ramp employees in Detroit.
16      Q    The below-the-wing people?
17      A    Correct.
18      MR. TUYN:  Ms. Brock, I know you're
19  asking the question HR generalist/HR manager.
20  But as we've heard from other witnesses,
21  there's a distinction between Northwest and
22  Delta in that Northwest was union represented
23  and Delta is not, so.
24      MS. BROCK:  Right.
25      MR. TUYN:  I assume the duties are

24

1  different.  So if you're asking for duties --
2      THE WITNESS:  Yeah.
3      MR. TUYN:  -- I think you're going
4  to have to differentiate between Northwest and
5  Delta.
6      MS. BROCK:  Well, initially she
7  testified that the duties stayed the same,
8  which is why I grouped them together.  So if
9  the duties changed, we do need to separate it
10  off, but her testimony was that the duties
11  stayed the same.
12      And that the title changed, but the
13  title changed well after it became Delta.  So
14  it had nothing to do with the union going away.
15  It had nothing to do with the merger.  It
16  wasn't until 2013 that the title actually
17  changed to HR manager.
18      MR. TUYN:  Yeah.  I don't think she
19  testified that all the duties stayed the same.
20      MS. BROCK:  Well, she didn't say the
21  word all.  But I asked her did the duties stay
22  the same, and she said yeah.  So I have no
23  problem breaking it up because I absolutely
24  want to know the differences between what she
25  did from the time she got there to the time she

25

1  left coming to Detroit.  So let's take the time
2  to do that.
3      Q    So your job duties, prior to the
4  merger was there a difference in your job
5  duties?
6      A    So the -- when I said the job duties
7  were similar, my intention was that HR -- you
8  know, I was HR in both companies.  You know,
9  the benefits, the investigations, those duties
10  were similar, if not the same.  But the way we
11  go about achieving those duties are different
12  at the two organizations.  So I think that's a
13  good clarification.
14      Q    So let me just start with what those
15  duties were, and then we can back up and talk
16  about the differences and how you accomplished
17  those duties.  So let's just talk about the
18  duties.  You began with oversight of everything
19  for the below-the-wing staff?
20      A    As well as the above-wing, the
21  customer service agents.
22      Q    Oh, above-wing as well?
23      A    Yes, correct.
24      Q    And so you would have been
25  responsible for overseeing all of the HR

26

1  responsibilities from hiring to benefits to
2  training to discipline and termination?
3      A    Correct.  And the involvement and
4  the process would be different.
5      Q    Can you tell me when it was
6  Northwest, what was the involvement in the
7  process?
8      A    So the involvement with the hiring,
9  we actually did all of the hiring in-house, so
10  the involvement was much greater.  The benefits
11  administration was all in-house.  Payroll was
12  all in-house.  So those questions were more --
13  we had a union at Northwest.
14      So the investigation and discipline
15  process would have been different in that, you
16  know, a union representative would have been
17  present as we were conducting investigations.
18  There was the grievance process.  Let me think
19  what else would be different.
20      Q    In the Northwest days, there was an
21  incident that occurred out at what is now the
22  Delta cargo out on Merriman where some nooses
23  were hung.  Would you have been privy to that
24  as the HR representative at that time?
25      A    Not as Northwest.  I didn't have

Donovan Reporting, PC                                                      770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                                          0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

12 (Pages 27 to 30)

27

1    cargo until it became Delta.  That would have
2    been a different HR person.
3        Q    And so you never heard about the
4    noose-hanging incident at the cargo?
5        A    I'm not aware of that, no.
6        Q    So the people that were out at the
7    cargo, did those people eventually come over to
8    what I'm going to call metro, I may not have
9    the terminology for Delta/Northwest correct,
10   but did those individuals come over to metro?
11       A    When you say, "did they come
12   over" --
13       Q    Yeah.
14       A    -- do you mean --
15       Q    Did they begin to work over at the
16   metro location?
17       A    The employees can bid to come to and
18   from the cargo facility to the airport, but we
19   didn't pick up all of the cargo employees and
20   bring them to the airport, if that's what
21   you're asking.
22       Q    So if anyone from the Northwest
23   cargo era chose to bid, they could very well
24   now be working over at metro?
25       A    They could be, yes.

28

1        Q    And you say you weren't responsible
2    for Northwest cargo.  Who was responsible for
3    Northwest, HR-wise, cargo?
4        A    It would have been a different HR
5    person.  I don't know who that would have been
6    at the time.  We move a lot in HR, so I don't
7    recall.
8        Q    Did Northwest ever make you as an HR
9    person aware that there had been an incident at
10   the cargo and that employees that were at the
11   cargo were now coming over to metro?
12       A    So can you repeat that question for
13   me?
14       Q    Yeah.  I guess where I'm trying to
15   go with it is whether you were ever alerted
16   that you had employees that may have been
17   involved in some sort of racial issue at cargo
18   that are now coming over and working at metro.
19       A    So I would not have received an
20   alert of that, no.  Was I aware that folks went
21   from cargo to the airport?  Yes.  Would I have
22   received an e-mail or a phone call saying
23   Johnny's coming over tomorrow and, oh, by the
24   way, here's his history?  No.
25       Q    And I understand that they didn't

29

1    give you any indication individually.  But did
2    they give you any indication generally that
3    there had been some racial tension or any sort
4    of racial incident at the cargo and that these
5    employees are also working and bidding and
6    coming over to metro?
7        A    Not that I recall.
8        Q    Now, I somewhat interrupted you.
9    You were telling me about the differences in
10   the process pre-merger and post-merger, and you
11   had gotten through pre-merger.  And we had
12   talked about basically it appears that prior to
13   you becoming a Delta employee, more of the
14   human resource responsibilities were done
15   in-house, that you-all were more responsible
16   locally for taking care of human resource
17   issues.  Am I correct in that?
18       A    Related to benefits and payroll,
19   yes, and recruiting.
20       Q    What kinds of things still were
21   taken care of outside of your local HR?
22   Because you made a distinction, and I don't
23   know where the distinction is.  You pointed to
24   benefits, you pointed to payroll, and you
25   pointed to union activity as being something

30

1    that was handled in-house.
2        And I took it a step further and
3    said locally those things were handled.  And
4    you kind of led me to believe or by your
5    response that there were some things that were
6    HR related that were not handled locally when
7    you were Northwest.  Am I correct in that?
8        A    No.  I mean, I would say parts of
9    the grievance process would not be handled
10   locally depending on the level that it would go
11   to.  But, you know, I didn't administer the
12   benefit plan.  That happens corporately.  I
13   mean, each location didn't have a separate pay
14   scale or a separate benefit plan.
15       So the administration of those plans
16   would have been handled corporately, but the
17   questions from employees would have been
18   handled locally.
19       Q    So is my understanding correct that
20   the HR, the local HR, was responsible for
21   carrying out the rules, policies, and
22   procedures of the corporation?
23       A    Yes.
24       Q    And that local HR was responsible
25   for the purview -- their reach would have been

Donovan Reporting, PC                                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

31

1    Detroit metro?
2       A    Well, my reach would have been the
3    above and below-wing employees, not all of
4    metro.  We also have pilots and flight
5    attendants, and those would have had -- as well
6    as, you mentioned cargo.  Those would have had
7    separate HR folks.
8            So my reach, yes, would have been
9    all of that within what we call airport
10   customer service which is the above and
11   below-wing employees.
12      Q    Now, you also indicated that after
13   the merger there were some changes to the
14   process by which you conducted pretty much
15   those same responsibilities.  Can you tell me
16   about those differences in the process?
17      A    Yes.  So to be clear, all those
18   changes would not have happened right at merger
19   because there had to have been, you know, a
20   union election and things happened, you know,
21   in a pretty orderly fashion.  So I'll talk to
22   the changes, but the changes happened at
23   different points.
24      Q    They were gradual?
25      A    Correct.  So the benefits, the

32

1    payroll, retirement, those type of questions,
2    we actually have at Delta an employee service
3    center.  So employees can call the service
4    center to get those questions answered.
5    Although I do answer those questions locally,
6    many employees call that number to get those
7    types of questions answered.
8            The focus at Delta is more
9    employee-relations focused as well as
10   leadership-development focused versus kind of
11   the what we would consider traditional HR work,
12   the benefits, the payroll, all of that type of
13   thing.  As well as the grievance process would
14   have went away once union -- the representation
15   vote took place.
16      Q    Why did you move to Georgia?
17      A    This is a new position.  It's a
18   promotion for me.
19      Q    Is this a position you had to apply
20   for?
21      A    Yes.
22      Q    Was there some sort of internal
23   posting at Delta for the position?
24      A    Yes.
25      Q    What made you decide to apply for a

33

1    position that would require you to relocate?
2       A    Well, it was the position that --
3    you know, increased responsibility.  It's a
4    promotion.  There's lots more opportunity at
5    Delta here in Atlanta as well.
6       Q    In your role as a human resource
7    generalist/manager for Delta, what involvement,
8    if any, did you have in disciplining employees?
9       A    I did not administer discipline.
10      Q    Right.  But my question is:  What
11   role did you play in disciplining of employees?
12   What involvement did you have?
13      A    Well, it would depend upon the
14   circumstances.  Some instances, I would have no
15   involvement.  The leader would do -- would do
16   it on their own.  Other circumstances, I may
17   have just seen the investigation results and
18   here's what the recommendation from the leader
19   is and I say I support.
20           Other instances, I may actually
21   conduct the investigation with the leader and
22   provide my recommendations to leadership of
23   what to happen.  So it really varies based on
24   the circumstances.
25      Q    Now, you indicated that sometimes

34

1    you have no role at all.  So is it the case
2    that when you were in Detroit as a Delta
3    employee that disciplines would take place and
4    you wouldn't have any idea that the discipline
5    took place?
6       A    That's correct.
7       Q    And is there a particular level by
8    which they needed to notify you of a discipline
9    taking place?
10      A    Not a particular level, no.  It was
11   more based on the topic.
12      Q    What kinds of topics did they need
13   to notify you that a discipline had taken
14   place?
15      A    Typically, it would be circumstances
16   where it involved a people policy versus an
17   operational policy.
18      Q    Explain to me, what do you mean by a
19   "people policy"?
20      A    So a violation of any of the
21   corporate HR policies, such as discrimination
22   or time and attendance or any of the people
23   policies versus they didn't follow the
24   appropriate procedure when working the
25   aircraft.

Donovan Reporting, PC                                        770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

---

35

1    Q    So, for example, if an employee is
2  driving one of those little carts and they
3  don't have their seat belt on and they get a
4  safety infraction, they wouldn't necessarily
5  have to notify you of that?
6    A    Correct. They know what to do.
7  They handle that.
8    Q    Would they have to notify you for
9  any sort of time card fraud discipline?
10   A    Well, let me be clear. They don't
11 have to necessarily notify me. When I say
12 "have to," it's not -- I don't know how to
13 describe it.
14   Q    I don't either. So please try.
15 Please try.
16   A    The role of HR at Delta is to advise
17 and counsel based on the policies. The leader
18 makes that decision. We help them make the
19 right decision for the company. So are there
20 instances where there was potentially time card
21 issues where they didn't bring it to my
22 attention? That's very possible.
23       However, the team in Detroit was
24 really good about making me aware of those
25 circumstances. Can I say absolutely every time

---

36

1  they made me aware? I can't say that.
2    Q    And if you needed to investigate a
3  decision that was made that maybe you weren't
4  made aware of, you could just ask the manager
5  what happened, why did you take this particular
6  course of action?
7    A    Correct.
8    Q    One of the things that you said is
9  that HR advises and counsels and basically
10 they're there to help the management to make
11 the right decision. So if at some later point
12 it came to your attention that the management
13 didn't make the right decision, do you have the
14 authority to cause any change to happen?
15   A    Me personally, no. I would have to
16 go to their leader to say, I don't believe they
17 made the right decision, here's why. And then
18 their leader would be the one to ultimately
19 make the decision to change that decision.
20   Q    So is it also true that as an HR
21 employee manager/generalist in Detroit that you
22 couldn't necessarily -- you didn't have the
23 authority to necessarily change whatever
24 decision had been made. Did you also have the
25 authority to say what would happen on the front

---

37

1  end? Let me try to fix the question.
2        So I asked you a question about the
3  back end. The discipline has already been
4  done, you've become aware of it, and what could
5  you do about it. And basically, it's nothing
6  except go to the higher management and say,
7  hey, I think you have a problem here, this
8  shouldn't have happened this way, and something
9  different needs to happen. Am I correct in
10 that?
11   A    The influence of that.
12   Q    The influence of that --
13   A    Yes, correct.
14   Q    -- on the back end. On the front
15 end prior to the discipline actually being
16 administered, do you have any authority to say
17 what level of discipline should be administered
18 on that front end?
19   A    I make recommendations, yes.
20   Q    Do they have to follow your
21 recommendations?
22   A    No. But to clarify, if -- again, if
23 we disagree, we're going to their leader. It's
24 a very fluid process. I know it sounds kind
25 of -- I don't know. I don't know how it

---

38

1  sounds. But if we're talking and we have an
2  issue and I say it should be this and you're
3  the leader and you say it should be this level
4  and we disagree, we're going to your leader.
5        And then the leader is going to
6  weigh in. And if necessary, we're going to go
7  to their leader. And if not there, we're going
8  to go to my leader until we can all agree on
9  what the appropriate action is.
10   Q    I think I understand a little bit.
11 And be patient with me on this.
12   A    No problem.
13   Q    Because I worked in human resources
14 a lot of years. And then I've been practicing
15 as an attorney in labor and employment for a
16 number of years. And I've never come across a
17 corporation that's set up quite like this.
18   A    Okay.
19   Q    So you're really teaching me
20 something very new to add to my list of things
21 to just know. So when you say it's very fluid,
22 would this process continue until there's some
23 agreement between HR and the, I want to call it
24 the operations side?
25   A    Yes. And, you know, if at some

---

Donovan Reporting, PC                                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

15 (Pages 39 to 42)

---

39

1    point, you know, I think there's enough risk, I
2    may involve our legal department. Or I may
3    involve or equal opportunity department to say,
4    you know, can you provide the operations some
5    comparables on why what they're trying to do is
6    not with our practice?
7          It's rare that it gets to that
8    point. I'd like to think I'm good at what I do
9    and can influence the decision, but there is a
10   process in place to do that.
11   Q    But you're unable to utilize those
12   skills if the management on the operations side
13   didn't make you aware that a particular
14   situation was going on; correct?
15   A    That would be correct. However, as
16   you mentioned, I may find out about it on the
17   back end and influence a different decision.
18   And they don't like that. They don't want to
19   have to go back and make a different decision.
20   So they are very good, and it is the culture
21   that HR is involved in that, in those
22   processes.
23         I'm sorry if I gave you the
24   impression that they're just out there doing
25   whatever they want because that's not the case.

---

40

1    You know, is there a seat belt violation that I
2    wasn't aware of? Sure. But anytime it's, you
3    know, we're taking statements and it's an
4    investigation, they're very good about reaching
5    out to the HR person and saying here's what we
6    have, what's the appropriate level of
7    performance development.
8          I just don't want to give you the
9    impression that absolutely everything comes
10   across my desk because that wouldn't be
11   accurate either.
12         MR. TUYN: Barb, Felicia's very good
13   at asking questions. You have to be careful to
14   just answer her questions.
15         THE WITNESS: Okay.
16         MR. TUYN: You're going well beyond
17   her questions.
18         THE WITNESS: Okay.
19         MR. TUYN: If she wants to go into
20   that, she can.
21         THE WITNESS: Okay.
22         MR. TUYN: You've got to listen to
23   her question and answer her question.
24   Q    I was going to kind of come back
25   anyways, so thank you. Because let me just

---

41

1    clarify my understanding because I've gotten my
2    understanding from lots of different people and
3    none of them are fully the HR person that you
4    are. And so that's why I wanted to talk to you
5    so badly, because I thought that you could help
6    me to clarify what is still unclear for me in
7    my head.
8          So the PL has the authority to make
9    a decision about whether to discipline an
10   employee or not. Am I correct in that?
11   A    Yes.
12   Q    Once the PL makes that decision, do
13   they run that decision up to their leader?
14   A    Almost always.
15   Q    Can they make the decision without
16   running it up to their leader?
17   A    Can they?
18   Q    Yes.
19   A    Yes.
20   Q    In particular, if a PL decides not
21   to discipline an employee, there would be no
22   way for that direct manager to necessarily know
23   that the PL made that decision. Am I correct
24   in that? So something happens. I see you do
25   something. And I'm not going to discipline you

---

42

1    for whatever the reason.
2          The department manager would not
3    necessarily be aware of that; correct?
4    A    Correct.
5    Q    Now, if the PL makes the decision to
6    put something in writing, would that then cause
7    the DM to be aware that some discipline took
8    place?
9    A    Most of the time, yes.
10   Q    Explain to me the "most of the
11   time." Under what circumstances or what are
12   you thinking about that causes you to say,
13   indefinitely, yeah, if they put it in writing
14   that they're going to run it up to the DM or
15   the DM would be aware?
16   A    The DM typically reviews the
17   letter. The DM is sometimes present when the
18   letter is issued. But to say that that happens
19   a hundred percent of the time, I can't say
20   that.
21   Q    And then under what circumstances
22   does the DM, if you know, because I don't even
23   know if this changes based on DM, does the DM
24   take that discipline decision to the general
25   manager?

---

Donovan Reporting, PC                                                    770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

16 (Pages 43 to 46)

43

1    A    I don't know when -- I mean, can you
2  repeat the question for me?
3    Q    Yeah.  Because I've gotten -- I've
4  taken you from PL --
5    A    Yeah.
6    Q    -- and what the PL's authority is.
7  And we've talked about the authority to decide
8  not to discipline and that really no one would
9  know that they decided -- necessarily know that
10 they decided not to discipline.
11       We've talked about the PL deciding
12 to discipline and that the letter being
13 presented to the DM, but you can't say a
14 hundred percent of the time, but typically
15 being presented to the DM.
16       Now, I'm at the DM level, and I'm
17 saying from the DM to the GM.  Would that
18 letter then go from the DM to the GM?
19    A    At certain levels, yes.
20    Q    What levels would the discipline
21 then go from the DM to the GM, if you know?
22    A    The final corrective action for
23 sure.
24    Q    And the GM for the below-the-wing
25 folks, I think I'm jazzy now, would that have

44

1  been Mohammad Sarsour during the 2012 time
2  period?
3    A    Yes.
4    Q    Now, I think Mr. De La Torre, he
5  testified that he takes all of his disciplinary
6  decisions up to the general manager.  Is that
7  your experience with Mr. De La Torre?
8    A    Yes.
9    Q    When in the process of the
10 discipline moving from the PL to the DM to the
11 GM is HR involved, or is it at various stages?
12    A    Various stages.
13    Q    Were you involved at all in the
14 disciplines of Jason Conover or Christopher
15 Culpepper?
16    A    Yes.
17    Q    How were you involved?
18    A    I reviewed the investigation and
19 their recommendation for discipline.
20    Q    What did the investigation that you
21 reviewed consist of?
22    A    Statements from both Conover and
23 Culpepper as well as summary from I believe --
24 I don't recall who the leader was who ran that
25 investigation.

45

1    Q    Summary from the leader, that would
2  be the PL?
3    A    Or the department manager.
4    Q    And so do you remember anything else
5  being a part of this investigation that you
6  reviewed for Conover and Culpepper?
7    A    Not that I recall.
8    Q    Were the -- I'm going to help you a
9  little bit.
10    A    Okay.
11    Q    Were the Kronos punches a part of
12 that investigatory packet?
13    A    Not that I recall.
14    Q    Were the County swipes a part of
15 that investigatory package?
16    A    Not that I recall.
17    Q    Did you pull any information outside
18 of what was provided to you on Mr. Conover or
19 Mr. Culpepper?
20    A    No.
21    Q    The investigatory information that
22 you reviewed on Mr. Conover and Mr. Culpepper,
23 where does that information go?  And by that I
24 mean, if someone is under investigation leading
25 to discipline, are the investigatory documents

46

1  put in their personnel record?  Are they kept
2  in the file cabinet marked investigations?  I
3  mean, what happens to those documents?
4    A    The actual investigation documents?
5    Q    Yeah.
6    A    Is that what you're asking?
7    Q    Yeah.
8    A    They would be kept in an
9  investigation file.
10    Q    And where is that file kept?
11    A    That particular one would likely be
12 in my office.
13    Q    Now, after you left, what happened
14 to the files that were in your office?
15    A    They're still there.
16    Q    Okay.
17    A    I don't know.  You would have to ask
18 the person who's there now.
19    Q    Who took your place down there?  Do
20 you know?
21    A    Who replaced me?
22    Q    Yeah.
23    A    Danielle Hughes.
24    Q    Is she in your office now?
25    A    Yes.

Donovan Reporting, PC                                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

47

1     MS. BROCK:  Just for the record,
2  Attorney Tuyn, and I know you're aware of this,
3  I didn't receive a written statement for
4  Mr. Conover.  And I also did not receive a
5  summary from the PL or department manager as to
6  the Conover-Culpepper incident.
7     Q   If you could tell me, at least for
8  the summary, I think I have -- I have
9  Mr. Culpepper's statement, so I know what he
10 said.  I have Mr. Conover's testimony of what
11 he said in his written statement, so I think
12 I'm good there.
13     I don't have that summary.  Can you
14 tell me, what do you recall being in the
15 summary from the PL or department manager?  And
16 I understand you don't remember which.  But can
17 you tell me what was in that summary?  What do
18 you remember?
19     A   I don't recall what was in the
20 summary.
21     Q   Let me ask this.  And if you know
22 it, then maybe it came from the summary.  And
23 we can try to figure out, if it didn't, when
24 you found it out.  Were you made aware that
25 Mr. Culpepper -- well, let me back up.

48

1     You are aware or you were aware that
2  Mr. Culpepper removed Mr. Conover from the RTS
3  line; correct?
4     A   Yes.
5     Q   And that he was not the ALA, the RTS
6  ALA, and he should not have been removing
7  anyone from the line; correct?
8     A   Correct.
9     Q   Were you aware at the time of this
10 discipline, that would have been back in
11 November of 2012 -- it's hard to forget things,
12 I'm asking you to forget it if you found it out
13 later -- were you aware that Mr. Culpepper also
14 was being disciplined because he was punched in
15 and was not working for part of the shift?
16     A   At that point, no.
17     Q   Were you made aware at that point
18 that Mr. Culpepper was actually docked four
19 hours of pay for being punched in and not
20 working part of the shift?
21     A   No.
22     Q   When did you become aware that
23 Mr. Culpepper was also being disciplined for
24 time card fraud?  And when I say "time card
25 fraud," because I know it says that in the

49

1  discipline, so that's not a fair question.
2  When I say "time card fraud," I mean that he
3  was accused of being punched in and not working
4  for part of his shift.
5     A   Yesterday.
6     Q   When did you, and I know it's a
7  similar question, slightly different, when did
8  you find out that Mr. Culpepper's pay was
9  docked for four hours for being punched in and
10 not working part of his shift in that November
11 2012 time frame?
12     A   Per you just saying it.  I was not
13 aware of that.
14     Q   Let's talk about Mr. Conover just a
15 little bit.  Now, I do know that you're aware,
16 and we're going to get to how I know and all
17 the documents in just a minute, I do know that
18 you were aware that Mr. Conover asked
19 Mr. Culpepper to remove him from the RTS line;
20 correct?
21     A   Yes.
22     Q   Were you aware that Mr. Conover went
23 and found a place to sleep and would sleep
24 throughout the vast majority of his shift that
25 day?

50

1     A   Yes.
2     Q   Were you aware that Mr. Conover's
3  pay was docked pretty much the entire shift for
4  his being punched in and being somewhere else
5  asleep --
6     A   No.
7     Q   -- on the job that day?
8     A   No.
9     Q   Now, I understand you weren't aware
10 of that in the 2012 time frame.  Were you aware
11 of his pay being docked for his being punched
12 in and not working the vast majority of his
13 shift back in November of 2012 prior to today?
14     A   No.
15     Q   You just found that out when I said
16 it?
17     A   That's correct.
18     Q   Were you made aware in the January
19 of 2014 time frame that Mr. Culpepper's
20 discipline was reduced from a written
21 corrective to a written coaching?
22     A   No.
23     Q   Have you ever in your time as a
24 Delta employee, which would -- bad question.
25     During your time as an HR

Donovan Reporting, PC                                          770.499.7499

Barbara A. Franz                    Rodrigues v Delta Air Lines, Inc.                    December 11, 2014

18 (Pages 51 to 54)

---

51

1    generalist/manager, which means you would have
2    been in Detroit, Delta employee, were you aware
3    of an employee being disciplined and then that
4    discipline being later reduced to a lower
5    discipline?
6        A    Yes.
7        Q    Under what circumstances?
8        A    I can't give you a specific
9    circumstance.
10       Q    Well, can you tell me what
11   circumstances, not referencing anyone in
12   particular -- your testimony is that you know
13   it's happened; correct?
14       A    Yes.
15       Q    Can you tell me what circumstances
16   would lead to an employee's discipline being
17   reduced?
18       A    The ones that I recall were -- I
19   can't recall the specific infraction, but it
20   would have been an employee who came to myself
21   or the next level of leadership and said, I
22   think this is inappropriate.  And after review,
23   it was determined that, yes, it was
24   inappropriate, and a different letter or in
25   some cases the -- no letter, you know, the

---

52

1    letter was just removed, took place.
2        Q    Thank you for that, because that was
3    a good explanation.  Have you in your time as
4    HR in Detroit, I'm trying to make it easier on
5    myself, as HR in Detroit ever seen such a
6    reduction in discipline happen more than a year
7    after the discipline took place?
8        A    No.
9        (Whereupon a document was identified as
10       Plaintiff's Exhibit 1.)
11       Q    Ms. Franz, I've handed you what has
12   been marked as Exhibit 1.  And it is the Final
13   Corrective Action Notice for Jason Conover.  Do
14   you see that?
15       A    Yes.
16       Q    And have you seen this discipline
17   before?
18       A    Yes.
19       Q    And so this is the discipline that
20   we've been talking about where he requested to
21   have Mr. Culpepper remove him from the RTS
22   system; correct?
23       A    Yes.
24       Q    And it indicates in the second
25   sentence of the first paragraph that

---

53

1    Mr. Conover was being investigated for time
2    card fraud.  Was what Mr. Conover was accused
3    of doing considered time card fraud?
4        A    No.
5        Q    Why not?
6        A    From what I recall, he was given
7    authorization to be off the clock or to be away
8    from his work area.
9        Q    So your recollection is that
10   Mr. Conover was given permission to be away
11   from his work area.  To your knowledge, did
12   that permission extend to remaining punched in
13   and sleeping for the vast majority of his
14   shift?
15       A    No.
16       Q    And so would his being punched in
17   and being somewhere else sleeping for the vast
18   majority of his shift be considered time card
19   fraud?
20       A    I would not have considered it that.
21       Q    And why not?
22       A    Because he was given authorization
23   to do so.
24       Q    You're saying that it's your
25   understanding that Mr. Culpepper gave him this

---

54

1    permission you're referring to?
2        A    Correct.
3        Q    And so Mr. Culpepper gave him
4    permission to stay on the clock and get paid
5    while being asleep for the vast majority of his
6    shift?
7        A    Correct.
8        Q    So did Mr. Culpepper commit time
9    card fraud in giving an employee permission to
10   be away from his work area asleep while getting
11   paid?
12       MR. TUYN:  Well, let me just object
13   as to lack of foundation.  And I think you're
14   representing facts that aren't in evidence.
15   There's no evidence that Culpepper knew that
16   Conover was sleeping.  Conover doesn't say
17   that.  Culpepper didn't say that.
18       So that isn't what Culpepper was
19   disciplined for.
20       MS. BROCK:  Well, I understand your
21   objection.  But this is the HR person who was
22   there.  And she was there, and neither of us
23   were.  And so although she may not have known
24   he was away sleeping, she certainly knew that
25   Mr. Culpepper is who removed him from the line.

---

Donovan Reporting, PC                                              770.499.7499

Barbara A. Franz                Rodrigues v Delta Air Lines, Inc.                December 11, 2014

---

55

1        MR. TUYN:  Yeah.  And she testified
2  to that.  But she didn't testify that Culpepper
3  knew that Conover was sleeping after he took
4  him off the line.
5        MS. BROCK:  Well, let me ask it this
6  way.  Whether she knew he was sleeping or not,
7  whether she knew he was punched in and wasn't
8  working.
9     Q    When Mr. Culpepper removed
10  Mr. Conover from the RTS line, were you aware
11  as to whether Mr. Culpepper knew that -- well,
12  I take it back.
13        Didn't you just tell me that
14  Mr. Conover had permission to be away from his
15  work station?
16     A    Correct.
17     Q    He had permission to be punched in
18  and away from his work station?
19     A    Yes.
20     Q    And Mr. Culpepper is who provided
21  him that permission; correct?
22     A    Yes.
23     Q    So was it time card fraud for
24  Mr. Culpepper to have allowed an employee to be
25  away from their work station, not working, and

---

56

1  remaining punched in?
2     A    No.
3     Q    Why not?
4     A    We have employees who are given
5  authorization to be away from their work area
6  and continue to be paid.  That in and of itself
7  would not be considered time card fraud.
8     Q    What would make it time card fraud?
9     A    If they didn't have the
10  authorization.
11     Q    So as long as a supervisor said it
12  was okay for him to be on the clock and away
13  from his work area, not working, it's okay?
14     A    Yes.
15     Q    Then why, if you know, was
16  Mr. Conover's pay docked --
17     A    It wasn't aware.
18     Q    -- for that time?
19     A    I wasn't aware of that.
20     Q    Well, sitting here today now that
21  you are aware, what reasons can an employee's
22  pay be docked?  If I'm punched in, if I'm a
23  Delta employee and I'm punched in and I'm
24  punched in an entire shift and management takes
25  my pay for almost the entire shift, for what

---

57

1  reasons can that occur?
2     A    I'm not aware that we've done that.
3     Q    Right.  But I'm representing that we
4  have.
5     A    Yeah.
6     Q    So my question to you is:  How could
7  that occur, or why could that occur?
8     A    I can't speak to that.  I didn't
9  make that decision.
10     Q    And have you ever seen an employee
11  punch in and have the entire shift, just about,
12  taken away from them?
13     A    No.
14     Q    Mr. Conover is the first person
15  that, as far as you know, that's ever occurred
16  for?
17     A    Yes.
18     Q    And what about Mr. Culpepper's
19  situation where he was docked for four hours of
20  pay that day?  Have you ever known of another
21  employee to be on the clock and have their pay
22  taken for four hours?
23     A    No.
24     Q    Can you, sitting here today, think
25  of any circumstance where the reaction of

---

58

1  management would be to take a person's pay for
2  so many hours that they were punched in?
3     A    No.
4     Q    Can you, sitting here today, and I
5  know it's tough because a million things could
6  happen that could probably lead to this kind of
7  situation, but sitting here today, can you
8  think of any situation that would warrant
9  management to say, yes, that person was punched
10  in, but we're taking four hours or six hours or
11  more from them of their pay for that day?
12     A    No.
13     Q    Sitting here today, considering that
14  you didn't become aware of Mr. Conover's pay
15  being docked until today, do you still know
16  whether Mr. Conover committed time card fraud
17  or not?  Want me to change the question?
18     A    Yeah.
19     Q    Because it's a little icky.
20     A    I'm not sure I understand.
21     Q    What I'm asking is, is you don't
22  know why his pay was docked.  So can you be
23  sure that he didn't commit time card fraud?
24        MR. TUYN:  Well, is your question --
25  first of all, I don't think we've defined time

---

Donovan Reporting, PC                                                770.499.7499

Barbara A. Franz                    Rodrigues v Delta Air Lines, Inc.                    December 11, 2014

59

1    card fraud.
2         MS. BROCK: Well, let me have her --
3    stop right there. Let me have her define it.
4    We can go question by question, and that way
5    we'll get every objection you have answered.
6         Q    What is time card fraud?
7         A    I would define it as an employee
8    being paid for time that they were not on
9    property that they didn't have authorization to
10   not be on property.
11        Q    So in order for it to be time card
12   fraud in your mind, the person has to be off
13   the property?
14        A    When I say off property, I mean not
15   working. Thank you for that clarification.
16        Q    And so again, my question is:
17   Considering that you were not aware that
18   Mr. Conover's pay was docked, can you say that
19   he was not off property in November of 2012?
20   Can you still say that?
21        A    Repeat that question for me.
22        Q    Yeah.
23        A    Because there were --
24        Q    Considering that you did not know
25   his pay was docked --

60

1         A    Correct.
2         Q    -- can you still say he was not off
3    property?
4         A    I don't know. I mean, I don't know
5    where he was.
6         Q    So now you recognize that you really
7    didn't know where Mr. Conover was at the time
8    that this discipline took place?
9         MR. TUYN: Well, your question was
10   did he engage in time card fraud.
11        MS. BROCK: No. That's not my last
12   question. That was the question a few
13   questions ago.
14        MR. TUYN: Well, I mean, if your
15   question is did he do anything wrong, that's
16   different than --
17        MS. BROCK: No, that's not what I'm
18   asking.
19        MR. TUYN: -- was it time card
20   fraud.
21        MS. BROCK: I'm being very specific
22   about what I'm asking.
23        Q    Do you need me to ask it again?
24   Because I don't want to get an objection that
25   I've asked it and you've answered it. Do you

61

1    feel comfortable that you've given me an answer
2    to my question?
3         A    Go ahead and repeat it again for me.
4         Q    Okay.
5         A    I'm sorry.
6         Q    It's okay. I don't mind. I don't
7    mind. I plan to be here all day, so it's okay.
8    Let me try to walk up to it, and maybe that
9    will help us get there.
10        At the time that this discipline was
11   issued, you were not aware that Mr. Conover's
12   pay had been docked almost the entire shift?
13        A    That's correct.
14        Q    And you also testified that, based
15   on your understanding of what Mr. Conover did,
16   that would not be time card fraud; correct?
17        A    Well, I wasn't aware that -- you're
18   putting those two things together. Can you
19   rephrase that for me? Because you're putting
20   the pieces together, but I wasn't aware of this
21   piece.
22        Q    And I get it.
23        A    Okay.
24        Q    And so I'm kind of at your
25   before-awareness mind.

62

1         A    Okay.
2         Q    Before you became aware, so let's
3    wipe out that he was docked at this point, from
4    what you were told and what you're aware that
5    Mr. Conover did, you would not consider that
6    time card fraud; correct?
7         A    That's correct.
8         Q    Now you have become aware that
9    Mr. Conover was actually docked for the vast
10   majority of his shift on this November 2012
11   day. Can you still say he did not commit time
12   card fraud?
13        A    Yes.
14        Q    How and why?
15        A    Because I don't understand why he
16   was docked. So until I understood that
17   decision, my thought is the same in that it is
18   not time card fraud.
19        (Whereupon a document was identified as
20        Plaintiff's Exhibit 2.)
21        Q    Okay. Now I need to ask a similar
22   set of questions about Mr. Culpepper, but I
23   think it will be easier for him because we got
24   through it on Mr. Conover.
25        Before we get to Exhibit 2,

Donovan Reporting, PC                                                         770.499.7499

Barbara A. Franz          Rodriques v Delta Air Lines, Inc.          December 11, 2014

63

1    Exhibit 1 indicates that Mr. Conover was being
2    investigated for time card fraud.  Is it your
3    understanding today that, although he was
4    investigated for time card fraud, he wasn't
5    disciplined for time card fraud?
6        A    That is my understanding, yes.
7        Q    Then what was Mr. -- I mean, looking
8    at this discipline, I need to see what are we
9    saying in this paper that Mr. Conover was
10   disciplined for.
11           MR. TUYN:  And before you respond,
12   make sure you read it.
13           MS. BROCK:  Oh, absolutely.  I'm in
14   no hurry today.
15       A    Okay.
16       Q    So what was, according to the
17   discipline, Mr. Conover disciplined for?  He
18   was investigated for time card fraud.  What was
19   he disciplined for?
20       A    In reading this, job performance.
21       Q    Isn't it true that Delta considers
22   any disciplinary action a performance
23   opportunity?
24       A    Yes.
25       Q    So when you say when it says

64

1    performance, couldn't it very well be just a
2    performance opportunity?
3        A    What do you mean by that?
4        Q    Yeah.  It's a phrase.  Mr. Domingo
5    De La Torre told me that Delta uses a general
6    term in his testimony, and it's performance
7    opportunities, that we try to work through
8    performance opportunities.  We give disciplines
9    to try to improve performance, but that would
10   be for anything that we discipline you for, is
11   to improve performance.
12       A    No.  Every discipline is not going
13   to say job performance.
14       Q    Or it's going to say attendance, or
15   it's going to say safety.
16       A    Or it could say conduct.
17       Q    What about Mr. Conover's performance
18   caused him to receive this discipline?
19           MR. TUYN:  We're still talking about
20   Conover?
21           MS. BROCK:  We are.
22       A    Can you repeat that question for
23   me?
24       Q    Sure.  What about Mr. Conover's
25   performance caused him to be disciplined?

65

1        A    Based on what this says, not being
2    in his work area.
3        Q    And you know I've asked this a bunch
4    of different ways at this point.  Have you ever
5    known of an employee to be docked pay for poor
6    performance?
7        A    No.
8        Q    Ms. Franz, taking a look at what has
9    been marked Exhibit 2, we see a corrective
10   action notice regarding performance, and it's
11   for Christopher Culpepper.  Do you see that?
12       A    Yes.
13       Q    And this also indicates that he was
14   being investigated for time card fraud, yeah,
15   in that second sentence of the first paragraph.
16   Do you see that?
17       A    Yes.
18       Q    And so for Mr. Culpepper, what was
19   he actually disciplined for?  I understand he
20   was investigated for time card fraud.  But what
21   was he disciplined for?
22       A    He was disciplined for using his ALA
23   authority when he was not in an ALA capacity.
24       Q    And he was also demoted; correct?
25       A    That is correct.

66

1        Q    And your understanding per your
2    testimony is that Culpepper gave Conover
3    permission to remain punched in and be away
4    from his work station; correct?
5        A    Yes.
6        Q    In the giving an employee permission
7    to be, based on your understanding -- I'm not
8    saying it happened that way, but that's your
9    understanding of it.  For an ALA to give
10   permission to an employee to be punched in and
11   away from their work station, is that time card
12   fraud?
13       A    No.
14       Q    Why not?
15       A    They have the authorization to do
16   so.
17       Q    So an ALA can actually tell an
18   employee, you can stay punched in and not work?
19       A    Yes.
20       Q    And make sure they -- and they still
21   can get paid for that?
22       A    Yes.
23       Q    Wow.  Now, with Mr. Culpepper and
24   the fact, and I know it's not discussed in this
25   discipline, the fact that he was on the clock

Donovan Reporting, PC                                          770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

22 (Pages 67 to 70)

67

1    and not working for part of his shift, would
2    that be considered time card fraud?
3        A    Repeat that for me.
4        Q    Sure. Mr. Culpepper, he was punched
5    in, and he didn't work for part of his shift.
6    Would that be considered time card fraud?
7        A    If he did not have authorization,
8    yes.
9        Q    Is it your position that
10   Mr. Culpepper was not disciplined for time card
11   fraud?
12       A    Yes.
13       Q    And how come? How come that's your
14   position that it wasn't time card fraud?
15       A    Because the discipline was for his
16   misuse of his ALA authority.
17       Q    Sitting here today now that you know
18   some additional information, are you sure that
19   his discipline was for the misuse of his
20   authority?
21       A    That's what it says.
22       Q    So as far as you know, he didn't get
23   disciplined for being punched in and not
24   working part of his shift?
25       A    That's my understanding.

68

1        Q    Now, I've represented to you today
2    that Mr. Culpepper was docked for four hours,
3    but I think you've already testified that you
4    have no reason why he would have been docked
5    for four hours of pay for that day.
6        A    I'm not aware of that.
7        (Whereupon a document was identified as
8    Plaintiff's Exhibit 3.)
9        Q    Ms. Franz, you've been handed
10   Exhibit 3. And it is a Written Coaching Notice
11   Regarding Performance for Christopher
12   Culpepper. Do you see that?
13       A    Yes.
14       Q    And if you turn the page, we're
15   going to come back, but if you just turn the
16   page, you'll see that it's dated January 15th
17   of 2014; correct?
18       A    Yes.
19       Q    And you would have still been the HR
20   manager at that point; correct?
21       A    Yes.
22       Q    If you look back at the first page
23   and you compare it to Exhibit 2, you will
24   notice that it's all the same except for the
25   title. You see where the title is changed?

69

1    Exhibit 2 says Corrective Action Notice
2    Regarding Performance, and Exhibit 3 is a
3    written coaching. Do you see that?
4        A    Yes.
5        Q    And again it says he was
6    investigated for time card fraud. Do you see
7    that?
8        A    Yes.
9        Q    And then I think there's a couple of
10   other differences. If you turn the page, you
11   will see that in that second paragraph on the
12   second page the amount of time that the
13   discipline would remain in his journal has been
14   changed. Do you see that?
15       A    Yes.
16       Q    And let's go back to the signature
17   date. Mr. Culpepper signed Exhibit 2 November
18   21st of 2012; correct?
19       A    Yes.
20       Q    He signed Exhibit 3, his written
21   coaching for the same infraction, January 15th
22   of 2014; correct?
23       A    Yes.
24       Q    So that was a year and two, three
25   months after the original signature; correct?

70

1        A    Yes.
2        Q    Before today, were you aware that
3    Mr. Culpepper's discipline had been reduced in
4    this manner?
5        A    Before today?
6        Q    Yes.
7        A    Yes.
8        Q    Before yesterday, were you aware
9    that Mr. Culpepper's discipline was reduced in
10   this manner?
11       A    No.
12       Q    In your role as human resource
13   generalist/manager for Delta, what involvement,
14   if any, did you have in terminating employees?
15       A    I'm involved. Can you --
16       Q    And what is your role?
17       A    Okay. Thank you. I may -- the
18   role's going to vary based upon the
19   circumstances. I may be part of the
20   investigation and then the subsequent
21   termination or -- but always, I am involved in
22   reviewing the termination file and the
23   recommendation for termination from the
24   operation.
25       Q    I'm sorry for taking you back and

Donovan Reporting, PC                                                              770.499.7499

**71**

1  forth. I just had a thought. We talked about
2  you seeing the disciplinary file for
3  Mr. Conover, and we talked about the fact that
4  you saw several documents. You talked about
5  the statements from, oh, from both Culpepper
6  and Conover.
7      The summary from the PL or
8  department manager, was there a summary for
9  both Conover and Culpepper?
10     A   I don't recall.
11     Q   If there was no summary for one or
12  the other -- well, let me ask it this way. Do
13  you remember there being a summary for one of
14  them?
15     A   I remember there being a summary.
16     Q   And your remembrance right now is of
17  one summary, it sounds like. Is that the case?
18     A   I can't recall.
19     Q   But you know there was a summary.
20  You don't know if there was one or two, and you
21  don't know for which individual?
22     A   Correct.
23         MR. TUYN: Before you go any
24  further, can we take a break?
25         MS. BROCK: Yeah. If you can just

**72**

1  let me finish about what was in Culpepper's,
2  and I won't ask anything outside of that.
3         MR. TUYN: Okay.
4      Q   So you can't recall whether it was
5  for one or the other of them or whether it was
6  just one that covered both of them. You just
7  can't recall?
8      A   Right.
9      Q   But you know there was a summary.
10  Yes?
11     A   Yes.
12     Q   For any information that was not in
13  the summary, you would have had to have asked
14  the PL or the department manager what was going
15  on; correct?
16     A   Yes.
17     Q   And I'm almost done with this line.
18  For Culpepper, I know I asked for Conover, did
19  you see any Kronos punches in that
20  investigatory file for Culpepper?
21     A   Not that I recall.
22     Q   Did you see any County swipes for
23  that investigatory file for Culpepper?
24     A   Not that I recall.
25     Q   And you didn't pull anything in

**73**

1  addition to what you were provided for
2  Mr. Culpepper?
3      A   That's correct.
4      Q   Would Mr. Culpepper's investigatory
5  file also be in your former office to the best
6  of your knowledge?
7      A   I don't know.
8      Q   That's where you left it?
9      A   I don't -- I don't specifically know
10  if, this particular investigation, there's a
11  file in my office for it.
12         MS. BROCK: Okay. I understand.
13  And I can appreciate that. We can get a break.
14         MR. TUYN: Okay.
15  (Proceedings in recess, 10:30 a.m. to
16  10:43 a.m.)
17     Q   Before we took the break, we had
18  gotten over into the Conover-Culpepper world
19  once again, and now I'm back to the termination
20  world. And I had asked you before we went back
21  to Conover and Culpepper about your role as a
22  human resource generalist/manager in the
23  termination process.
24         And you did provide me with some of
25  your responsibilities in that regard. And one

**74**

1  of them in particular that I noted was that you
2  review the file. And when you review the
3  termination file, what are you looking for?
4      A   I'm looking for the reason that the
5  operation is recommending to term. I'm looking
6  to see if that's supportive with the infraction
7  or the policy violation. And I'm looking for
8  documentation to support that decision.
9      Q   Do you conduct any independent
10  investigation into the termination files when
11  you receive them?
12     A   No.
13     Q   So your decision as far as whether
14  to recommend termination or not recommend
15  termination is based on the file that the
16  management or operations side would have put
17  together and sent to you?
18     A   There may be additional questions or
19  additional documentation that isn't in the file
20  that I asked for, but I don't do an
21  investigation.
22     Q   Have you ever in your time as Delta
23  HR in Detroit denied or recommended that a
24  termination -- a recommended termination not
25  take place?

Electronically signed by Joel Moyer (501-161-376-4513)          0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

75

1    A    Yes.
2    Q    Under what circumstances have you,
3  and it doesn't have to be specific to one
4  person, under what circumstances have you
5  recommended that a recommended termination not
6  take place?
7    A    If any of those things that I'm
8  looking for are not in the file.  So if the
9  decision is not consistent with what we've done
10  in the past as far as the infraction, if
11  there's not documented evidence of what took
12  place, there's stuff missing, then it -- yeah.
13    Q    And have you had any occasion where
14  the operations side didn't accept your
15  recommendation that termination not take place?
16    A    Yes.
17    Q    Under what circumstances have they
18  not taken your recommendation?
19    A    I can't give you a specific
20  circumstance.
21    Q    In the instances when the operations
22  side did not accept your recommendation for
23  termination, did you exercise your option of
24  taking it up the management chain?
25    A    Every time.

76

1    Q    And taking it up the management
2  chain, were you able to get the termination
3  reversed or the recommendation to terminate
4  reversed?
5    A    Yes.
6    Q    Was the Rodriques, Beydoun, and
7  Leela termination the first ethics compliance
8  hot line investigation you conducted?
9    A    No.
10    Q    How many ethics hot line
11  investigations would you estimate that you've
12  conducted in your career as a Delta HR
13  manager/HR person?
14    A    I don't know.
15    Q    Well, let me get a range.  Was it
16  ten times?  Because it's a long career, I
17  don't know if you get -- I guess what I'm
18  trying to sense, is it a high volume or is it a
19  low volume of hot line calls for Detroit for
20  race discrimination.
21          Would you say less than ten in your
22  career there?
23    A    No.
24    Q    Less than 20?
25    A    Well, are you specifically talking

77

1  about the type of compliance call or compliance
2  calls in general?
3    Q    The type.  I'm talking about --
4    A    I couldn't speak to --
5    Q    -- racial discrimination.
6    A    -- the type.  I'm sorry.  I thought
7  you were asking about compliance calls in
8  general.
9    Q    Have you ever done a race
10  discrimination compliance call other than the
11  one involving Jerrick Rodriques?
12    A    I can't speak to the specifics of
13  the previous compliance calls.
14    Q    And I understand that.
15    A    Yeah.
16    Q    So sitting here today, is it safe to
17  say you have no recollection of doing a race
18  discrimination call from the hot line other
19  than Mr. Rodriques, the one involving
20  Mr. Rodriques?
21    A    I have no recollection of the
22  previous topics of the compliance calls.
23          MR. TUYN:  And just to clarify,
24  you're saying the one concerning Mr. Rodriques,
25  but I assume you're grouping.  There were six

78

1  different hot line complaints that essentially
2  said the same thing.
3          MS. BROCK:  Yeah.
4          MR. TUYN:  Or that mention Rodriques
5  in one vein or another.
6          MS. BROCK:  Yeah.
7          MR. TUYN:  So when you say the one,
8  you're talking about the six?
9          MS. BROCK:  Yeah.
10    Q    So outside of that one, you have no
11  recollection --
12    A    Yeah, no, I don't.
13    Q    Let me ask you this.  Have you,
14  since you can't remember any specific
15  investigation or any specific topics of
16  investigation, have you ever found that Delta
17  did commit race discrimination in one of your
18  investigations?
19    A    No.
20    Q    And you didn't find that Delta
21  committed race discrimination as to
22  Mr. Rodriques; correct?
23    A    Correct.
24          (Whereupon a document was identified as
25          Plaintiff's Exhibit 4.)

Donovan Reporting, PC                                                        770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

25 (Pages 79 to 82)

79

1    Q    Ms. Franz you've been handed what
2  has been marked as Exhibit 4, and it appears to
3  be a policy of Delta's.  Am I correct in that?
4    A    Looks like it, yes.
5    Q    Have you ever seen this policy
6  before?
7    A    Yes.
8    Q    Now, it indicates that Delta is
9  committed to a workplace free from
10 discrimination.  And that's in the very first,
11 We Value Diversity paragraph?
12   A    Uh-huh (affirmative).
13   Q    Yes?
14   A    Yes.
15   Q    Have you found that Delta is
16 committed to a workplace free from
17 discrimination?
18   A    Yes.
19   Q    And then moving down a little bit,
20 it says, "Discrimination Is Not Tolerated."
21 Have you found that Delta does not tolerate
22 discrimination?
23   A    Yes.
24   Q    Have you ever known of anyone to be
25 terminated for discriminating?

80

1    A    No.
2    Q    Do you know of anyone ever being
3  disciplined for discrimination?
4    A    No.
5    Q    Have you ever known of anyone being
6  investigated for discrimination other than the
7  one set of investigations you conducted with
8  Jerrick Rodriques?  And I know I asked you for
9  you, but I'm just talking generally now.  Not
10 necessarily investigations that you performed,
11 per se, but have you ever known of anyone to be
12 investigated for race discrimination?
13   A    To be able to give specifics of
14 that, no.
15   Q    Even without the specifics, are you
16 aware of anyone being investigated for race
17 discrimination?
18   A    Yes.
19   Q    And to the best of your knowledge,
20 whatever person, whatever group of people,
21 whatever situations you're thinking of, was it
22 found that discrimination existed?
23   A    Not that I recall.
24   Q    In the very last paragraph on
25 Exhibit 4, it talks about reporting any kind of

81

1  discrimination, harassment, and the like.  And
2  it says you can report it to your leader, your
3  manager, the HR professional, or the equal
4  opportunity department.  Where is that
5  department located?
6    A    Here in Atlanta.
7    Q    And the equal opportunity
8  department, is the method by which to contact
9  them published somewhere?  Like how would I
10 call them?
11   A    The directory, the corporate
12 directory.
13   Q    That corporate directory, is it
14 online?
15   A    Yes.
16   Q    And does it direct you to any one
17 person, or do you just call the department?
18 Would you just call that department?
19   A    You would call the department.  Or
20 if you knew the name, you could search for a
21 name as well.
22   Q    And then it continues that you may
23 also call Delta's ethics and compliance help
24 line.  I've been calling it a hot line, so I
25 probably will not be able to stop calling it a

82

1  hot line.
2    A    Okay.
3    Q    So if I say hot line, I mean Delta's
4  ethics and compliance help line.  Okay?  What
5  is the purpose of the hot line?
6    A    To report concerns to Delta.
7    Q    Is it any other purpose other than
8  just reporting?  Is it to try to get a concern
9  resolved or fixed or corrected, or is it just
10 to report it?
11   A    I would say it's all those things.
12     (Whereupon a document was identified as
13 Plaintiff's Exhibit 5.)
14   Q    Mr. Franz, you've been handed
15 Exhibit 5, and it is what appears to be a
16 policy entitled Personnel Conduct Standards and
17 Appearance Guidelines.  Do you see that?
18   A    Yes.
19   Q    Am I correct that this is a policy?
20   A    It appears to be, yes.
21     MR. TUYN:  Well, objection.  It says
22 guideline.
23   Q    Well, let me ask.  What's the
24 difference between a guideline and a policy?
25   A    In my definition, a policy would be

Donovan Reporting, PC                                                        770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

26  (Pages 83 to 86)

83

1    this is -- it's black and white.  A guideline
2    may be gray.
3        Q    Am I correct that you don't have to
4    follow a guideline?
5        A    No.
6        Q    So you do have to follow a
7    guideline?
8        A    But it's a guideline, so there could
9    be room to do something potentially
10   differently.
11       Q    So you don't have to 100 percent
12   follow a guideline?
13       A    Yes.
14       Q    Do you have to 100 percent follow a
15   policy?
16       A    Yes.  That's my definition.
17       Q    Well, you're the HR manager.
18       A    I'm just --
19       Q    Now, you're a senior person, so I'm
20   willing to take your word for it.  And the
21   first page, you will see, is just a cover
22   sheet.  I just wanted to have something so we
23   could know what this document is, but I did not
24   put every page of it.
25            You'll see the numbers at the bottom

84

1    kind of skip because I didn't need all of the
2    sections and I didn't want to ask you about all
3    of the sections.  But I thought it was only
4    fair if I kind of told you where it came from,
5    so to speak.
6            The second page has a
7    nondiscrimination policy.  Do you see that
8    there?
9        A    Yes.
10       Q    And it indicates that in that first
11   paragraph near the bottom right before you get
12   to the first bullet point, it says, "The
13   Director - Equal Opportunity is responsible for
14   coordinating the day-to-day implementation of
15   Delta's equal opportunity program."
16            Do you know who the director - equal
17   opportunity is?
18       A    Well, the head of equal opportunity
19   is Melissa Seppings.  I'm not sure if that's
20   her title.
21       Q    And it says the date -- have you
22   seen this document before, first of all?
23       A    I have.
24       Q    It says, "the day-to-day
25   implementation of Delta's equal opportunity

85

1    program," and then it says, "which primarily
2    consists of the following policies and
3    objectives."  Do you see that?
4        A    Yes.
5        Q    So those things that are listed
6    directly under that sentence, would that be
7    the, to the best of your knowledge, "the equal
8    opportunity program," quote-unquote?
9        A    Yes.
10       Q    Now, understanding that the entire
11   document is a guideline, but it indicates here
12   that these are policies and objectives.  So
13   with that, does that mean that these bullet
14   points are things that you have to follow?
15   They're policies?
16       A    Well, some are objectives.
17       Q    Tell me which ones are policies and
18   which ones are objectives.
19       A    I wouldn't be comfortable
20   differentiating that.
21       Q    Is that safe to say that you're
22   unsure which ones are policies and objectives?
23       A    I'm unsure how they would -- how
24   equal opportunity would define it.
25       Q    Is this policy only interpreted by

86

1    equal opportunity, or do you use it in your
2    day-to-day work as an HR manager?
3        A    I would use the first bullet.  I
4    would not use the second bullet.  I don't
5    conduct business with outside firms.  So some
6    of it, yes, and some of it, no.
7        Q    So as to that first bullet, is that
8    a policy or an objective?
9        A    I would say it's a policy.
10       Q    The last bullet, "ensuring
11   compliance with applicable laws," is that a
12   bullet that you would make use of?
13       A    Yes.
14       Q    I understand why two and probably
15   three you may not day-to-day make use of.
16   Would bullet number four be a policy or an
17   objective?
18       A    I would say it's a policy.
19       Q    In that paragraph under the fourth
20   bullet point, it says, "involved as well as the
21   company's obligations as a federal government
22   contractor."  So Delta is a federal government
23   contractor?
24       A    That's what it says.
25       Q    Are you aware of whether they're a

Donovan Reporting, PC                                        770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

87

1    federal contractor?
2        A    I am not.
3        Q    Have you ever seen -- in the last
4    sentence, it indicates implementation of the
5    company's affirmative action plan.  Have you
6    ever seen the company's affirmative action plan
7    before?
8        A    I've seen the Detroit plan, not
9    necessarily the whole company's.
10       Q    And under what circumstances did you
11   come to see the Detroit affirmative action
12   plan?
13       A    We're provided a copy every year.
14       Q    What can you tell me about Detroit's
15   affirmative action plan?  What is the Detroit
16   affirmative action plan?
17       A    I wouldn't be able to speak to the
18   specifics.
19       Q    You receive it every year?
20       A    Yes.
21       Q    Did you read it every year?
22       A    Cover to cover?  No.
23       Q    Did you read any of it every year?
24       A    Yeah.
25       Q    The part that you read, what did it

88

1    say?
2        A    The part that I reviewed was the
3    demographic information.
4        Q    And when you say "the demographic
5    information," is it the information that you
6    yourself would be reporting or your department
7    as to how many of each group works there?
8        A    I wouldn't report it.  But yes,
9    it's that information.
10       Q    Does it have any goals of where you
11   would want to be as to those relative race
12   categories?
13       A    I don't believe so.  It may.  I
14   don't recall.
15       Q    And you would review those
16   statistical -- that statistical data and
17   information for Detroit for what reason?
18       A    For knowledge.
19       Q    What would you do with that
20   knowledge?  Anything in particular?  I guess
21   I'm trying to find out, did you do something?
22   Do you read it and see the numbers and say,
23   hey, we need to work on this or that?  Or do
24   you just read it and you just -- so you can
25   just know?

89

1        A    Well, I read it so I would know.
2        Q    Would you take any action based on
3    the numbers that are reported?  Would you take
4    any action as far as hiring?  Would you create
5    a retention plan?  Would you do anything in
6    particular after you review those numbers?
7        A    No.
8        Q    Based on your remembrance, the
9    numbers that you saw in that report, were they
10   satisfactory to you as far as the number of
11   minorities that were employed within Delta at
12   Detroit?
13       A    There was nothing that stuck out, so
14   yes.
15       Q    Were there as many, to the best of
16   your remembrance, African-Americans employed
17   with Delta in Detroit as Caucasians?
18       A    I don't recall.
19       Q    But nothing stuck out in your mind?
20       A    Correct.
21       Q    Well, you worked there for quite
22   some time.  When you left the Detroit location,
23   were there just as many African-Americans
24   employed there as white employees?
25       A    I couldn't speak to that.

90

1        (Whereupon a document was identified as
2        Plaintiff's Exhibit 6.)
3        Q    You've been handed Exhibit 6,
4    Ms. Franz, and it is a document entitled
5    Reliability.  Do you see that?
6        A    Yes.
7        Q    And this appears to be a
8    Delta-issued document; is that correct?
9        A    It looks familiar.  The formatting
10   looks a little bit different, but yes.
11       Q    Good.  I'm glad you said that.
12   Looking at the bottom where it says Personnel
13   Practices Manual, what is the Personnel
14   Practices Manual?
15       A    Yeah, we don't have that anymore.
16       Q    And when was the Personnel Practices
17   Manual done away with?
18       A    Well, it wasn't necessarily done
19   away with.  It was reformatted.  I don't recall
20   when that occurred.
21       Q    Has this policy -- well, let me ask.
22   Is this a policy?  Is Exhibit 6 a policy?
23       A    Yes.
24       Q    Was this policy rolled over into the
25   on-the-road document or off-the-road document?

Electronically signed by Joel Moyer (501-161-376-4513)                0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.              December 11, 2014

91

1      A    No.
2      Q    I don't recall -- am I'm using the
3   right name?
4      A    I don't think you're using the right
5   term.
6      Q    I'm not using the right name.
7   There's a manual that I saw, and it has a big
8   airplane on the front of it.  And it says
9   either on-the-road of off-the-road.  I can't
10  remember.
11     A    Well, there's Rules of the Road.
12  But no, this would not be in that document.
13     Q    Where was this document rolled over
14  into?  Where is it now?
15     A    The term that's used, I believe,
16  online is -- I don't know exactly what it's
17  called.  I think the link says People Policies.
18     (Whereupon a document was identified as
19     Plaintiff's Exhibit 7.)
20     Q    You've been handed Exhibit 7.  And
21  it appears to be the same as Exhibit 6, but
22  it's kind of set up a little bit different.  Is
23  this what you're meaning when you said it's
24  like been reformatted?
25     A    Yes.

92

1      Q    So the way that you recall seeing it
2   is how it looks in Exhibit 7; correct?
3      A    I recall seeing it in both formats,
4   but 7 is the more recent.
5      Q    And we don't know when the format
6   changed?
7      A    I do not.
8      Q    What is regular and predictable
9   attendance?
10     A    Are you asking me what that means?
11     Q    Yes.
12     A    So regular and predictable
13  attendance, to me, means that you are reliable
14  and you come to work.
15     Q    Where can the reliability policy be
16  found?
17     A    On the company intranet site.
18     Q    Intranet.  Intranet?
19     A    Yes.
20     Q    And that's under People Policies;
21  correct?
22     A    Yes.
23     Q    What are the other headers that you
24  can remember?  Because People Policies is an
25  odd phrase.  What other ones do they have?

93

1   Other types of policies?
2      A    No.  Well, Operational Policies.
3      (Whereupon a document was identified as
4      Plaintiff's Exhibit 8.)
5      Q    I've handed you what has been marked
6   as Exhibit 8, and it is a Topics Discussed with
7   Agent for Jerrick Rodriques.  Do you see that?
8      A    Yes.
9      Q    And would this be Mr. Rodriques's
10  journal?
11     A    No.
12     Q    What is the journal?  I haven't been
13  able to get a sense of what is the journal.  If
14  this isn't the journal, what is the journal?
15     A    Well, I wouldn't call this a
16  journal.  This is the Northwest equivalent of
17  the journal.  So this is the electronic
18  performance development system.  We called it
19  EPD.  It's equivalent to the journal, but I
20  would not call this a journal.
21     Q    How would I know that I have the
22  journal?  What would I see that lets me know I
23  have the journal?
24     A    You would see dates and
25  documentation of conversation that was -- that

94

1   took place with Mr. Rodriques.
2      Q    Is this document Exhibit 8 still
3   utilized?
4      A    No.
5      Q    When did Delta stop utilizing this
6   Exhibit 8?
7      A    Around March of -- well, I'm not
8   sure.
9      Q    Okay.  It says -- and that may
10  explain why it says it.  That was my question.
11  It says, "Manager:  Manager does not exist."
12  Why?
13     A    The system wasn't that robust to
14  feed that.  Everybody's would have said manager
15  does not exist.
16     Q    And then it says, "Manager
17  reassignment on March 12, '12."  Do you know
18  why it says that?
19     A    No.
20     Q    And then up under that, it says,
21  "Document Code S, nature of document, manager."
22  Are those just the headings for each of those
23  lines underneath?
24     A    Yes.
25     Q    And then there's a March -- I don't

Donovan Reporting, PC                                          770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                    0d7dd3ea-0852-412c-bc02-57d1c002befc

95

1    know.  I think the date comes first in military
2    date, so I'm going to say the 13th of March,
3    2012.
4        A    Yes.
5        Q    And then it has a number.  But do we
6    know what any of that means?
7        A    So the number is the employee number
8    of the person who pulled it up.  So the B27556
9    would be somebody's Northwest employee number.
10   Date would have been auto-populated.
11       Q    And when you say "auto-populated,"
12   what do you mean?
13       A    When this was pulled up, it would
14   have been March 13th of 2012.
15           (Whereupon a document was identified as
16           Plaintiff's Exhibit 9.)
17       Q    Ms. Franz, this e-mail from December
18   11th of 2012 at 1800 hours has been marked as
19   Exhibit 9.  Do you see that?
20       A    Yes.
21       Q    And this is an e-mail that you were
22   cc'd on; correct?
23       A    Yes.
24       Q    And this is an e-mail that's
25   regarding Mr. Rodriques's punch discrepancy.

96

1    Do you see that?
2        A    Yes.
3        Q    If you would turn with me to the
4    second page, the very last paragraph of
5    Mr. Domingo De La Torre's e-mail indicates that
6    Mr. Kotula has an additional incident of punch
7    discrepancy that he would basically be
8    providing at some later time.  Do you see that?
9        A    Yes.
10       Q    Do you ever recall any additional
11   date being brought in by Mr. Kotula?
12       A    When you say "date," what do you
13   mean?
14       Q    Yeah, date that there was a
15   discrepancy.
16       A    No.
17       Q    So we have above that four dates of
18   discrepancy there.  And I know we'll talk about
19   the November 10th later, shortly actually, but
20   there were four dates that were brought that
21   are listed in this e-mail; correct?
22       A    Yes.
23       Q    And as far as you know, it was only
24   those four dates that were taken under
25   consideration in Mr. Rodriques's termination;

97

1    correct?
2        A    There were four dates, yes.
3        Q    And not necessarily these four, and
4    I get it.
5        A    Yeah.
6        Q    Because we're going to talk about
7    the one.
8        A    Okay.
9        Q    But there were four dates; correct?
10       A    To the best of my knowledge, yes.
11       Q    And why, if you know, were you cc'd
12   on this e-mail from Mr. Kriksciun -- I didn't
13   pronounce that right.
14       A    Kriksciun.
15       Q    -- Kriksciun to Mr. Sarsour?
16       A    I would believe it was because I was
17   copied on the previous e-mail.
18       Q    So it just carried on.  So
19   Mr. De La Torre copied you because he tends --
20       A    Huh-uh, no.  He sends it to his
21   leader.
22       Q    Let me back up.  Okay.  So he sent
23   it to his leader, who sent it to --
24       A    His leader.
25       Q    -- his leader, and he brought you

98

1    in?
2        A    Correct.
3        Q    So for whatever the reason, he felt
4    HR needed to be aware of what was happening?
5        A    Yes.
6        Q    And so that's how you ended up being
7    involved in what was happening with
8    Mr. Rodriques at this stage?
9        A    Can you repeat that question?
10       Q    Yeah.  That's how you ended up being
11   notified of what was happening with
12   Mr. Rodriques?
13       A    Yes.
14           (Whereupon a document was identified as
15           Plaintiff's Exhibit 10.)
16       Q    Exhibit 10 is an e-mail from
17   Mr. De La Torre to you dated December 17th of
18   2012.  And it has some attachments to it:
19   documents and statements, journal, RFT for J.
20   Rod., and support document.  Do you see that?
21       A    Yes.
22       Q    And then he also asked, "Do you have
23   a moment today to go over the documents and the
24   RFT file?"  Do you see that?
25       A    Yes.

Electronically signed by Joel Moyer (501-161-376-4513)                    0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

30 (Pages 99 to 102)

99

1    Q    Did you in fact meet with
2  Mr. De La Torre to go over the documents in the
3  RFT file?
4    A    Yes.
5    Q    And what assistance did
6  Mr. De La Torre need that he wanted to go over
7  the file with you?  What did he need you to do?
8    A    That's normal.  That's normal
9  protocol.
10    Q    And what was the purpose in him
11  going over the file with you?
12    A    To show why he was recommending him
13  for termination.
14    (Whereupon a document was identified as
15    Plaintiff's Exhibit 11.)
16    Q    Exhibit 11 is dated December 18th,
17  2012.  It looks like it's a memo, and it's
18  signed by you.  Do you see that?
19    A    Yes.
20    Q    And the first sentence of the
21  document says Note to File regarding Jerrick
22  Rodriques.  A note to what file?
23    A    His employment file.
24    Q    And you began the next sentence
25  reporting the investigation into

100

1  Mr. Rodriques's time card records, but dot,
2  dot, dot.  Who conducted the investigation?
3    A    Domingo.
4    Q    My mind is jumping, so my apologies.
5  Could Mr. Culpepper have been demoted without
6  his DM being aware?
7    A    I don't believe so.
8    Q    Could he have been demoted without
9  the general manager being aware?
10    A    I don't think so.
11    Q    In the 11-17, back to Exhibit 11,
12  11-17 of '12 summary of information, you give
13  some information in regard to Mr. Rodriques and
14  what occurred on November 17th.  And you're
15  welcome to take a moment and read to refresh
16  your memory.
17      Where did you get that information
18  from that's provided under November 17th of
19  2012?
20    A    Domingo.
21    Q    Did Mr. De La Torre tell you where
22  he got that information?
23    A    From Mr. Kotula.
24    Q    Did he tell you whether he looked
25  into it to see whether Mr. Rodriques's task

101

1  line actually turned green indicating he had
2  punched in?
3    A    When you say who, who are you
4  referring to?
5    Q    De La Torre.
6    A    He did not indicate that.
7    Q    Did he indicate what Mr. Kotula had
8  done to try to substantiate Mr. Rodriques's
9  whereabouts on that day?
10    A    Not that I recall.
11    Q    So for the November 17th, November
12  20th, and December 11th dates that are on this
13  memo to the file or note to the file, you
14  weren't directly involved in any of these
15  steps, were you?
16    A    That's correct.
17    Q    Why is it you that wrote the note
18  summary versus the individual who was involved,
19  like Mr. De La Torre?  Why would you write the
20  summary versus him?
21    A    I would -- this is my summary based
22  upon what I saw in the file and my conversation
23  with Domingo.
24    (Whereupon a document was identified as
25    Plaintiff's Exhibit 12.)

102

1    Q    Exhibit 12 is an internal memo dated
2  December 18th of 2012 from you to Tyesha Gray
3  regarding Mr. Rodriques; correct?
4    A    Yes.
5    Q    And why did you send this memo to
6  Ms. Gray?
7    A    This is part of our recommendation
8  for term process.
9    Q    And do you know why the process
10  requires this to be sent to Ms. Gray?
11    A    She's my boss.
12    Q    Are you just making her aware?  Are
13  you, as is indicated at the bottom, seeking her
14  approval?  What's the reason for sending it?
15    A    So the reason is the operation is
16  recommending his termination.  I'm supporting
17  it.  So I'm sending it to her to get her
18  support as well.
19    Q    Did you and Mr. De La Torre discuss
20  any discipline short of termination for
21  Mr. Rodriques?
22    A    Not that I recall.
23    Q    Did you and Ms. Gray discuss any
24  discipline short of termination for
25  Mr. Rodriques?

Donovan Reporting, PC                                        770.499.7499

Barbara A. Franz                    Rodrigues v Delta Air Lines, Inc.                    December 11, 2014

31 (Pages 103 to 106)

---

103

1    A    Not that I recall.
2    Q    Would you have been willing to hold
3 that conversation if Mohammad Sarsour would
4 have recommended something short of
5 termination?
6    A    We would have had discussion.
7    Q    Would you have had that discussion
8 if Mr. De La Torre would have recommended
9 something short of termination?
10    A    We would have had discussion, yes.
11    Q    And of course, because it didn't
12 happen, you can't say today whether you would
13 have agreed to that or not, can you?
14    A    No.
15    Q    Now, this particular memo to
16 Ms. Gray doesn't list the dates, you know,
17 like, and I'm going to show you shortly,
18 Mr. De La Torre actually put the dates and what
19 was done. Your memo to Ms. Gray didn't include
20 that detail. Why not?
21    A    That's not -- I wouldn't include
22 that. What I'm focused on is what is the
23 violation that was -- what is the violation or
24 the policy that was violated. That's what I'm
25 intending to speak to.

---

104

1    (Whereupon a document was identified as
2    Plaintiff's Exhibit 13.)
3    Q    Exhibit 13 is a checklist or appears
4 to be a checklist for recommendation of
5 termination of Mr. Rodrigues. Do you see that?
6    A    Yes.
7    Q    And I know his name isn't on it, but
8 I believe it's for Mr. Rodrigues. Now, the
9 second box says, "Date MSS transaction
10 completed." What does that mean?
11    A    It's a manager self-service. That's
12 our system where the leaders would put in
13 transactions for employees.
14    Q    What kind of transactions for
15 employees?
16    A    In this particular case, it would
17 have been a suspension transaction.
18    Q    Now, the date that this indicates
19 that the suspension transaction was put in is
20 December 11th. Am I correct that Mr. Rodrigues
21 was suspended on the 12th?
22    A    Well, he would have been spoken to
23 on the 11th, so the suspension would have been
24 effective the 12th.
25    Q    And so his suspension was keyed in

---

105

1 on the 11th?
2    A    Yes.
3    Q    And then the next line says, "RFT
4 approval received; VP senior leader." What
5 does that mean?
6    A    That means we've spoken to the
7 senior leader in the station.
8    Q    Which was who?
9    A    At the time, it would have been
10 Andrew Zarras.
11    Q    Give me the name again.
12    A    Andrew Zarras, Z-A-R-R-A-S.
13    Q    And what is Mr. Zarras's role?
14    A    He was the vice president.
15    Q    And so who would have spoken to him?
16    A    Most likely Mr. Kriksciun.
17    Q    And when you say he would have been
18 spoken to, for what reason?
19    A    We're recommending termination of
20 this employee and here's why and to gain his
21 support.
22    Q    RFT approval received, what does
23 that mean?
24    A    Rec for term approval received.
25    Q    The recommendation for termination

---

106

1 approval received. So that means that this VP
2 person, Mr. Zarras, approved the recommendation
3 of termination?
4    A    Correct.
5    Q    And that approval was on -- can you
6 read that date there?
7    A    I would say that's 12-13.
8    Q    Me too. And so the actual
9 recommendation for termination was approved the
10 day after the effective date of Mr. Rodrigues's
11 suspension?
12    A    From Mr. Zarras.
13    Q    From Mr. Zarras. The day after the
14 suspension?
15    A    (Nods head affirmatively.)
16    Q    Yes?
17    A    Yes.
18    Q    And although the recommendation for
19 termination was approved the day after his
20 suspension, it still wasn't actually effective
21 until January of 2013. Do you know why?
22    A    Well, there's a process in between
23 that.
24    Q    I understand. But that's still a
25 long time. So do you know why it took from --

---

Donovan Reporting, PC                                                   770.499.7499

Barbara A. Franz               Rodrigues v Delta Air Lines, Inc.               December 11, 2014

32 (Pages 107 to 110)

107

1  everything at metro level, I'm going to call
2  it, was completed by December 13th of 2012.
3       A    No, it wasn't.
4       Q    Why did it take --
5       A    Because -- did we look at -- because
6  I met with Domingo on the 17th.
7       Q    So --
8       A    Right, so --
9       Q    -- the senior VP approved it before
10  you did?
11      A    Yes.
12      Q    So he didn't know the position HR
13  was going to take at the time that he approved
14  it?
15      A    Correct.
16      Q    The VP, is he only a VP over like
17  operations?
18      A    He would be the VP of airport
19  customer service, so the above and below-wing.
20      (Whereupon a document was identified as
21      Plaintiff's Exhibit 14.)
22      Q    Exhibit 14, it's another e-mail.
23  And it's an e-mail from you to Nhia Francis
24  dated December 18th of 2012.  And it states --
25  so the original report you received -- oh,

108

1  yeah, that the 17th was not on the report sheet
2  that you received for punches; correct?
3       A    Well, there were several that
4  weren't, according to this e-mail.
5       Q    So you had to request from her his
6  punches because he had already been suspended;
7  correct?
8       A    The data, yes.
9       Q    Because you couldn't get them out of
10  Kronos because he had already been suspended?
11      A    I would not have been able to get
12  them out of Kronos, period.  I don't have
13  access to Kronos.  But our attendance
14  coordinator would not have been.
15      Q    And so you had not seen any of his
16  punches.  Or let me ask it a different way.
17      Were any of his punches printed
18  prior to this request to your knowledge?
19      A    Not to my knowledge.
20      Q    So when you got the RFT file, the
21  punches, the Kronos punches for Mr. Rodriques,
22  would they have been in that file at the time
23  you received it?
24      A    No.
25      Q    So the Kronos punches is something

109

1  that you requested after you were provided the
2  file to review?
3       A    Yes.
4       Q    The same thing about the swipes, the
5  County swipes.  Were the County swipes in the
6  file for Mr. Rodriques when you actually
7  received it?
8       A    I don't recall.  They should have
9  been in the file when I sent it.  I don't know
10  if they were in it originally.
11      Q    So Ms. Francis did ultimately send
12  you those November 17th punches; correct?
13      A    Yes.
14      (Whereupon a document was identified as
15      Plaintiff's Exhibit 15.)
16      Q    Exhibit 15 is an e-mail from you to
17  Mr. De La Torre dated December 18th, 2012, at
18  12:44.  And you say to him, "Please see the
19  attached punches."  Did you send him some of
20  the punches that you had received from
21  Ms. Francis?
22      A    It appears that way, yes.
23      Q    You don't remember, though?
24      A    Specifically, no.  By reading the
25  e-mail, yes, that's what occurred.

110

1       Q    And then you point out to him, "In
2  the RFT it states:  November 10th, County swipe
3  at 14:27 and punch in at 14:28."  Do you see
4  that?
5       A    Yes.
6       Q    Would there have been a problem if
7  the County swipe was 14:27 and the punch in was
8  14:28?
9       A    I would want -- yes.
10      Q    What would have been the problem?
11      A    It takes more than a minute to get
12  from where the bus swipe would be to the time
13  clock.
14      Q    How many minutes does it normally
15  take to your knowledge?
16      A    On average, I would -- I mean, I've
17  never rode the bus.  But from what I hear from
18  employees, you know, roughly five minutes.
19      Q    And so you bring it to his attention
20  that there seemed to be some problem with the
21  November 10th date that was in his list of four
22  dates that were problematic with
23  Mr. Rodriques.  Am I correct in that?
24      A    Yes.
25      Q    Did Mr. De La Torre respond to you

Donovan Reporting, PC                                              770.499.7499

Barbara A. Franz             Rodriques v Delta Air Lines, Inc.             December 11, 2014

---

111

1    in e-mail, to the best of your remembrance, in
2    regard to these punches?
3        A    I don't recall.
4        Q    So in fact, at the stage that
5    Mr. De La Torre sent you the RFT file, it was
6    incorrect in regard to that November 10th date?
7        A    Yes.
8        (Whereupon a document was identified as
9        Plaintiff's Exhibit 16.)
10       Q    Exhibit 16 is a memo dated December
11   15th of 2012 from Mr. De La Torre to
12   Mr. Sarsour.  Do you see that?
13       A    Yes.
14       Q    And again we have Mr. De La Torre
15   listing those four dates that were at issue for
16   Mr. Rodriques; correct?
17       A    Yes.
18       Q    And we know that ultimately that
19   November 10th date was the incorrect actual
20   date; correct?
21       A    Yes.
22       Q    And it did get corrected at some
23   later point; right?
24       A    Yes.
25       Q    And that was before it was sent to

---

112

1    corporate for final approval; correct?
2        A    Yes.
3        Q    Now, on that November 10th date, it
4    says County swipe at the employee lot 14:27,
5    punch in at 14:28.  Do you see that?
6        A    Yes.
7        Q    And as you indicated, that would
8    have been a problem because it takes more than
9    a minute to get from the lot over to where the
10   clock would be; correct?
11       A    Yes.
12       Q    And you estimated that it would take
13   maybe five minutes to get from the one to the
14   other; correct?
15       A    Yes.
16       (Whereupon a document was identified as
17       Plaintiff's Exhibit 17.)
18       Q    Exhibit 17 is also dated December
19   15th, and it is a memo from Mr. De La Torre to
20   Mr. Sarsour.  Do you see that?
21       A    Yes.
22       Q    And on this particular memo, it
23   looks a little bit different because it
24   actually has Mr. De La Torre's signature on it
25   and it doesn't have a cc line to you; correct?

---

113

1        A    No.
2        Q    But it does have the date changed,
3    and the date was changed from November 10th to
4    November 8th; correct?
5        A    Yes.
6        Q    And it indicates County swipe at
7    employee lot 14:27.  And then above that is
8    14:24 and a few seconds written in.  Do you see
9    that?
10       A    Yes.
11       Q    Do you recall there being an
12   instance by which it was determined that
13   Mr. Rodriques actually swiped the lot at 14:24?
14       A    I don't recall that specific
15   conversation, no.
16       (Whereupon a document was identified as
17       Plaintiff's Exhibit 18.)
18       Q    Plaintiff's Exhibit 18, I am going
19   to represent to you that this is what Delta has
20   indicated are swipes for Mr. Rodriques in the
21   County lot.  And if you could, take a look at
22   the November 8th dates there.
23       A    Uh-huh (affirmative).
24       Q    And if you would, see the very first
25   November 8th date says, 14:24 and 11 seconds at

---

114

1    the bus entry lot.  Do you see that?
2        A    Yes.
3        Q    And so that would be employee lot
4    bus entry.  That would be entering into the
5    parking lot; correct?
6        A    Yes.
7        Q    So in fact, he did swipe at 14:24
8    and 11; correct?
9        A    Yes.
10       Q    Now, had you seen these swipes
11   before today?
12       A    Yes.
13       Q    And so at some point, did you become
14   aware that Mr. Rodriques actually swiped the
15   lot at 14:24?
16       A    Yes.
17       Q    And then it goes on -- and did you
18   become aware of that before the recommendation
19   for termination package was sent to corporate?
20       A    Yes.
21       Q    And in spite of that, the
22   correction, the date of November 8th was still
23   left on his list of perceived infractions and
24   sent to corporate?
25       A    What do you mean?

---

Donovan Reporting, PC                                      770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

34 (Pages 115 to 118)

115

1    Q    Yeah.  You still told corporate that
2  he had inconsistencies on November 8th also;
3  right?
4    A    Yes.
5    Q    Let's look at the next entry,
6  November 8th, 14:27 and 53 seconds, the door
7  reader.  Do you see that there?
8    A    Yes.
9    Q    Does that indicate or mean that
10 Mr. Rodriques had gone through one of the
11 doors?
12   A    Yes.
13   Q    At 14:27?
14   A    That's correct.
15   Q    And that was three minutes and 42
16 seconds after he pulled into the lot?
17   A    Yes.
18   Q    So that was just about four minutes
19 after he pulled into the lot?
20   A    Yes.
21   Q    And so what would be wrong if he --
22 well, let me go to the next one.
23       And then on Exhibit 17, it says he
24 had no punch in; however, a PACE slip for 14:28
25 start was submitted.  Do you see that?

116

1    A    Uh-huh (affirmative).
2    Q    Yes?
3    A    Yes.
4    Q    So if he walked in the door at 14:27
5  and 53 seconds, what was wrong with him putting
6  14:28, a minute later, as his start time on the
7  PACE sheet?
8    A    What was his shift start time?
9    Q    I don't know.
10   A    Oh.
11   Q    I just know that --
12   A    But you're asking me if there's an
13 issue or not.
14   Q    No.  The issue --
15   A    I would have to know the start time.
16   Q    The issue here, my understanding,
17 and maybe you can tell me because I don't want
18 to testify, is not that he was tardy.  It was
19 that he falsified the time, that he could not
20 have possibly been at work at 14:28 because he
21 wasn't in the lot.
22       That's what I've been hearing.
23 That's what's written on everything.  He wasn't
24 in the lot.  He couldn't have possibly been
25 here.  But in fact, he was in the lot.  And in

117

1  fact, he swiped through another door all prior
2  to 14:28.  So what was the problem?
3    A    I don't know.
4    Q    If you could go back, and we're
5  going to work through them a little bit more,
6  Exhibit 16, Mr. De La Torre indicated in the
7  paragraph under the bullet points, "After
8  further investigation, we have come to the
9  conclusion that this is a case of time card
10 fraud."
11       So was Mr. De La Torre in fact
12 recommending Mr. Rodriques's termination
13 because of time card fraud?
14   A    Yes.
15       MR. TUYN:  You referenced
16 Exhibit 16.  Exhibit 17 --
17       MS. BROCK:  I did.
18       MR. TUYN:  -- is the same --
19       MS. BROCK:  I know what it says,
20 Counsel.  If you have a question you want to
21 ask her, please ask her in your redirect.  I am
22 going to get to that document.  But I do not
23 want you feeding this witness testimony.
24       MR. TUYN:  I'm not feeding
25 testimony.  I'm objecting because --

118

1        MS. BROCK:  Well, what's the --
2        MR. TUYN:  -- you are relying on an
3  unsigned document.
4        MS. BROCK:  What's the objection
5  under the Rules of Evidence?  What is your
6  objection?
7        MR. TUYN:  Lack of foundation.
8        MS. BROCK:  Then that's fine.  We
9  accept your lack of foundation objection.
10 Thank you.
11   Q    Exhibit 17.  So your testimony is
12 that at this point you're unsure as to what the
13 problem was with the November 8th date;
14 correct?
15   A    That's correct.
16   Q    Did you at the time that you were
17 working through this recommendation of
18 termination, did it sink in with you that on
19 that date he really had gotten here on that
20 date?
21   A    It did not.
22   Q    And at some later point, wasn't it
23 brought to your attention -- and it's going to
24 come up a little bit later.  Maybe in his
25 appeal I think is where it's going to come up,

Donovan Reporting, PC                                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

35 (Pages 119 to 122)

119

1    and we'll get to it, so I'm not trying to
2    blindside you.
3          At some later point, didn't it come
4    to your attention that Mr. Rodriques actually
5    said that Mr. De La Torre said that November
6    8th date would not be included and he had given
7    him a piece of paper and scratched it off. Do
8    you remember that coming up?
9       A    I remember that being
10   Mr. Rodriques's claim, yes.
11      Q    And so now does that make a little
12   bit more sense that in fact he was told, don't
13   worry about the November 8th date, that it
14   wouldn't be included because he was actually
15   here on that date and on time? Or at least he
16   was here in time for 14:28. We don't know what
17   time his shift started that day.
18      A    Can you rephrase that for me.
19      Q    Sure. Doesn't it make sense that
20   Mr. Rodriques would have said, hey, he told me
21   that that date wouldn't even be considered
22   because, in fact, he was -- he was there on
23   that date?
24      A    Well, I can't speak to that. I
25   wasn't in the conversation.

120

1       Q    Right.
2       A    So.
3       Q    But you can speak to whether it
4    makes sense or not that that's what occurred.
5    Did it make sense that, yeah, he said that this
6    date wouldn't even be considered?
7       A    It makes sense that, based on these
8    dates, it appears as though he was there. I
9    can't draw the conclusion that it makes sense
10   that Domingo said what he said because I wasn't
11   there.
12      Q    Do you recall reading in the
13   recommendation for termination file where
14   Mr. De La Torre indicated, and you quoted it to
15   corporate on an occasion or two, and I think
16   we'll get to it, that Mr. Rodriques said that
17   the November 6 date was some sort of oversight
18   and had mentioned that he was voting on that
19   day. Do you remember that?
20      A    I remember that. I don't recall
21   when it occurred in the chain of events.
22      Q    Now, Mr. De La Torre also made other
23   changes from Exhibit 16 to Exhibit 17. He
24   changed the description of what Mr. Rodriques
25   did to, "We have determined that Mr. Rodriques

121

1    has fraudulently submitted his time records."
2    Do you see that?
3       A    Yes.
4       Q    Where on Exhibit 16, he had
5    indicated that Mr. Rodriques had committed time
6    card fraud; correct?
7       A    Yes.
8       Q    Did you instruct Mr. De La Torre to
9    change his phrasing to fraudulently submitted
10   his time records?
11      A    I don't recall that specific
12   conversation. I frequently change or make
13   recommendations for change on these.
14      Q    But you don't recall?
15      A    No.
16      Q    Do you recall whether anyone else
17   told Mr. De La Torre to change the use of his
18   language?
19      A    No, I do not.
20   (Whereupon a document was identified as
21   Plaintiff's Exhibit 19.)
22      Q    Ms. Franz, you've been handed what
23   has been marked as Exhibit 19.
24      A    Yes.
25      Q    And it is an e-mail dated December

122

1    18th of 2012. And it is from you to Tyesha
2    Gray. Do you see that?
3       A    Yes.
4       Q    And you indicate in the e-mail to --
5    and Ms. Gray is your direct report; correct?
6    She's your boss. She was your boss at the
7    time?
8       A    Yes.
9       Q    And you included Mr. Rodriques's RFT
10   HR - Time card.doc. Do you see that?
11      A    Uh-huh (affirmative).
12      Q    Yes?
13      A    Yes.
14      Q    And Mr. Rodriques's RFT OPS --
15   operations?
16      A    Yes.
17      Q    -- - Time Card.doc; correct?
18      A    Yes.
19      Q    And in the body of the e-mail, you
20   tell Ms. Tyesha that this termination is for
21   time card fraud; correct?
22      A    Yes.
23      Q    So in fact, Mr. Rodriques was
24   terminated for time card fraud?
25      A    Yes.

Donovan Reporting, PC                                                                    770.499.7499

Barbara A. Franz                    Rodrigues v Delta Air Lines, Inc.                    December 11, 2014

36 (Pages 123 to 126)

123

1      (Whereupon a document was identified as
2   Plaintiff's Exhibit 20.)
3      Q    Exhibit 20 is an e-mail dated
4   December 21st from you to Mr. Sarsour.  Do you
5   see that?
6      A    Yes.
7      Q    Now, the content of this e-mail is
8   blank.  It has an attachment, but the actual
9   content is blank.  Do you know why this e-mail
10  is blank?
11     A    No.
12     Q    Was it typical for you to send
13  Mr. Sarsour an e-mail with no content?
14     A    Yes.
15     Q    Why?
16     A    We might have been on the phone.  It
17  could be a variety of reasons.  He may have
18  asked me in person for a copy of it.  A wide
19  variety of reasons why I would send an e-mail
20  without -- he knows why it's coming.
21     (Whereupon a document was identified as
22  Plaintiff's Exhibit 21.)
23     Q    Plaintiff's Exhibit 21 is an e-mail
24  dated January 9th of 2013, and it's from Lisa
25  Ali to Mr. De La Torre and Mr. Sarsour with you

124

1   cc'd as well as Ms. Gray.  Do you see that?
2      A    Yes.
3      Q    Who is Lisa Ali?
4      A    She was the ACS -- I think her title
5   was coordinator.
6      Q    And what does ACS stand for?
7      A    Airport customer service.
8      Q    And is she located here in Atlanta?
9      A    She was.
10     Q    Or was she?
11     A    Yes.
12     Q    Is she still located in Atlanta?
13     A    No.
14     Q    Is she still an employee of Delta to
15  the best of your knowledge?
16     A    No, she's not.
17     Q    And Ms. Ali instructed
18  Mr. De La Torre and Mr. Sarsour and yourself
19  and Ms. Gray via cc to inform Mr. Rodrigues
20  that he could appeal the termination decision;
21  correct?
22     A    Yes.
23     Q    And was Mr. Rodrigues informed that
24  he could appeal the termination decision?
25     A    I wasn't on that call, so I can't

125

1   attest to that.
2      Q    Do you know who informed him of his
3   termination?
4      A    I don't recall.
5      (Whereupon a document was identified as
6   Plaintiff's Exhibit 22.)
7      Q    Exhibit 22, an e-mail from you to
8   Mr. Kriksciun, and it's dated January 9th of
9   2013.  And you say, "Here is the one for
10  Rodrigues."  What did you mean by, "Here is the
11  one"?  Were you sending him multiple
12  recommendations for termination, or do you
13  remember what was going on?
14     A    I don't recall.
15     (Whereupon a document was identified as
16  Plaintiff's Exhibit 23.)
17     Q    Exhibit 23, it is an e-mail from you
18  to Lisa Ali dated January 10th of 2013;
19  correct?
20     A    Yes.
21     Q    And so this e-mail is you notifying
22  corporate that Mr. Rodrigues was told about the
23  termination; correct?
24     A    Yes.
25     Q    And you indicated that you're not

126

1   the one who actually told him; right?
2      A    I don't think I indicated that, but
3   I was not.
4      Q    Oh, because you told me you weren't
5   sure who told him and --
6      A    Okay.
7      Q    -- who -- you're not getting ready
8   to drive me crazy.  I'm doing the best I can.
9   So you didn't tell him, and you don't recall
10  who told him?
11     A    That's correct.
12     (Whereupon a document was identified as
13  Plaintiff's Exhibit 24.)
14     Q    Exhibit 24 is an e-mail from you to
15  Ms. Kelley Nabors regarding an appeal for
16  Jerrick Rodrigues.  Who is Kelley Nabors?
17     A    Kelley Nabors is part of our equal
18  opportunity department.
19     Q    Does the equal opportunity
20  department investigate the appeals of
21  terminations?  Is that part of their duties?
22     A    Yes.
23     Q    Going to the second page, the
24  earlier of the e-mails, the April 1st e-mail
25  between you and Ms. Nabors, she mentioned to

Donovan Reporting, PC                                      770.499.7499

Barbara A. Franz          Rodriques v Delta Air Lines, Inc.          December 11, 2014

37 (Pages 127 to 130)

127

1  you -- here's where you were told that
2  Mr. Rodriques said that he was told the
3  November 8th date would not be included and
4  that Mr. De La Torre had scratched off that
5  date and given him the slip; correct?
6      A    Yes.
7      Q    And she asked you to follow up with
8  Mr. De La Torre and with Carla Bell; correct?
9      A    Yes.
10      Q    Who is Carla Bell?
11      A    She's a performance leader or was.
12      Q    Is she still an employee of Delta?
13      A    Yes.
14      Q    What is her current position?
15      A    I don't know.  She's not a
16  performance leader anymore.  I'm not sure what
17  her actual title is.
18      Q    Did she go up or down?
19      A    I don't know.  She took a corporate
20  position, so I don't know if it was up, down,
21  or sideways.
22      Q    Okay.  Is she out here now?
23      A    I don't know where she's physically
24  located.
25      Q    Now, I understand that Ms. Bell was

128

1  on medical during this time.  Did you ever
2  confer with Ms. Bell after she returned from
3  medical about this scratching off of that
4  8th date and this slip of paper?
5      A    Not that I recall.
6      Q    And Mr. De La Torre, according to
7  your e-mail, said that he didn't have any
8  recollection of telling him that that date
9  wouldn't count and scratching off and giving
10  any papers; correct?
11      A    That's not in this e-mail.
12      Q    All right.  Give me a second.  I'll
13  have it for you.  But you did follow up with
14  Mr. De La Torre?
15      A    Yes.
16      Q    And he did in fact tell you that he
17  didn't remember giving him anything; correct?
18      A    That's -- yes, that's my -- yes.
19      (Whereupon a document was identified as
20      Plaintiff's Exhibit 25.)
21      Q    I have the e-mail.  I do actually
22  have it.  Exhibit 25, Ms. Franz, is the e-mail.
23      A    Thank you.
24      Q    You're welcome.  It's dated April
25  8th of 2013, and it's where you tell Ms. Nabors

129

1  that you spoke with Mr. De La Torre and that he
2  doesn't have any recollection of any of that;
3  correct?
4      A    Yes.
5      Q    Also in this e-mail is where you
6  indicate that this conversation between
7  Mr. De La Torre and Mr. Rodriques should have
8  been placed in Mr. Rodriques's journal.  But
9  based on her question, it looks like it might
10  not be there; correct?
11      A    Correct.
12      Q    Did you ever pull his journal to see
13  if it was there?
14      A    I wouldn't have had the journal at
15  this point.  It would have gone with the file.
16      Q    And do you recall seeing this
17  conversation in the journal?
18      A    I don't recall.
19      Q    And you re-quote -- well, let me ask
20  it.  The paragraph that starts with, "During
21  the interview, I questioned," is that a cut and
22  paste of Mr. De La Torre's e-mail to you at
23  some earlier point?
24      A    According to this e-mail, yeah.  It
25  says it was a e-mail I received from him the

130

1  day of suspension.
2      Q    Yeah.  I just didn't -- I want to
3  ask you about it, but I didn't want to make the
4  leap that this was not you talking because it
5  doesn't have quotation marks.
6      A    Oh, yeah.  No.
7      Q    So I just wanted to say that.
8      A    Okay.
9      Q    I knew it wasn't, but I needed you
10  to say it.
11      A    Okay.
12      Q    And you were letting Ms. Nabors know
13  that Mr. De La Torre says he admitted to
14  turning in the slip on the 5th for a start time
15  of 14:28; correct?
16      A    Correct.
17      Q    But in reality, he wasn't on the
18  premises until 16:19.  And he said it was some
19  sort of oversight; correct?
20      A    Yes.
21      Q    Did you know at that point that this
22  oversight that occurred on that day had
23  anything to do with him being voting -- voting
24  on that day, that it was Election Day?
25      A    At what point?

Donovan Reporting, PC                                      770.499.7499

Barbara A. Franz          Rodriques v Delta Air Lines, Inc.          December 11, 2014

38 (Pages 131 to 134)

131

1    Q    At this point, did you know?
2    A    No.
3    Q    At some later point, did you come to
4  know that Mr. Rodriques was saying, I was out
5  voting that day, and there was -- this is just
6  a mistake?
7    A    Yes.
8    Q    When did you become aware of that?
9    A    I don't recall timing.
10   Q    Was it before or after you
11  recommended his termination?
12   A    After.
13   Q    How did you become aware?
14   A    I don't -- I don't recall.  I just
15  remember that conversation.
16   Q    Were you aware that Mr. Rodriques
17  had notified his PL, Mr. Ortiz, that he was
18  running late that day?
19   A    That was the conversation.
20   Q    When you say, "that was the
21  conversation," what are you meaning?  Is that
22  the conversation you're recalling where you
23  found out that he was saying he was voting?
24   A    Yes.
25   Q    And you found out in the context of

132

1  him -- someone saying, I know right now --
2    A    Yeah.
3    Q    -- you're not able to remember who,
4  but someone saying he called in to Mr. Ortiz
5  and told him that he was voting.  He was
6  running late because he was voting.
7    A    Yes.
8    Q    Did you ever speak to Mr. Ortiz
9  about Mr. Rodriques's claim that he had been
10  texting him that day, letting him know he was
11  going to be late, that this wasn't a secret,
12  that he had been telling his PL that he was
13  going to be late that day?
14   A    I did talk to Mr. Ortiz, yes.
15   Q    Did Mr. Ortiz confirm that
16  Mr. Rodriques had been telling him that he was
17  going to be late that day?
18   A    He remembered the conversation, yes.
19  I didn't get the specifics of what that
20  conversation was.
21   Q    Did he indicate that he had approved
22  Mr. Rodriques to be late that day because he
23  was out voting?
24   A    I don't know that he said approved.
25  He said he was aware.

133

1    Q    And if Mr. Ortiz, and this is -- in
2  all fairness, I don't have testimony to this.
3  I'm not trying to tell you that this occurred.
4  I just have a question based on what happened
5  with Mr. Culpepper.
6        If Mr. Ortiz can say that he gave
7  Mr. Rodriques permission to sign in at 14:28 on
8  that day, would this now not be time card
9  fraud?  And if the question doesn't make sense,
10  let me take you back to your testimony.
11       You testified that, because
12  Mr. Culpepper gave Mr. Conover permission to
13  stay punched in on the clock and to go over and
14  do whatever Mr. Conover was doing that day,
15  that that would not be time card fraud because
16  he had permission from his PL to do so.
17   A    Uh-huh (affirmative).
18   Q    So my -- yes?  Yes?
19   A    Yes.
20   Q    So my question to you is:  If
21  Mr. Ortiz gave Mr. Rodriques that same kind of
22  permission, November 6 would not have been
23  considered time card fraud; correct?
24       MR. TUYN:  Just a foundational
25  objection.  It's not what the evidence is in

134

1  the case.
2        MS. BROCK:  Okay.  That's not what
3  your interpretation of the evidence is, but I'm
4  not representing that to her.  That's for
5  argument's sake.
6        MR. TUYN:  The way you phrased it
7  was that he gave him permission to put --
8        MS. BROCK:  I asked the question.
9        MR. TUYN:  -- 14:28 down on his time
10  card.
11       MS. BROCK:  I asked the question,
12  and I said to her I'm not representing anything
13  as fact to her before I even started the
14  question.  But go ahead.  Because that's going
15  to be my argument, and I don't want to put that
16  on you.
17       MR. TUYN:  All right.  Well,
18  official objection --
19   Q    So my question is --
20       MR. TUYN:  -- that you're asking the
21  witness to speculate.
22       MS. BROCK:  Okay.  Now that's a good
23  one.
24   Q    So my question to you is, is that,
25  if Mr. Ortiz actually gave Mr. Rodriques

Donovan Reporting, PC                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

39 (Pages 135 to 138)

135

1    permission to put 14:28 on his time card even
2    though he didn't get here until 16:19, would
3    that still be time card fraud?
4        A    I'm just thinking through.
5        Q    Please.
6        A    So you're stating that he,
7    Mr. Ortiz, said, I know you weren't here, put
8    the 14:28 on your time card, and I'll pay you
9    for the time that you were voting.
10       Q    Only --
11       A    Then yes, I would say that would not
12   have been time card fraud.
13       Q    And I'm only willing to go that far
14   if you're saying Mr. Culpepper told
15   Mr. Conover, you can stay punched in and get
16   paid even though you're going to go somewhere
17   else.
18           MR. TUYN:  Well, and that's not in
19   evidence either.  So lack of foundation to
20   that.
21           MS. BROCK:  She testified that her
22   understanding was that Mr. Culpepper gave him
23   permission.  I don't want to say to go sleep
24   because she didn't say to go sleep, so I said
25   to go somewhere else because I didn't want to

136

1    put that word in your mouth.
2           But that was her testimony, that
3    Mr. Culpepper gave him permission and that
4    that's why it was not time card fraud.  I just
5    asked the very same thing in regard to
6    Mr. Rodriques.
7        Q    If his PL, Mr. Ortiz, gave him
8    permission, would it not be time card fraud?
9        A    Gave him permission to be paid for
10   voting and --
11       Q    Paid.  Paid, period.
12       A    -- and gave that authorization --
13       Q    Paid, period.
14       A    I'm --
15           MR. TUYN:  That wasn't what the
16   question was.  The question was gave him
17   permission to put 14:28 down on a time card.
18       Q    I like that question better, so
19   let's stick with it, to put 14:28 on his time
20   card.
21       A    I'm not sure I understand the
22   question.
23       Q    Yeah.  I like his question much
24   better than mine.  His is way better than
25   mine.

137

1        So if Mr. Ortiz gave Mr. Rodriques
2    permission to put 14:28 on his time card, would
3    that now not be time card fraud?
4        A    He had authorization from his PL.
5    No.
6        Q    If you could, turn back to
7    Exhibit 17.  It's really 16 and 17.  But for
8    Attorney Tuyn's consideration, we'll focus on
9    Exhibit 17.  Mr. De La Torre indicated that
10   during the investigation of Mr. Rodriques's
11   payroll records, multiple time discrepancies,
12   none of which he has been able to explain.  You
13   see that there?
14       A    Yes.
15       Q    Didn't Mr. Rodriques in fact explain
16   one of his -- at least one, because we don't
17   know the conversation as to the 8th, the
18   November 8th date.  But as for the November 6th
19   date, didn't he explain that that was some sort
20   of oversight?  I'm not even talking about going
21   into the election stuff.
22       A    He said it could have been an
23   oversight.
24       Q    So that is an explanation; correct?
25   I mean, Mr. De La Torre may not have believed

138

1    it, but it was an explanation; correct?
2        A    I'm not sure that I would consider
3    that an explanation.  It could have been an
4    oversight on his part.  I mean, that's what
5    he's stating, but I don't know that I would
6    consider that an explanation.
7        Q    But at some point, an actual
8    explanation was proffered, correct, or given,
9    correct, as far as him voting, him talking to
10   Ortiz?  Some explanation for the November 6
11   date was given at some later point; correct?
12       A    I recall that.  I don't remember
13   when that was.
14       Q    But you don't know when it was?
15       A    Right.
16       Q    But you know at some later point an
17   explanation was actually provided for that?
18       A    Yes.
19           MR. TUYN:  Are we at a point where
20   we can take a break?
21           MS. BROCK:  Yeah.  Now's fine.
22       (Proceedings in recess, 12:22 p.m to
23   12:37 p.m.)
24       (Whereupon a document was identified as
25   Plaintiff's Exhibit 26.)

Donovan Reporting, PC                                                                 770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

40  (Pages 139 to 142)

---

139

1      Q    Ms. Franz, you have been handed what
2   has been marked as Exhibit 26, and it is a
3   document that the first block on it is dated
4   January 28th of 2013.  And it says, "Received
5   appeal."  Do you see that there?
6      A    Yes.
7      Q    Have you ever seen this document
8   before today?
9      A    Yes.
10     Q    Did you see it before yesterday?
11     A    No.
12     Q    And you did not draft this document
13  then; correct?
14     A    No, I did not.
15     Q    If you could turn to the second
16  page, and approximately in the middle of the
17  page there's a small paragraph, a one-sentence
18  paragraph that says, "Jerrick also said that
19  Domingo told him not to worry about the
20  November 8th, 2012, date.  And he scratched off
21  the date and gave the slip to Jerrick to keep."
22  Do you see that?
23     A    Yes.
24     Q    Who provided this information to
25  Ms. Nabors?

---

140

1      A    I don't know.
2      Q    And I do know that there was an
3   e-mail that we talked about a little bit
4   earlier where you told Ms. Nabors on April 8th
5   of 2013 that Mr. De La Torre didn't remember
6   anything about scratching anything off.  But
7   you don't know who actually informed her in the
8   first place.
9          You don't have personal knowledge.
10  I think she tells us, but you don't have
11  personal knowledge of who told her that?
12     A    No.
13         MR. TUYN:  Well, the document itself
14  is talking about a conversation that EO had
15  with Jerrick Rodriques.
16         MS. BROCK:  I get it.  I just wanted
17  to know if she had any personal knowledge about
18  it.
19     Q    And then she puts in parentheses,
20  "follow up on this comment has been requested
21  from HR."  And that's referring to the e-mail
22  that she sent you asking you to talk to Carla
23  Bell and to Mr. De La Torre.  Am I correct in
24  that?
25     A    I didn't write that.  I would assume

---

141

1   so, but.
2      Q    Oh, okay.  And then she also says in
3   italics a little bit further down, "I received
4   an investigation summary from HR that explains
5   the difference between all of the employees and
6   why two employees were not terminated and the
7   action they were placed on.  The two who were
8   not terminated had different circumstances than
9   those who were terminated."  Do you see that
10  there?
11     A    Yes.
12     Q    Did you provide her with the
13  investigation summary?
14     A    I don't recall doing that, but I
15  very well could have.
16     Q    Was there someone else under your
17  supervision that Ms. Nabors would have been in
18  touch with during an appeal investigation?
19     A    No.
20     Q    So when she says HR, in essence
21  she's saying Ms. Franz.  Am I correct?
22     A    Yes.  I think that's a fair
23  assumption.
24     Q    So at least in her notes, she's
25  saying it was you that sent her the

---

142

1   investigation summary for Conover and
2   Culpepper; correct?
3      A    No.  It doesn't say who.
4      Q    Well, it just says why the two
5   employees were not terminated.  I don't know of
6   any other two.  Do you know of any other two
7   that were not terminated?
8      A    Are there two -- there's lots of
9   employees who were not terminated.
10     Q    Of the two employees that were not
11  terminated in regard -- oh, the paragraph above
12  says Chris Culpepper and Jason Conover.  So as
13  to those two individuals, did you send the
14  investigation summary from HR?  Did you send
15  her an -- well, do you recall sending her an
16  investigation summary?
17     A    I don't recall specifically doing
18  that.
19     Q    Do you recall informing her that the
20  two who were not terminated had different
21  circumstances?
22     A    I remember having that conversation,
23  yes.
24     Q    And what about their circumstances
25  were different from Mr. Rodriques?

---

Donovan Reporting, PC                                                          770.499.7499

Barbara A. Franz                    Rodrigues v Delta Air Lines, Inc.                    December 11, 2014

41 (Pages 143 to 146)

143

1     A    With Chris Culpepper and Jason
2   Conover, I think the two differentiating
3   factors were that Mr. Culpepper provided
4   Mr. Conover the authorization as well as the
5   fact that it was a one-time incident, if I
6   recall correctly.
7        Q    But you don't remember seeing any of
8   Mr. Conover or Mr. Culpepper's swipes or Kronos
9   punches, do you, County swipes or Kronos
10  punches?
11       A    No.
12       Q    So how do you know it was a one-time
13  incident with the two of them?
14       A    Based on the investigation that was
15  conducted by the leader.
16       Q    So not an investigation you looked
17  into or conducted; correct?
18       A    Correct.
19       Q    Based on what someone else told
20  you --
21       A    It was a one --
22       Q    -- this was a one-time thing?
23       A    Correct.
24       Q    Do you know whether they looked at
25  Mr. Culpepper's or Mr. Conover's punches and

144

1   swipes?
2        A    They did, yes.
3        Q    When I say "punches," I mean Kronos.
4   When I say "swipes," I mean County swipes.
5        A    Yes.
6        Q    How do you know that?
7        A    They told me that.
8        Q    Yeah.  But they didn't tell you that
9   they docked their pay, so you're saying that
10  you believe what they told you?
11       A    Absolutely.
12       Q    So they told you -- and which is the
13  "they"?  Who actually said they looked at them?
14       A    I don't recall specifically, but I
15  believe it was in the e-mail communication.
16       Q    I don't have any e-mails regarding
17  Conover and Culpepper, so.
18       A    Oh, okay.  I don't recall where that
19  took place, but I do remember asking that
20  question.
21       Q    Somebody, but you don't know who,
22  told you that they looked at Conover's and
23  Culpepper's punches and swipes?
24       A    Yes.
25       Q    And they would have had to have

145

1   requested those swipes from the County;
2   correct?
3        A    They wouldn't have been able to do
4   it.  It would have probably been the attendance
5   coordinator who would have done so, yes.
6        Q    And she can't do it either.  She has
7   to go to the person who has that authority to
8   be able to actually e-mail over to Wayne
9   County; correct?
10       A    Okay.  Yeah.
11       Q    So through the chain, they did
12  request some swipes, because I'm -- I'm still
13  working with Wayne County to get these swipes.
14  And so you're saying that you know somebody
15  told you, you don't know who at Delta, that
16  they looked at the swipes from Mr. Conover and
17  Mr. Culpepper during this period of time?
18       A    Yes.
19       Q    And after comparing those swipes to
20  the Kronos time clocks, they said that there
21  was no other incident other than this one
22  incident that we're talking about in November
23  2012?
24       A    Correct.
25       Q    So you gave me two reasons that the

146

1   situation was different.  One was because
2   Culpepper actually gave Conover permission;
3   correct?
4        A    Yes.
5        Q    If Culpepper gave Conover
6   permission, why did they dock his pay,
7   Conover's pay?
8        A    I can't speak to that.  I didn't
9   make that decision.
10       Q    And as far as the situation with
11  Mr. Culpepper and Mr. Culpepper not working for
12  part of his shift, what happened with
13  Mr. Culpepper, do you still consider that to be
14  different?
15       I know you didn't know at the time.
16  But do you still consider that as being
17  different from what happened with
18  Mr. Rodrigues?
19       A    Yes.
20       Q    And how so?
21       A    It was one day.
22       Q    So it was okay that he punched in,
23  did not work, was docked for that pay because
24  he only did it once?
25       A    I didn't say it was okay.  I said it

Donovan Reporting, PC                                                      770.499.7499

Barbara A. Franz                     Rodrigues v Delta Air Lines, Inc.                     December 11, 2014

42 (Pages 147 to 150)

---

147

1   was different.
2       Q    So the defining factor for
3   Mr. Rodrigues is the number of incidents. Am I
4   correct?
5       A    In addition to -- yeah, I mean, that
6   was one of the factors, yes.
7       Q    What were the other factors?
8       A    I don't have the file to look at it.
9   Was there --
10      Q    I do. Would you like to see it? I
11  have it, unless you can answer me.
12      A    Okay. Ask me the question again.
13  Sorry.
14      Q    Sure. You said that it was
15  different because it was one instance for
16  Mr. Conover and one instance for Mr. Culpepper,
17  that that was one of the things that made it
18  different from what Mr. Rodrigues did.
19          I asked, so the difference was the
20  number of instances? And you said, that among
21  other things. I said, what else was different?
22      A    I would say that is what was
23  different.
24          MS. BROCK: Counsel, in addition to
25  not receiving any investigation summary, we

---

148

1   also didn't receive any e-mails where these
2   documents were sent from Detroit to Atlanta or
3   any communications back and forth in regard to
4   those documents.
5          MR. TUYN: I don't know what you're
6   referring to.
7          MS. BROCK: I'm specifically
8   referring to an investigation summary from HR
9   regarding Chris Culpepper and Jason Conover and
10  the fact that it was sent to Ms. Nabors by HR,
11  which is Ms. Franz.
12          MR. TUYN: It doesn't say an
13  investigation summary regarding Culpepper and
14  Conover. It says an investigation summary
15  which explained the difference. So as far as I
16  know, it may have been referring to the same
17  information that this witness provided in
18  investigating the hot line complaints where she
19  differentiated between the two.
20          That may have been the summary she
21  sent. I don't know. It doesn't --
22          MS. BROCK: Well, we can speculate
23  all day long. If it was produced, we would
24  know.
25          MR. TUYN: Well, you say you didn't

---

149

1   receive it. I know you received that.
2          MS. BROCK: Yeah, but it didn't go
3   to Ms. Nabors. I don't have a communication
4   where that document was sent to Ms. Nabors.
5   And Ms. Nabors says it was sent to her. And so
6   I don't have that. And if I did, I would have
7   read it and I would have noted this is what it
8   is and I wouldn't even be asking these
9   questions.
10          MR. TUYN: And, you know, if it was
11  sent to her, I don't know how it was sent to
12  her.
13          MS. BROCK: Exactly. All I'm
14  asking --
15          MR. TUYN: It could have just been
16  faxed to her. There might not be a cover
17  e-mail.
18          MS. BROCK: All I'm asking is that
19  you go back and look, Counsel. If there are
20  faxing documents, then there should be a fax
21  confirmation form. There should be something
22  that can support a statement in an
23  investigation, this is an investigation that
24  was occurring, that she received this
25  information.

---

150

1          And I don't have anything showing
2   that she received anything. I don't know what
3   she received. I only know it was from
4   Ms. Franz because she's saying that she's HR.
5          MR. TUYN: All right. Well, if we
6   need to supplement our discovery request, I'll
7   take a look at it.
8          MS. BROCK: I'd appreciated it.
9          MR. TUYN: But we don't have to
10  argue it today.
11          MS. BROCK: I'd appreciated it.
12  Thank you.
13          MR. TUYN: I mean, as far as I know,
14  investigation summary may have been a summary
15  phone conversation.
16          MS. BROCK: It could be.
17          MR. TUYN: Where there wouldn't be
18  any documentation.
19          MS. BROCK: It could be, except that
20  she said she received it. And I've never heard
21  anyone talk about receiving conversations. So
22  all I want is the information, Counsel, really.
23      Q    If you would look at what is Bates
24  stamped as page 61 at the bottom, it starts at
25  the bottom, so don't get comfortable on this

---

Donovan Reporting, PC                                               770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

---

151

1    page because we're really going to flip.
2        A    Okay.
3        Q    But I just wanted to take you where
4    we started.  April 15th, 2013.  It says, "Hey,
5    Barb.  Can you tell me if there has been an
6    incident with Lance Dowdell this year that
7    would seemingly be WPV?"  What does WPV stand
8    for?
9        A    Workplace violence.
10       Q    Was there an incident with a Lance
11   Dowdell?
12       A    I don't recall that name.
13       Q    Did you ever respond to Ms. Nabors?
14   I don't see a response from you in her chain of
15   stuff that was occurring.
16       A    I don't recall that.
17       Q    You don't recall whether you
18   responded to her?
19       A    Yeah.  No, I don't.  That name is
20   familiar, but I don't recall the specifics.
21           MS. BROCK:  Again, Counsel, and I'm
22   not being difficult, but if when you look for
23   the Conover-Culpepper information, if you could
24   check the electronic data at Delta to see about
25   a response to Ms. Nabors' inquiry here as to

---

152

1    Mr. Dowdell in that Mr. Rodriques included him
2    in his appeal.
3        Q    Were you able to confirm or deny
4    that there was a comment from those at the
5    Detroit location that they were keeping the
6    Lance Dowdell situation "away from ATL because
7    they don't want the top dogs asking what the
8    hell you are doing"?
9        A    I don't recall that.
10       Q    Were you able to confirm it or not?
11       A    I don't remember this e-mail at all.
12       Q    What race was Lance Dowdell?
13       A    I don't know.
14       Q    Now, we do know based on further
15   down, April 8th, 2013, that effective March 4th
16   of 2013 Lance Dowdell no longer works at Delta.
17   Do we see that?
18       A    Yes.
19       Q    And you, sitting here today, can't
20   recall why Mr. Dowdell is no longer employed?
21       A    I cannot.
22       (Whereupon a document was identified as
23       Plaintiff's Exhibit 27.)
24       Q    Exhibit 27.  Ms. Franz, Exhibit 27
25   is an e-mail from you to Cassandra LeeAustin

---

153

1    and Tyesha Gray.  And you indicate that you
2    have two compliance call, anonymous, on this
3    issue and that you're collecting data.  Do you
4    see that?
5        A    Yes.
6        Q    And that was in response -- let me
7    back up because these e-mails start from the
8    bottom up.  This was in response to a January
9    9th inquiry by Ms. LeeAustin to Ms. Gray and
10   you being cc'd saying that she had received a
11   call from Mr. Rodriques.  And he mentioned the
12   two non-minority employees and what had
13   happened with them; correct?
14       A    Yes.
15       Q    So Mr. Rodriques had made the
16   company aware himself directly to
17   Ms. LeeAustin that he felt that the two white
18   employees were treated differently.  He wants
19   to understand why he's being treated
20   differently than his non-minority peers.
21           So he made the company aware that he
22   felt that the two white employees were being
23   treated differently; correct?
24       A    Yes.
25       Q    You then provide somewhat of a

---

154

1    statement in regard to what happened with
2    Mr. Culpepper and Mr. Conover in that paragraph
3    that starts, "These other two employees he
4    mentions had a completely different issue."  Do
5    you see that?
6        A    Yes.
7        Q    And when you gave that explanation,
8    you only make mention of the Culpepper removing
9    Conover from the RTS line; correct?
10       A    Yes.
11       Q    And that's because you didn't know
12   about him, Culpepper, being punched in and away
13   from his work station or not working?
14       A    Correct.
15       Q    Had you known, you certainly would
16   have told them; correct?
17       A    Told --
18       Q    Yeah.
19       A    -- Cassandra and Tyesha?
20       Q    Yeah.
21       A    Oh, absolutely.
22       Q    Yeah.  Who is Ms. Cassandra
23   LeeAustin?
24       A    She is or was a general manager in
25   HR.

---

Donovan Reporting, PC                                    770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

44 (Pages 155 to 158)

155

1    Q    Would she have worked here in
2  Atlanta --
3    A    Yes.
4    Q    -- at that time?  Is she still an
5  employee of Delta?
6    A    Yes.
7    Q    And where is she now?
8    A    Still here in Atlanta.
9    Q    But she's not a general manager
10 anymore?
11   A    She is, just in a different area.
12   Q    To the best of your knowledge, did
13 anyone from corporate -- and when I say
14 "anyone," I mean Ms. Nabors, Ms. Gray,
15 Ms. LeeAustin -- conduct an independent
16 investigation into Mr. Rodriques's claims of
17 unfair treatment?
18   A    Not to my knowledge.
19   Q    So the information that those
20 individuals had was the information you
21 provided them to the best of your knowledge?
22   A    Correct.
23   Q    And you didn't have all of the
24 information yourself; correct?
25   A    What do you mean?

157

1    A    Yes.
2    Q    Did you conduct the ethics hot line
3  investigation into complaints of race
4  discrimination that involved Jerrick Rodriques?
5    A    No.
6    Q    Who conducted the investigation?
7    A    Related to this complaint?
8    Q    Yes.
9    A    Well, it has a few components, so it
10 was based upon the previous investigations that
11 were conducted.
12   Q    When you say "the previous
13 investigations," are you talking about
14 Mr. Kotula's investigation?
15   A    Yes.
16   Q    Mr. De La Torre's investigation?
17   A    Yes.
18   Q    You didn't conduct a separate
19 investigation, did you?
20   A    No.
21   Q    So it would have been those two
22 investigations.  The information you provided
23 in response to the appeal request --
24   A    Yes.
25   Q    -- are you considering that an

156

1    Q    Yeah.  You didn't know about the
2  docking of the pay.  You didn't know about --
3  of both of them being docked.  You didn't know
4  about Culpepper being away from his work
5  station and being docked because of it.  You
6  didn't know the whole story yourself, did you?
7    A    No.
8    Q    You told Ms. Gray to feel free to
9  call you if she wanted to discuss it further.
10 Do you recall whether she contacted you about
11 that?
12   A    I don't recall.
13     (Whereupon a document was identified as
14 Plaintiff's Exhibit 28.)
15   Q    These should go relatively quick
16 because they look pretty much the same, so that
17 should be a word of encouragement for you.
18 This is Exhibit 28, and it is an Ethics and
19 Compliance Reporting form.  Do you see that?
20   A    Yes.
21   Q    And it is for a report number ending
22 in 311.  Do you also see that?
23   A    Yes.
24   Q    Have you seen this document before
25 yesterday?

158

1  investigation?
2    A    No.  I said I didn't conduct the
3  investigation, so no.
4    Q    So when you say that it was based on
5  the investigation, it was based on information
6  Mr. Kotula and Mr. De La Torre provided?
7    A    Yes.
8    Q    And so as far as you know, did
9  anyone from corporate call and speak to anyone
10 at Detroit about this situation, like witnesses
11 to talk to people, to interview people, as far
12 as you know?
13   A    At the point that this was received?
14   Q    Well, in response to it.  Because
15 you said there's a few components to the
16 investigation of it.
17   A    No.  I said there were a few
18 components that we got information from.  There
19 were a few investigations that took place.
20   Q    Maybe it will help me if you tell me
21 what investigations took place, because you
22 said there were a few investigations that took
23 place.
24   A    So this is referring to Chris
25 Culpepper and claiming that his was time clock

Donovan Reporting, PC                                                770.499.7499

Barbara A. Franz                  Rodriques v Delta Air Lines, Inc.              December 11, 2014

45 (Pages 159 to 162)

159

1    fraud, so that would have been -- I believe
2    Mr. Sarsour was involved in that investigation.
3    And then -- oh, sorry. Go ahead.
4        Q    No, no, no.
5            MR. TUYN: Well, no. I don't think
6    you're done with your answer.
7        Q    No, no. I do want you to answer.
8        A    Okay. So then it says Jerrick
9    Rodriques was suspended because he punched the
10   wrong number of hours and hasn't come back to
11   work. So that would have been De La Torre.
12           And then it says Fadi Beydoun was
13   suspended for punching himself in and then
14   going through the employee lot. I don't recall
15   who conducted that investigation.
16           And then it claims that I was
17   contacted, but I was never contacted by
18   Mr. Rodriques. So that's why I mean there are
19   several parts to this.
20       Q    So Mr. Rodriques never contacted you
21   to find out when he would be coming back to
22   work?
23       A    Not that I recall, no.
24       Q    He never contacted you to ask him
25   why he had been suspended for such a long time?

160

1        A    Huh-uh (negative), not that I
2    recall.
3        Q    Would anyone other than you have
4    responded to this, responded to corporate
5    regarding this 311 report?
6        A    No.
7        Q    And I think you said it already.
8    But as far as you know, no one from corporate
9    conducted an investigation outside of you into
10   311 at metro?
11       A    Not that I'm aware of.
12       Q    Did anyone from corporate ever send
13   you any communication saying, hey, we talked to
14   people down there, and did you know this?
15       A    No.
16       Q    Now, you said you had seen this
17   before yesterday. Did you receive this at the
18   time that you were asked to look into it?
19       A    Yes.
20       Q    Who asked you to look into it?
21       A    Well, it comes in e-mail, and it's a
22   given to look into it. So I don't think anyone
23   specifically told me.
24       Q    The e-mail that it comes in, tell me
25   about that e-mail. I may actually have that

161

1    one. Tell me what it looks like. Is it an
2    automatic from the third party? Is it -- tell
3    me what that looks like.
4        A    The original e-mail would be
5    automated, and then I would receive it from
6    Lisa Ali. Or would have received it from Lisa
7    Ali, I should say.
8        Q    So Ms. Ali in her former position as
9    general manager?
10       A    Huh-uh (negative).
11       Q    Am I wrong about that?
12       A    Coordinator.
13       Q    The general manager was the other
14   person we just got finished talking about,
15   Ms. LeeAustin?
16       A    Yes.
17       Q    And so Ms. Ali, she was in the EO
18   department?
19       A    No. She's in ACS.
20       Q    And she's who would have forwarded
21   you the actual report that came in?
22       A    Yes.
23       Q    And in her forwarding you the
24   report, and again, I think I may have this
25   e-mail, she would have said to you, look into

162

1    this and let us know what's going on?
2        A    I don't know that she would have
3    said anything. It might have just been a
4    forward, or it might have said, for your
5    investigation. I don't know. Sometimes it
6    says different things. But she would have just
7    forwarded it to me, and I'd know what to do
8    with it.
9        Q    So when you received this report
10   311, it indicates that Mr. Domingo is the
11   person that is being accused, correct, because
12   it says who. So it indicates that Mr. Domingo
13   is who was being accused; correct?
14       A    I don't see that.
15       Q    Under Who, it says, "Caller, name
16   declined, reported Unknown Domingo"?
17       A    Oh, yes. I see that. Thank you.
18       Q    Oh, you're welcome. I don't mind.
19   And you understood that Domingo to be Domingo
20   De La Torre; correct?
21       A    Yes.
22       Q    When you received this report, did
23   you look into the reason why Mr. Rodriques's
24   suspension was for such a long period of time?
25       A    I did not look into it, no. I was

Donovan Reporting, PC                                        770.499.7499

Barbara A. Franz       Rodriques v Delta Air Lines, Inc.       December 11, 2014

46  (Pages 163 to 166)

163

1  aware.
2  Q    Why was it such a long period of
3  time?
4  A    Part of the reason was the review
5  process.  The other part was, unfortunately,
6  his suspension was over the holidays, and we
7  have a practice of not communicating
8  terminations during that period.
9  Q    What is that period?  When you say
10  "that period," from when to when?
11  A    It's a little different every year,
12  so I don't know when it was at this point.  But
13  typically it's the week before Christmas
14  through New Year's.
15  Q    And so you would have been aware
16  based on the statements of the caller, and I
17  think this one may have actually been
18  Mr. Rodriques, I don't have the number with me,
19  but I think this one was him, that based on the
20  anonymous call, that obvious discriminatory
21  practices -- the person felt that there were
22  obvious discriminatory practices happening in
23  Detroit.
24  So you knew that this was a
25  discrimination complaint; correct?

164

1  A    Yes.
2  (Whereupon a document was identified as
3  Plaintiff's Exhibit 29.)
4  Q    Exhibit 29.  Now, Exhibit 29 is
5  entitled ACS/CGO Compliance Call Report.  Do
6  you see that?
7  A    Yes.
8  Q    Have you seen this document before?
9  A    Yes.
10  Q    Now, I need to ask you about this
11  document.  When they were produced to me,
12  you'll see that Exhibit 28 is right in front of
13  what was marked as Exhibit 29.  Do these two
14  documents go together?  Like when you see them,
15  when you have them, when you receive
16  Exhibit 28, would Exhibit 29 be the response to
17  it?  Do they go together?
18  A    Exhibit 29 would be the response to
19  the compliance calls, yes.
20  Q    Do you do one of these for each
21  call?  And when I say "these," I mean
22  Exhibit 29.
23  A    I do a template to respond to every
24  compliance call, yes.
25  Q    So that makes sense to me, because

165

1  when they were produced to me, and that will
2  help us get through the pile, each report had
3  one of these compliance call reports behind
4  it.  So you would have just created a template
5  and then used it in response to each call?
6  A    Yes.
7  Q    And so any other communication where
8  you discuss a template, Exhibit 29 and the
9  other exhibits which we'll mark shortly are
10  what you would have been referring to?
11  A    Referring to a template, I would
12  call this a template, yes.
13  Q    Because I'm specifically asking --
14  let me show you why I'm asking.
15  (Whereupon a document was identified as
16  Plaintiff's Exhibit 30.)
17  Q    I've handed you Exhibit 30, and it
18  is an e-mail from Sheandra Clark to Deborah
19  Kircher cc'ing Gail Perdue.  Do you see that?
20  A    Yes.
21  Q    Now, if you look down -- and it's
22  dated February 11th of 2013.  If you look down
23  to the bottom, you're going to see where it
24  says, February 4th of 2013.  It's an e-mail
25  from you to Ms. Kircher.  And you say,

166

1  "Attached is the template completed for the six
2  compliance calls."
3  So when you say "template" in this
4  e-mail, is Exhibit 29 what you would have been
5  talking about?
6  A    Yes.
7  Q    And so Exhibit 29 you created as a
8  template for responding to the compliance calls
9  that had come in that involved Mr. Rodriques?
10  A    Yes.
11  Q    Who is Ms. Sheandra Clark?
12  A    She's one of our attorneys.
13  Q    And is she the attorney, if you
14  know, who is responsible for the ethics and
15  compliance hot line reporting?
16  A    Yes.  That's my understanding.
17  Q    And who is Deborah Kircher?
18  A    At the time, Deb Kircher would have
19  been a peer of mine.
20  Q    And when you say "a peer," tell me
21  what position did she hold.
22  A    She would have also been an HR
23  generalist/manager.
24  Q    In what location?
25  A    She was physically located in

Donovan Reporting, PC       770.499.7499

**167**

1  Cincinnati.
2     Q    And she would have held that
3  position as of February 2013?
4     A    Yes.
5     Q    So why would you have been sending
6  the template to Ms. Kircher?
7     A    Deb had the responsibility for our
8  HR team to track and ensure the compliance
9  calls were complete in a timely fashion.  So
10 they filtered to her and then to Sheandra for
11 review and closure.
12    Q    So it was Ms. Kircher's
13 responsibility to make sure that, at least for
14 your team -- and when you say your team, is it
15 separated demographically or geographically?
16    A    It's separated by division.
17    Q    And at least for the division that
18 included Detroit, it would also obviously
19 include Cincinnati; correct?
20    A    Yes.
21    Q    And for that division, Ms. Kircher
22 had the responsibility of making sure that the
23 compliance calls were responded to timely?
24    A    Yes.
25    Q    What is considered a timely response

**168**

1  to those calls?
2     A    I believe at the time the guideline
3  was 45 days.
4     Q    Within 45 days of the call coming
5  in?
6     A    Correct.
7     Q    And then you said, now, did she
8  have -- did Ms. Kircher have any other
9  responsibility other than making sure it was on
10 time?
11    A    No, not that I recall.
12    Q    I guess what I'm asking even more
13 specifically is, did she review your work to
14 make sure that the investigation was complete
15 or she -- did she have any of those kind of
16 responsibilities?
17    A    She would read it and make sure she
18 understood it, but I don't know that she was
19 really auditing the investigation.  Right?
20 She -- that wasn't her role.
21    Q    And then you said it filtered
22 through her and then went to Ms. Clark?
23    A    Correct.
24    Q    Was there anybody between her and
25 Ms. Clark who it went to?

**169**

1     A    No.
2     Q    Do you know what would happen after
3  it would get to Ms. Clark, the response?  Do
4  you know what happens after it gets to
5  Ms. Clark?
6     A    What do you mean, what happens?
7     Q    Yeah.  Does she meet with a
8  committee?  Does she just review it and make a
9  decision?  Do you know any of that?
10    A    I can't speak to that.
11    Q    Good.  It's okay.  And then she
12 indicates in Exhibit 30, Ms. Kircher, that she
13 had conferenced with you and Tyesha in January
14 about those calls.  Can you tell me about this
15 conference?
16    A    I can't tell you about the details.
17 I remember it occurring.  And it typically
18 would occur based upon the number of calls.
19    Q    Explain that a little bit more for
20 me.  So is it because it was so many calls?
21    A    I think in this particular case, you
22 know, it was six calls about the same topic.  I
23 believe Sheandra requested the call, if I
24 remember correctly, to say where are we at,
25 what's going on, and Tyesha would have been

**170**

1  involved because she was my leader.
2     Q    Was it unusual, as far as you know,
3  to receive six calls about the same topic?
4     A    Unusual?  It's happened before.
5     Q    How many times?  More than five?
6     A    For me?
7     Q    Yeah.  More than five?
8     A    No, probably not.
9     Q    And you said that you remember the
10 conference happening, but you can't remember
11 what the substance of the conference was?
12    A    Right.  I remember talking about the
13 calls.  But the detailed conversation, I don't
14 recall.
15    Q    And then Ms. Kircher also requested
16 from Ms. Clark permission to close the file.
17 Was that the standard process?  You would send
18 it to her, and she would request the close from
19 Ms. Kircher?
20    A    From Ms. Clark?
21    Q    I'm sorry.
22    A    Yes.
23    Q    Ms. Clark.
24    A    Yes.
25    Q    That's the standard process?

Electronically signed by Joel Moyer (501-161-376-4513)                    0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

48  (Pages 171 to 174)

171

1    A   Yes.
2    Q   So you would not be the one who
3  actually requested the close of the file?
4    A   Well, no.  I would request it, but
5  it would filter through Deb to get to Sheandra.
6    Q   So at some point, you said to
7  Deborah, and here's what we got and can we
8  close it, and so she would go from there and go
9  to Ms. Clark and say here's what we've got and
10  can we close it?
11    A   Yes.
12    Q   Did anyone come back and ask you
13  questions as to why, according to Exhibit 29,
14  you did not interview anyone about the call?
15    A   No.
16    Q   Did you ever ask Mr. De La Torre if
17  he discriminated against Mr. Rodriques in the
18  treatment?
19    A   Did I ask him that specific
20  question?  No.
21    Q   Did you ask Mr. Kotula whether he
22  discriminated against Mr. Rodriques in handling
23  this matter?
24    A   No.
25    Q   Did you ask Mr. Sarsour whether he

172

1  discriminated against Mr. Rodriques in handling
2  this matter?
3    A   No.
4    Q   Did you ask Mr. De La Torre whether
5  Mr. Conover or Mr. Culpepper had been treated
6  differently because of their race?
7    A   No.
8    Q   Did you ask Mr. Sarsour whether
9  Mr. Conover or Mr. Culpepper were treated
10  differently because of their races?
11    A   No.
12    Q   Why not?  Why didn't you ask any of
13  those questions?
14    A   I didn't ask them because the
15  circumstances of the situation were different
16  enough.
17    Q   As you knew them on that day?
18    A   As I knew them on that day, that
19  race was not a factor.
20    Q   Do you think, had you asked about
21  what happened with Mr. Culpepper, somebody
22  would have told you that we docked his pay?
23    A   I don't know.
24    Q   They wouldn't lie to you, out and
25  out lie to you, would they?

173

1    A   No.
2    MS. BROCK:  Can you read back her
3  response to me as to why she did not ask them
4  any of those questions?
5    (Whereupon off-the-record discussions
6    ensued.)
7    (Whereupon the court reporter read back
8    the referred-to portion as follows:)
9    Q   Why not?  Why didn't you ask any of
10  those questions?
11    A   I didn't ask them because the
12  circumstances of the situation were different
13  enough.
14    (Whereupon the reading back was
15    concluded.)
16    Q   And those were the circumstances as
17  you knew it on that day; correct?
18    A   Yes.
19    Q   Sitting here today, do you know why
20  Mr. Culpepper was not terminated in response to
21  the November 2012 incidents, with an S?
22    A   When you say the November 12th,
23  you're referring --
24    Q   November 2012.  I'm sorry.
25    A   November 2012, you're referring to

174

1  him providing authorization to Mr. Conover?
2    Q   And to his being missing for part of
3  his shift on that same day.
4    A   That was -- well, we've established
5  I wasn't aware of that.
6    Q   I understand.
7    A   So based upon what I knew at the
8  time, he wasn't terminated because the offense
9  and what he violated was not a terminable
10  offense.
11    Q   Right.  But my question was:
12  Sitting here today, do you know why he wasn't
13  terminated in response to those incidents?
14    A   Well, the answer would be the same.
15    Q   I just need you to say it.
16    A   Yeah.
17    Q   It's okay.
18    A   Okay.  Yeah, the answer would be the
19  same in that, based upon the findings of the
20  investigation, it was not terminable.
21    Q   On your template, you indicate where
22  it says attach all statements, you say all
23  attachments were previously sent.  Are you
24  referring to the RFT file?
25    A   I can't speak to what I was

Donovan Reporting, PC                                                  770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

49 (Pages 175 to 178)

175

1    referring to.  Attach all statements, I don't
2    recall what, when I say previously sent, what
3    that would have meant.
4        Q     But you didn't obtain any documents
5    outside of the RFT file; correct?
6        A     Correct.
7        Q     And there's where you requested
8    closure; correct?
9        A     Yes.
10   (Whereupon a document was identified as
11   Plaintiff's Exhibit 31.)
12       Q     Exhibit 31 is Ethics and Compliance
13   Reporting number ending in 660.  Do you see
14   that?
15       A     Yes.
16       Q     This call came in on January 3rd of
17   2013.  And in this call, it also indicates that
18   Mr. Domingo is the reported person; correct?
19       A     Yes.
20       Q     And this complaint also references
21   the Conover-Culpepper incident; correct?
22       A     Yes.
23       Q     And it mentions Mr. Rodriques and
24   Mr. -- I believe his last name is Beydoun.
25       A     Yes.

176

1        Q     Correct?  Did you open up any sort
2    of separate investigation for each of these
3    calls that came through?
4        A     No.
5        Q     And you do recall receiving this
6    particular reporting form; correct?
7        A     Yes.
8        Q     And you were asked to conduct the
9    investigation as to this form; correct?
10       A     No.  I would have been asked to look
11   into it, not specifically to conduct an
12   investigation.
13       Q     Very good distinction.
14       A     But yes.
15       Q     So what you did was not an
16   investigation in fact.  You just looked into
17   the complaints that were here?
18       A     Correct.
19       Q     And to the best of your knowledge,
20   did anyone else conduct an investigation?
21       A     Not to my knowledge, no.
22       MR. TUYN:  Other than the
23   investigations that had already been conducted.
24       MS. BROCK:  Counsel --
25       MR. TUYN:  The determinations for

177

1    the discipline.
2        MS. BROCK:  -- we're specifically
3    talking about in response to this complaint.
4    This is a race discrimination complaint that
5    was made to the hot line.  And there were two
6    now we're talking about.  We're talking about
7    report ending in 311 and report ending in 660,
8    was there an investigation into this complaint.
9        She said she looked into it.  She
10   said she didn't investigate it.  And to the
11   best of her knowledge, nor about anyone else.
12       (Whereupon a document was identified as
13   Plaintiff's Exhibit 32.)
14       Q     You've been handed Exhibit 22, and
15   it is --
16       A     I'm sorry.  It says 32.
17       Q     Oh.  32.  I am so sorry, Ms. Franz.
18   I am sorry.  Exhibit 32.  And it is your
19   template for responding to the hot line calls;
20   correct?
21       A     Yes.
22       Q     And you would have filed this very
23   same template in response to call ending in
24   660; correct?
25       A     Yes.

178

1        (Whereupon a document was identified as
2    Plaintiff's Exhibit 33.)
3        Q     Exhibit 33 is hot line report ending
4    in the numbers 716.  Do you see that?
5        A     Yes.
6        Q     And this was a complaint made on
7    January 8th of 2013 at 6:08 p.m.  Do you see
8    that?
9        A     Yes.
10       Q     And this particular complaint
11   doesn't reference Mr. De La Torre, but it does
12   reference Mr. Rodriques and Mr. Fadi Beydoun;
13   correct?
14       A     Yes.
15       Q     And it also indicates that the
16   Caucasian employees were treated differently?
17       A     Yes.
18       Q     And it also indicates that the
19   caller feels that there is an issue of
20   discrimination involved here?
21       A     Yes.
22       Q     And you did receive report number
23   716 so that you could look into it; correct?
24       A     Yes.
25       Q     And you did in fact look into it;

Donovan Reporting, PC                                                        770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

50 (Pages 179 to 182)

179

1    correct?
2        A    Yes.
3        Q    Now, I didn't hand you your template
4    in response to report number 716, but is it
5    true that you would have provided the same
6    template that we've been talking about here
7    today in response to complaint number 716?
8        A    Yes.
9        (Whereupon a document was identified as
10       Plaintiff's Exhibit 34.)
11       Q    Exhibit 34, you've been handed, is
12   compliance report number ending in 159,
13   reported on January 9th of 2013 at 4:40 p.m.
14   Do you see that?
15       A    Yes.
16       Q    And did you receive complaint number
17   159 to conduct so that you can look into it?
18       A    Yes.
19       Q    And did you in fact look into it?
20       A    Yes.
21       Q    And you were aware that this was
22   another race discrimination complaint; correct?
23       A    Yes.
24       (Whereupon a document was identified as
25       Plaintiff's Exhibit 35.)

180

1        Q    Exhibit 35 is another copy of your
2    template. Am I correct that you would have
3    provided this template in response to complaint
4    number 159?
5        A    Yes.
6        Q    And when I say "template," all of
7    the information in your templates were the
8    same; correct?
9        A    Yes.
10       Q    And you obtained all of that
11   information in the same way; correct?
12       A    Yes.
13       Q    So I guess what I'm asking is that
14   you didn't do something for number 311 that you
15   didn't do for number 159 or vice versa?
16       A    No.
17       (Whereupon a document was identified as
18       Plaintiff's Exhibit 36.)
19       Q    You've been handed Exhibit 36.
20   Exhibit 36 is an Ethics and Compliance
21   Reporting ending in the numbers 421, and it was
22   reported on January 9th of 2013 at 9:47 p.m.
23   Do you see that?
24       A    Yes.
25       Q    Now, did you receive this Ethics and

181

1    Compliance Reporting document ending in 421 to
2    look into it?
3        A    Yes.
4        Q    And did you in fact look into it?
5        A    Yes.
6        Q    And you were aware that this was yet
7    another complaint of race discrimination?
8        A    Yes.
9        (Whereupon a document was identified as
10       Plaintiff's Exhibit 37.)
11       Q    Exhibit 37 you've been handed is yet
12   another copy of your template. And please
13   understand, I keep giving them to you because
14   when they were produced to me they were
15   produced behind each of your reports or each of
16   the compliance hot line reports. And so I just
17   have to confirm that this was in response to
18   that report. Okay?
19       So the template that you have is
20   Exhibit 37. It would be the same template that
21   we've been speaking of here today; correct?
22       A    Yes.
23       Q    And this template would have been
24   filed in response to the complaint ending in
25   421; correct?

182

1        A    Yes.
2        (Whereupon a document was identified as
3        Plaintiff's Exhibit 38.)
4        Q    Ms. Franz, Exhibit 38 is an Ethics
5    and Compliance Reporting dated January 31st of
6    2013. Report was made at 2:29 p.m. Do you see
7    that?
8        A    Yes.
9        Q    The report number ends in the
10   numbers 995. Am I correct?
11       A    Yes.
12       Q    And did you receive this particular
13   report so that you could look into it; correct?
14       A    Yes.
15       Q    And did you in fact look into it?
16       A    Yes.
17       Q    And you were aware that this was yet
18   another complaint of race discrimination;
19   correct?
20       A    Yes.
21       (Whereupon a document was identified as
22       Plaintiff's Exhibit 39.)
23       Q    Ms. Franz, Exhibit 39 is your
24   template. Would you have filed the same
25   template in response to your compliance report

Donovan Reporting, PC                                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

51 (Pages 183 to 186)

183

1   ending in 995?
2       A    Yes.
3       Q    And again for all of these
4   templates, you didn't do anything different for
5   this template as you did for any of the other
6   responded templates; correct?
7       A    Correct.
8           MS. BROCK:  I have no other
9   questions.
10          MR. TUYN:  I have just a couple.
11  EXAMINATION
12  BY MR. TUYN:
13      Q    Ms. Franz, with respect to your
14  involvement in reviewing the request for
15  termination that Mr. De La Torre gave you for
16  Jerrick Rodriques and the six hot line
17  complaints that mentioned Mr. Rodriques in any
18  way, did you become aware of any evidence that
19  Mr. Rodriques was being discriminated against
20  based on his race?
21      A    No.
22      Q    Did you become aware of any evidence
23  that he was being retaliated against based on
24  either his race or his engagement in any
25  protected activity including raising claims of

184

1   race discrimination in the hot line complaints?
2       A    No.
3       Q    Did you discriminate or retaliate
4   against Mr. Rodriques based on his race or his
5   engagement in any protected activity including
6   the hot line complaints?
7       A    No.
8       Q    Who did you say your boss was at the
9   time?
10      A    Tyesha Gray.
11      Q    And do you know what her race is?
12      A    She is African-American.
13      Q    And you indicated that Sheandra
14  Clark was the Delta in-house attorney that was
15  overseeing the ethics and compliance hot line?
16      A    That's correct.
17      Q    Do you know her race?
18      A    She is African-American.
19          MR. TUYN:  That's all I have.
20          MS. BROCK:  I just have a few
21  follow-up.
22  RE-EXAMINATION
23  BY MS. BROCK:
24      Q    Ms. Franz, in your looking into the
25  six hot line calls, did you ask anyone any

185

1   specific questions about the hot line
2   complaints?
3       A    At the time the hot line complaints
4   came in, no.  I already had the information
5   from the previous.
6       Q    From the previous investigations --
7       A    Correct.
8       Q    -- done by the other people?
9       A    Correct.
10      Q    Were those previous investigations
11  into race discrimination?
12      A    No.
13      Q    So in your looking into the six
14  hot line calls for race discrimination, did you
15  ask any specific questions about those calls?
16      A    No.
17      Q    And as far as Ms. Gray, did
18  Ms. Gray, I understand she's African-American,
19  did she investigate anything dealing with
20  Mr. Rodriques to the best of your knowledge?
21      A    I don't know.  There was the one
22  phone call, but I don't know if she
23  specifically spoke to him.  That would have
24  been Ms. Austin.  She's also African-American.
25  So I don't -- I don't know what those

186

1   conversations were, if any.
2       Q    So let me ask it this way.  Did she
3   contact -- did Ms. Gray contact anyone, to your
4   knowledge, at the Detroit location to inquire
5   into Mr. Rodriques's situation --
6       A    Not --
7       Q    -- other than you?
8       A    Not to my knowledge, no.
9       Q    Other than you?  I mean, I'm sure
10  she was e-mailing back and forth with you;
11  correct?
12      A    No.  I mean, we wouldn't have
13  exchanged e-mails, I don't believe.
14      Q    Oh.  So she --
15      A    Other than the one that had the
16  phone call in it from Ms. Austin, but.
17      Q    So any information Ms. Gray had
18  would have only been the information you
19  provided; correct?
20      A    To my knowledge.
21      Q    And the same thing with Ms. Austin.
22  Did Ms. Austin conduct a separate investigation
23  into any of Mr. Rodriques's allegations?
24      A    Not to my knowledge.
25      Q    I understand that she's

Donovan Reporting, PC                                                         770.499.7499

Barbara A. Franz                Rodriques v Delta Air Lines, Inc.                December 11, 2014

52 (Pages 187 to 190)

---

**187**

1    African-American.  So any information that she
2    would have had would have been, to the best of
3    your knowledge, the information you gave her;
4    correct?
5        A    Or the information that she received
6    from Mr. Rodriques in that call.
7        Q    And outside of that, she had no
8    additional information, to the best of your
9    knowledge?
10       A    To the best of my knowledge.
11       Q    Yeah.  And we talked about Ms. Gray,
12   Ms. Austin, and Ms. Clark.  Same thing with
13   Ms. Clark.  Did Ms. Clark conduct any sort of
14   independent investigation into Mr. Rodriques's
15   complaints, to the best of your knowledge?
16       A    Not to the best of my knowledge, no.
17       Q    Did she ever contact you or have the
18   individual who, I'm blanking on it right now,
19   who's in Cincinnati call you and say, hey, I
20   was looking into this, and I found some
21   additional information?
22       A    No.  The only conversation we would
23   have had was that January conversation.  And I
24   don't recall the specifics, but Ms. Clark
25   certainly would have asked me some questions

---

**188**

1    regarding, you know, where we were with the
2    investigation, but.
3        Q    And so any information Ms. Clark,
4    who I understand is an African-American, would
5    have received was the information you gave her
6    as far as you know?
7        A    Correct, or the compliance calls.
8        Q    So it was what was in the complaints
9    themselves, the six complaints, or what you
10   told her in response to those complaints?
11       A    Correct.
12       MS. BROCK:  I have no other
13   questions.
14       MR. TUYN:  I don't have anything
15   further.
16       THE COURT REPORTER:  Is she going to
17   reserve signature?
18       MR. TUYN:  She doesn't have to sign.
19       THE COURT REPORTER:  She does not
20   have to sign.
21       MS. BROCK:  No, no, she doesn't.
22       THE COURT REPORTER:  All right.
23       (Proceedings adjourned, 1:44 p.m.)
24
25

---

**189**

1        CERTIFICATE OF COURT REPORTER
2    STATE OF GEORGIA
3    COUNTY OF COBB
4        I hereby certify that the foregoing
5    deposition was reported as stated in the
6    caption, and the questions and answers thereto
7    were reduced to writing by me;
8        That the witness's right to read and
9    sign the deposition was waived;
10       That the foregoing pages 1 through 190
11   represent a true, correct, and complete
12   transcript of the evidence given on the
13   above-referenced date by the witness, BARBARA
14   A. FRANZ, who was first duly sworn by me;
15       That I am not of kin or counsel to any
16   of the attorneys or parties in this case.
17       I do hereby disclose pursuant to
18   Article 10.B. of the Rules and Regulations of
19   the Board of Court Reporting of the Judicial
20   Council of Georgia that I am a Georgia
21   Certified Court Reporter; that I am an employee
22   of Donovan Reporting PC; that Donovan
23   Reporting PC was contacted by the attorney
24   taking the deposition to provide court
25   reporting services for this deposition; that I

---

**190**

1    am not taking this deposition under any
2    contract that is prohibited by OCGA 15-14-37(a)
3    and (b) or Article 7.C. of the Rules and
4    Regulations of the Board; and I am not
5    disqualified for a relationship of interest
6    under OCGA 9-11-28(c).
7        There is no contract to provide
8    reporting services between myself or any person
9    with whom I have a principal and agency
10   relationship nor any attorney at law in this
11   action, party to this action, party having a
12   financial interest in this action, or agent for
13   an attorney at law in this action, party to
14   this action, or party having a financial
15   interest in this action.  Any and all financial
16   arrangements beyond my usual and customary
17   rates have been disclosed and offered to all
18   parties.
19       This 29th day of December, 2014.
20
21
     JOEL P. MOYER, CCR 2745
22   Certified Court Reporter
23
24
25

---

Donovan Reporting, PC                                                770.499.7499

Electronically signed by Joel Moyer (501-161-376-4513)                    0d7dd3ea-0852-412c-bc02-57d1c002befc

Barbara A. Franz — Rodriques v Delta Air Lines, Inc. — December 11, 2014

**A**

**able** 9:12,23 76:2
80:13 81:25 87:17
93:13 108:11 132:3
137:12 145:3,8
152:3,10
**above-referenced**
189:13
**above-the-wing**
25:22
**above-wing** 25:20
**absence** 15:8
**absolutely** 24:23
35:25 40:9 63:13
144:11 154:21
**accept** 75:14,22
118:9
**access** 108:13
**accomplished** 25:16
**account** 21:12
**accurate** 9:11 40:11
**accused** 49:3 53:2
162:11,13
**achieving** 25:11
**acronym** 13:5
**ACS** 124:4,6 161:19
**ACS/CGO** 4:11 6:1,8
6:15,19,24 164:5
**action** 3:10,12 7:16
19:9,23 36:6 38:9
43:22 52:13 63:22
65:10 69:1 87:5,6
87:11,15,16 89:2,4
141:7 190:11,11,12
190:13,14,15
**activity** 29:25 183:25
184:5
**actual** 8:21 46:4
106:8 111:19 123:8
127:17 138:7
161:21
**add** 38:20
**addition** 73:1 147:5
147:24
**additional** 19:11
67:18 74:18,19
96:6,10 187:8,21
**adjourned** 188:23
**administer** 30:11
33:9
**administered** 37:16

37:17
**administration** 26:11
30:15
**admitted** 130:13
**advise** 35:16
**advises** 36:9
**affectionately** 22:4
**affirmative** 79:12
87:5,6,11,15,16
113:23 116:1
122:11 133:17
**affirmatively** 106:15
**African-American**
184:12,18 185:18
185:24 187:1 188:4
**African-Americans**
89:16,23
**agency** 190:9
**agent** 4:1,1 93:7
190:12
**agents** 23:14 25:21
**ago** 13:18 60:13
**agree** 38:8
**agreed** 103:13
**agreement** 38:23
**ahead** 61:3 134:14
159:3
**Air** 1:5,12 2:12 5:22
6:5,10,12,17,21
**aircraft** 34:25
**airplane** 91:8
**airport** 23:12 27:18
27:20 28:21 31:9
107:18 124:7
**ALA** 48:5,6 65:22,23
66:9,17 67:16
**alert** 28:20
**alerted** 28:15
**Ali** 5:5,10 123:25
124:3,17 125:18
161:6,7,8,17
**allegations** 186:23
**alleged** 20:9
**allowable** 7:21
**allowed** 55:24
**amount** 69:12
**Andrew** 105:10,12
**and/or** 17:14
**anonymous** 153:2
163:20
**answer** 8:7,21 9:21
11:3 32:5 40:14,23

61:1 147:11 159:6
159:7 174:14,18
**answered** 32:4,7 59:5
60:25
**answers** 189:6
**anybody** 168:24
**anymore** 90:15
127:16 155:10
**anytime** 40:2
**anyways** 40:25
**apologies** 100:4
**appeal** 118:25 124:20
124:24 126:15
139:5 141:18 152:2
157:23
**appeals** 126:20
**Appearance** 3:19
82:17
**APPEARANCES** 2:1
**appears** 29:12 79:2
82:15,20 90:7
91:21 104:3 109:22
120:8
**applicable** 86:11
**apply** 32:19,25
**appreciate** 73:13
**appreciated** 150:8,11
**appropriate** 19:9
34:24 38:9 40:6
**approval** 102:14
105:4,22,24 106:1,5
112:1
**approved** 106:2,9,19
107:9,13 132:21,24
**approximately**
139:16
**April** 14:20 21:6,8
22:14 126:24
128:24 140:4 151:4
152:15
**area** 11:23 53:8,11
54:10 56:5,13 65:2
155:11
**argue** 150:10
**argument** 134:15
**argument's** 134:5
**arrangements** 190:16
**Article** 7:5 189:18
190:3
**asked** 24:21 37:2
49:18 60:25 65:3
72:13,18 73:20

74:20 80:8 98:22
123:18 127:7 134:8
134:11 136:5
147:19 160:18,20
172:20 176:8,10
187:25
**asking** 11:4 23:19
24:1 27:21 40:13
46:6 48:12 58:21
60:18,22 77:7
92:10 116:12
134:20 140:22
144:19 149:8,14,18
152:7 165:13,14
168:12 180:13
**asleep** 50:5 54:5,10
**assistance** 99:5
**assume** 21:11 23:25
77:25 140:25
**assumption** 141:23
**ATL** 152:6
**Atlanta** 1:12 2:13
33:5 81:6 124:8,12
148:2 155:2,8
**attach** 174:22 175:1
**attached** 109:19
166:1
**attachment** 123:8
**attachments** 98:18
174:23
**attend** 11:14,20
16:10
**attendance** 34:22
64:14 92:9,13
108:13 145:4
**attendants** 31:5
**attended** 12:10
**attention** 35:22 36:12
110:19 118:23
119:4
**attest** 125:1
**attorney** 7:16 8:3,10
10:7 38:15 47:2
137:8 166:13
184:14 189:23
190:10,13
**attorneys** 2:3 18:4
166:12 189:16
**auditing** 168:19
**Austin** 185:24 186:16
186:21,22 187:12
**authority** 36:14,23

36:25 37:16 41:8
43:6,7 65:23 67:16
67:20 145:7
**authorization** 53:7
53:22 56:5,10 59:9
66:15 67:7 136:12
137:4 143:4 174:1
**automated** 161:5
**automatic** 161:2
**auto-populated**
95:10,11
**available** 16:21
**Avenue** 2:9
**average** 110:16
**aware** 17:15 27:5
28:9,20 35:24 36:1
36:4 37:4 39:13
40:2 42:3,7,15 47:2
47:24 48:1,1,9,13
48:17,22 49:13,15
49:18,22 50:2,9,10
50:18 51:2 55:10
56:17,19,21 57:2
58:14 59:17 61:11
61:17,20 62:2,4,8
68:6 70:2,8 80:16
86:25 98:4 100:6,9
102:12 114:14,18
131:8,13,16 132:25
153:16,21 160:11
163:1,15 174:5
179:21 181:6
182:17 183:18,22
**a.m** 1:14 7:2 73:15,16

**B**

**b** 190:3
**bachelor** 11:25
**back** 12:4 25:15 37:3
37:14 39:17,19
40:24 47:25 48:10
50:13 55:12 68:15
68:22 69:16 70:25
73:19,20 97:22
100:11 117:4
133:10 137:6 148:3
149:19 153:7
159:10,21 171:12
173:2,7,14 186:10
**bad** 50:24
**badly** 41:5
**Barb** 40:12 151:5

**Barbara** 1:8 3:3 4:6
  4:10,14,16 5:1,3,7
  5:10,12,15,20 7:7
  7:14 189:13
**based** 19:7 33:23
  34:11 35:17 42:23
  61:14 65:1 66:7
  70:18 74:15 89:2,8
  101:21 120:7 129:9
  133:4 143:14,19
  152:14 157:10
  158:4,5 163:16,19
  169:18 174:7,19
  183:20,23 184:4
**basically** 15:10 29:12
  36:9 37:5 96:7
**basis** 16:10
**Bates** 150:23
**becoming** 21:1 22:7
  29:13
**before-awareness**
  61:25
**began** 14:20 25:18
  99:24
**Beginning** 1:14
**believe** 12:13 14:1
  20:6 23:6 30:4
  36:16 44:23 88:13
  91:15 97:16 100:7
  104:8 144:10,15
  159:1 168:2 169:23
  175:24 186:13
**believed** 137:25
**Bell** 127:8,10,25
  128:2 140:23
**below-the-wing**
  23:16 25:19 43:24
**below-wing** 31:3,11
  107:19
**belt** 35:3 40:1
**benefit** 30:12,14
**benefits** 15:8 25:9
  26:1,10 29:18,24
  31:25 32:12
**best** 8:6 73:5 80:19
  85:7 89:15 97:10
  111:1 124:15 126:8
  155:12,21 176:19
  177:11 185:20
  187:2,8,10,15,16
**better** 18:5 136:18,24
  136:24

**Beydoun** 76:6 159:12
  175:24 178:12
**beyond** 40:16 190:16
**bid** 27:17,23
**bidding** 29:5
**big** 91:7
**big-picture** 15:10
**Birmingham** 2:9
**bit** 8:4 20:16 21:19
  38:10 45:9 49:15
  79:19 90:10 91:22
  112:23 117:5
  118:24 119:12
  140:3 141:3 169:19
**black** 83:1
**blank** 123:8,9,10
**blanking** 187:18
**blindside** 119:2
**block** 5:18 139:3
**Board** 7:6 189:19
  190:4
**body** 122:19
**book** 18:6,8
**boss** 102:11 122:6,6
  184:8
**bottom** 83:25 84:11
  90:12 102:13
  150:24,25 153:8
  165:23
**Boulevard** 2:12
**box** 104:9
**brand** 17:25
**break** 9:17,22 21:19
  71:24 73:13,17
  138:20
**breaking** 24:23
**bring** 16:22 20:12
  27:20 35:21 110:19
**brings** 20:8
**Brock** 1:9 2:3 3:4,5
  7:11,15 17:18 18:3
  21:14,18,23 23:18
  23:24 24:6,20 47:1
  54:20 55:5 59:2
  60:11,17,21 63:13
  64:21 71:25 73:12
  78:3,6,9 117:17,19
  118:1,4,8 134:2,8
  134:11,22 135:21
  138:21 140:16
  147:24 148:7,22
  149:2,13,18 150:8

  150:11,16,19
  151:21 173:2
  176:24 177:2 183:8
  184:20,23 188:12
  188:21
**brought** 7:17 96:11
  96:20 97:25 118:23
**bullet** 84:12 85:13
  86:3,4,7,10,12,16
  86:20 117:7
**bunch** 65:3
**bus** 110:12,17 114:1
  114:4
**business** 11:25 12:22
  86:5
**B27556** 95:8

**C**

**C** 4:3
**cabinet** 46:2
**call** 6:1,8,15,20 27:8
  28:22 31:9 32:3,6
  38:23 77:1,10,18
  81:10,17,18,19,23
  93:15,20 107:1
  124:25 153:2,11
  156:9 158:9 163:20
  164:5,21,24 165:3,5
  165:12 168:4
  169:23 171:14
  175:16,17 177:23
  185:22 186:16
  187:6,19
**called** 91:17 93:18
  132:4
**caller** 162:15 163:16
  178:19
**calling** 81:24,25
**calls** 76:19 77:2,7,13
  77:22 164:19 166:2
  166:8 167:9,23
  168:1 169:14,18,20
  169:22 170:3,13
  176:3 177:19
  184:25 185:14,15
  188:7
**capacity** 65:23
**caption** 189:6
**card** 35:9,20 48:24
  48:24 49:2 53:2,3
  53:18 54:9 55:23
  56:7,8 58:16,23

  59:1,6,11 60:10,19
  61:16 62:6,12,18
  63:2,4,5,18 65:14
  65:20 66:11 67:2,6
  67:10,14 69:6
  100:1 117:9,13
  121:6 122:21,24
  133:8,15,23 134:10
  135:1,3,8,12 136:4
  136:8,17,20 137:2,3
**card.doc** 122:10,17
**care** 29:16,21
**career** 76:12,16,22
**careful** 40:13
**cargo** 26:22 27:1,4,7
  27:18,19,23 28:2,3
  28:10,11,17,21 29:4
  31:6
**Carla** 127:8,10
  140:22
**carried** 97:18
**carrying** 30:21
**carts** 35:2
**case** 1:4 34:1 39:25
  71:17 104:16 117:9
  134:1 169:21
  189:16
**cases** 51:25
**Cassandra** 5:20
  152:25 154:19,22
**categories** 88:12
**Caucasian** 178:16
**Caucasians** 89:17
**cause** 36:14 42:6
**caused** 64:18,25
**causes** 42:12
**cc** 112:25 124:19
**CCR** 190:21
**cc'd** 95:22 97:11
  124:1 153:10
**cc'ing** 165:19
**center** 32:3,4
**certain** 43:19
**certainly** 54:24
  154:15 187:25
**Certificate** 3:6 189:1
**certification** 13:10
  14:7
**certified** 1:10 12:23
  189:21 190:22
**certify** 189:4
**chain** 75:24 76:2

  120:21 145:11
  151:14
**change** 36:14,19,23
  58:17 121:9,12,13
  121:17
**changed** 21:7,20 23:4
  24:9,12,13,17 68:25
  69:14 92:6 113:2,3
  120:24
**changes** 31:13,18,22
  31:22 42:23 120:23
**check** 151:24
**checklist** 4:11 104:3
  104:4
**Chicago** 13:17,24
**chose** 27:23
**Chris** 142:12 143:1
  148:9 158:24
**Christmas** 163:13
**Christopher** 3:13,15
  44:14 65:11 68:11
**Cincinnati** 167:1,19
  187:19
**circumstance** 51:9
  57:25 75:20
**circumstances** 20:6
  33:14,16,24 34:15
  35:25 42:11,21
  51:7,11,15 70:19
  75:2,4,17 87:10
  141:8 142:21,24
  172:15 173:12,16
**Civil** 7:22
**claim** 119:10 132:9
**claiming** 158:25
**claims** 155:16 159:16
  183:25
**clarification** 25:13
  59:15
**clarify** 10:22 37:22
  41:1,6 77:23
**Clark** 6:3 165:18
  166:11 168:22,25
  169:3,5 170:16,20
  170:23 171:9
  184:14 187:12,13
  187:13,24 188:3
**clear** 31:17 35:10
**clock** 53:7 54:4 56:12
  57:21 66:25 110:13
  112:10 133:13
  158:25

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

**clocks** 145:20
**close** 170:16,18 171:3
171:8,10
**closure** 167:11 175:8
**coaching** 3:15 50:21
68:10 69:3,21
**COBB** 189:3
**Code** 94:21
**collect** 18:23
**collected** 19:6,14
**collecting** 153:3
**come** 22:4 27:7,10,11
27:17 38:16 40:24
67:13,13 68:15
87:11 92:14 117:8
118:24,25 119:3
131:3 159:10 166:9
171:12
**comes** 10:25 40:9
95:1 160:21,24
**comfortable** 9:19
61:1 85:19 150:25
**coming** 25:1 28:11,18
28:23 29:6 119:8
123:20 159:21
168:4
**comment** 140:20
152:4
**commit** 54:8 58:23
62:11 78:17
**committed** 58:16
78:21 79:9,16
121:5
**committee** 169:8
**communicating**
163:7
**communication**
144:15 149:5
160:13 165:7
**communications**
148:3
**companies** 25:8
**company** 35:19 92:17
153:16,21
**company's** 86:21
87:5,6,9
**comparables** 39:5
**compare** 68:23
**comparing** 145:19
**complainant** 19:11
**complaint** 18:13,18
20:9 157:7 163:25

175:20 177:3,4,8
178:6,10 179:7,16
179:22 180:3 181:7
181:24 182:18
**complaints** 78:1
148:18 157:3
176:17 183:17
184:1,6 185:2,3
187:15 188:8,9,10
**complete** 167:9
168:14 189:11
**completed** 104:10
107:2 166:1
**completely** 154:4
**compliance** 5:22 6:1
6:6,8,10,13,15,17
6:19,22,24 76:7
77:1,1,7,10,13,22
81:23 82:4 86:11
153:2 156:19 164:5
164:19,24 165:3
166:2,8,15 167:8,23
175:12 179:12
180:20 181:1,16
182:5,25 184:15
188:7
**components** 157:9
158:15,18
**computer** 18:25
19:16
**concern** 18:19 82:8
**concerning** 77:24
**concerns** 82:6
**concluded** 173:15
**conclusion** 117:9
120:9
**conduct** 3:19 12:7
13:25 16:7,15 17:6
17:8 19:18 33:21
64:16 74:9 82:16
86:5 155:15 157:2
157:18 158:2 176:8
176:11,20 179:17
186:22 187:13
**conducted** 31:14 76:8
76:12 80:7 100:2
143:15,17 157:6,11
159:15 160:9
176:23
**conducting** 15:9
18:10,11,15 26:17
**confer** 128:2

**conference** 169:15
170:10,11
**conferenced** 169:13
**Confidential** 3:18,21
3:23 4:3,5,13,16,18
4:20,22 5:1,3,7,9,12
5:14,19,22 6:1,3,5,8
6:10,12,15,17,19,21
6:24
**confirm** 132:15 152:3
152:10 181:17
**confirmation** 149:21
**Conover** 3:11 44:14
44:22 45:6,18,22
47:4 48:2 49:14,18
49:22 52:13 53:1,2
53:10 54:16,16
55:3,10,14 57:14
58:16 60:7 61:15
62:5,9,24 63:1,9,17
64:20 66:2 71:3,6,9
72:18 73:21 133:12
133:14 135:15
142:1,12 143:2,4,8
144:17 145:16
146:2,5 147:16
148:9,14 154:2,9
172:5,9 174:1
**Conover's** 47:10 50:2
56:16 58:14 59:18
61:11 64:17,24
143:25 144:22
146:7
**Conover-Culpepper**
47:6 73:18 151:23
175:21
**consider** 32:11 62:5
138:2,6 146:13,16
**consideration** 96:25
137:8
**considered** 53:3,18
53:20 56:7 67:2,6
119:21 120:6
133:23 167:25
**considering** 58:13
59:17,24 157:25
**considers** 63:21
**consist** 44:21
**consistent** 75:9
**consists** 85:2
**contact** 17:17 81:8
186:3,3 187:17

**contacted** 156:10
159:17,17,20,24
189:23
**contain** 13:24
**content** 123:7,9,13
**context** 131:25
**continue** 38:22 56:6
**Continued** 4:25 5:25
**continues** 81:22
**contract** 190:2,7
**contractor** 86:22,23
87:1
**conversation** 93:25
101:22 103:3
113:15 119:25
121:12 129:6,17
131:15,19,21,22
132:18,20 137:17
140:14 142:22
150:15 170:13
187:22,23
**conversations** 150:21
186:1
**coordinating** 84:14
**coordinator** 108:14
124:5 145:5 161:12
**copied** 97:17,19
**copy** 87:13 123:18
180:1 181:12
**corporate** 16:24
34:21 81:11,13
112:1 114:19,24
115:1 120:15
125:22 127:19
155:13 158:9 160:4
160:8,12
**corporately** 30:12,16
**corporation** 30:22
38:17
**correct** 12:11 17:10
19:24 21:3,10 22:7
22:8,18 23:3,17
25:23 26:3 27:9
29:17 30:7,19
31:25 34:6 35:6
36:7 37:9,13 39:14
39:15 41:10,23
42:3,4 48:3,7,8
49:20 50:17 51:13
52:22 54:2,7 55:16
55:21 60:1 61:13
61:16 62:6,7 65:24

65:25 66:4 68:17
68:20 69:18,22,25
71:22 72:15 73:3
78:22,23 79:3
82:19 83:3 89:20
90:8 92:2,21 95:22
96:21 97:1,9 98:2
101:16 102:3
104:20 106:4
107:15 108:2,7
109:12 110:23
111:16,20 112:1,10
112:14,25 113:4
114:5,8 115:14
118:14,15 121:6
122:5,17,21 124:21
125:19,23 126:11
127:5,8 128:10,17
129:3,10,11 130:15
130:16,19 133:23
137:24 138:1,8,9,11
139:13 140:23
141:21 142:2
143:17,18,23 145:2
145:9,24 146:3
147:4 153:13,23
154:9,14,16 155:22
155:24 162:11,13
162:20 163:25
167:19 168:6,23
173:17 175:5,6,8,18
175:21 176:1,6,9,18
177:20,24 178:13
178:23 179:1,22
180:2,8,11 181:21
181:25 182:10,13
182:19 183:6,7
184:16 185:7,9
186:11,19 187:4
188:7,11 189:11
**corrected** 82:9
111:22
**correction** 114:22
**corrective** 3:10,12
43:22 50:21 52:13
65:9 69:1
**correctly** 143:6
169:24
**Council** 189:20
**counsel** 2:1 7:4 9:8
10:4 22:3 35:17
117:20 147:24

Donovan Reporting, PC                                                        770.499.7499

Barbara A. Franz                    Rodrigues v Delta Air Lines, Inc.                    December 11, 2014

Page 194

149:19 150:22
151:21 176:24
189:15
**counsels** 36:9
**count** 128:9
**County** 45:14 72:22
109:5,5 110:2,7
112:4 113:6,21
143:9 144:4 145:1
145:9,13 189:3
**couple** 8:20 69:9
183:10
**course** 12:5 36:6
103:11
**courses** 13:13
**court** 1:1,10 7:6 8:8
9:3 173:7 188:16
188:19,22 189:1,19
189:21,24 190:22
**cover** 83:21 87:22,22
149:16
**covered** 72:6
**crazy** 126:8
**create** 8:11 89:4
**created** 165:4 166:7
**creating** 8:12
**Culpepper** 3:13,15
44:15,23 45:6,19,22
47:25 48:2,13,18,23
49:19 52:21 53:25
54:3,8,15,17,18,25
55:2,9,11,20,24
62:22 65:11,18
66:2,23 67:4,10
68:2,12 69:17 71:5
71:9 72:18,20,23
73:2,21 100:5
133:5,12 135:14,22
136:3 142:2,12
143:1,3 144:17
145:17 146:2,5,11
146:11,13 147:16
148:9,13 154:2,8,12
156:4 158:25 172:5
172:9,21 173:20
**Culpepper's** 47:9
49:8 50:19 57:18
70:3,9 72:1 73:4
143:8,25 144:23
**culture** 39:20
**curious** 18:4
**current** 20:16 127:14

**customary** 190:16
**customer** 23:12,14
25:21 31:10 107:19
124:7
**cut** 129:21

**D**

**D** 2:11
**Danielle** 46:23
**data** 88:16 108:8
151:24 153:3
**date** 69:17 84:21 95:1
95:2,10 96:11,12,14
104:9,18 106:6,10
110:21 111:6,19,20
112:3 113:2,3,25
114:22 118:13,19
118:20 119:6,13,15
119:21,23 120:6,17
127:3,5 128:4,8
137:18,19 138:11
139:20,21 189:13
**dated** 3:11,13,16,19
3:22 4:4,6,8,9,14,17
4:19,21 5:1,3,5,8,10
5:13,15,18,20,23
6:4,6,11,13,18,22
68:16 98:17 99:16
102:1 107:24
109:17 111:10
112:18 121:25
123:3,24 125:8,18
128:24 139:3
165:22 182:5
**dates** 93:24 96:17,20
96:24 97:2,9
101:12 103:16,18
110:22 111:15
113:22 120:8
**daughter's** 11:16
**day** 49:25 50:7 57:20
58:11 61:7 62:11
68:5 101:9 106:10
106:13,19 119:17
120:19 130:1,22,24
130:24 131:5,18
132:10,13,17,22
133:8,14 146:21
148:23 172:17,18
173:17 174:3
190:19
**days** 26:20 168:3,4

**day-to-day** 84:14,24
86:2,15
**De** 4:19,21 5:5 44:4,7
64:5 96:5 97:19
98:17 99:2,6
100:21 101:5,19
102:19 103:8,18
109:17 110:25
111:5,11,14 112:19
112:24 117:6,11
119:5 120:14,22
121:8,17 123:25
124:18 127:4,8
128:6,14 129:1,7,22
130:13 137:9,25
140:5,23 157:16
158:6 159:11
162:20 171:16
172:4 178:11
183:15
**Deakins** 2:7
**dealing** 185:19
**Deb** 166:18 167:7
171:5
**Deborah** 6:4 165:18
166:17 171:7
**December** 1:13 7:1
95:17 98:17 99:16
101:12 102:2
104:20 107:2,24
109:17 111:10
112:18 121:25
123:4 190:19
**decide** 32:25 43:7
**decided** 43:9,10
**decides** 41:20
**deciding** 43:11
**decipher** 9:12
**decision** 19:7 35:18
35:19 36:3,11,13,17
36:19,19,24 39:9,17
39:19 41:9,12,13,15
41:23 42:5,24 57:9
62:17 74:8,13 75:9
124:20,24 146:9
169:9
**decisions** 44:6
**declined** 162:16
**Defendant** 1:6 2:6
**define** 59:3,7 85:24
**defined** 58:25
**defining** 147:2

**definition** 82:25
83:16
**DEF-000041** 4:10
**DEF-000042** 4:21
**DEF-000044** 4:12
**DEF-000054** 4:2
**DEF-000055** 5:6
**DEF-000057** 4:8
**DEF-000058** 5:18
**DEF-000062** 5:18
**DEF-000093** 3:17
**DEF-000095** 5:23
**DEF-000096** 5:23
**DEF-000097** 6:1
**DEF-000098** 6:2
**DEF-000099** 6:7
**DEF-000100** 6:7
**DEF-000101** 6:8
**DEF-000102** 6:9
**DEF-000103** 6:14
**DEF-000104** 6:14
**DEF-000105** 6:15
**DEF-000106** 6:16
**DEF-000107** 6:18
**DEF-000108** 6:18
**DEF-000109** 6:20
**DEF-000110** 6:20
**DEF-000111** 6:23
**DEF-000112** 6:23
**DEF-000113** 6:24
**DEF-000121** 3:22
**DEF-000123** 3:22
**DEF-000124** 3:24
**DEF-000129** 3:24
**DEF-000132** 3:20
**DEF-000136** 3:20
**DEF-000166** 3:13
**DEF-000167** 3:14
**DEF-000174** 3:11
**DEF-000175** 3:11
**DEF-000176** 5:2
**DEF-000181** 5:4
**DEF-000193** 4:17
**DEF-000196** 5:21
**DEF-000197** 5:21
**DEF-000210** 4:15
**DEF-000211** 4:15
**DEF-000222** 5:16
**DEF-000224** 5:16
**DEF-000226** 5:13
**DEF-000227** 5:13
**DEF-000231** 5:8

**DEF-000232** 5:8
**DEF-000234** 4:4 5:11
**DEF-000236** 4:4
**DEF-000238** 5:11
**DEF-000324** 4:6
**DEF-000335** 4:19
**DEF-000337** 4:23
**DEF-000364** 6:11
**DEF-000365** 6:11
**DEF-000368** 6:4
**DEF-164** 3:16
**DEF-165** 3:16
**degree** 12:19,22
**DeLaTorre** 4:6,17
**Delta** 1:5,12 2:12,12
3:17,23 5:22 6:5,10
6:12,17,21 7:17
14:14,16,17,22 15:4
15:6,23 20:21
21:17 22:7 23:22
23:23 24:5,13
26:22 27:1 29:13
32:2,8,23 33:5,7
34:2 35:16 50:24
51:2 56:23 63:21
64:5 70:13 74:22
76:12 78:16,20
79:8,15,21 82:6
86:22 89:11,17
94:5 113:19 124:14
127:12 145:15
151:24 152:16
155:5 184:14
**Delta's** 79:3 81:23
82:3 84:15,25
**Delta-issued** 90:8
**Delta/Northwest**
27:9
**demographic** 88:3,4
**demographically**
167:15
**demoted** 65:24 100:5
100:8
**denied** 74:23
**deny** 152:3
**department** 15:16,17
17:21 39:2,3 42:2
45:3 47:5,15 71:8
72:14 81:4,5,8,17
81:18,19 88:6
126:18,20 161:18
**depend** 33:13

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

Page 195

depending 30:10
deposed 7:25
deposition 1:8 7:18
  7:19 10:4 13:4
  189:5,9,24,25 190:1
depositions 18:6
Dept 2:12
describe 35:13
description 120:24
desk 40:10
detail 18:19 19:11
  103:20
detailed 170:13
details 169:16
determinations
  176:25
determine 19:13,19
  19:21,23
determined 51:23
  113:12 120:25
Detroit 22:1 23:10,13
  23:15 25:1 31:1
  34:2 35:23 36:21
  51:2 52:4,5 74:23
  76:19 87:8,11,15
  88:17 89:12,17,22
  148:2 152:5 158:10
  163:23 167:18
  186:4
Detroit's 87:14
development 15:22
  40:7 93:18
difference 25:4 82:24
  141:5 147:19
  148:15
differences 24:24
  25:16 29:9 31:16
  69:10
different 16:14,18,19
  16:20 24:1 25:11
  26:4,15,19 27:2
  28:4 31:23 37:9
  39:17,19 41:2 49:7
  51:24 60:16 65:4
  78:1 90:10 91:22
  108:16 112:23
  141:8 142:20,25
  146:1,14,17 147:1
  147:15,18,21,23
  154:4 155:11 162:6
  163:11 172:15
  173:12 183:4

differentiate 24:4
differentiated 148:19
differentiating 85:20
  143:2
differently 83:10
  153:18,20,23 172:6
  172:10 178:16
difficult 151:22
direct 41:22 81:16
  122:5
directly 85:6 101:14
  153:16
director 84:13,16
directory 81:11,12,13
disagree 37:23 38:4
disciplinary 44:5
  63:22 71:2
discipline 26:2,14
  33:9 34:4,8,13 35:9
  37:3,15,17 41:9,21
  41:25 42:7,24 43:8
  43:10,12,20 44:10
  44:19 45:25 48:10
  49:1 50:20 51:4,5
  51:16 52:6,7,16,19
  60:8 61:10 63:8,17
  64:10,12,18 66:25
  67:15,19 69:13
  70:3,9 102:20,24
  177:1
disciplined 48:14,23
  51:3 54:19 63:5,10
  63:17,19 64:25
  65:19,21,22 67:10
  67:23 80:3
disciplines 34:3 44:14
  64:8
disciplining 33:8,11
disclose 189:17
disclosed 190:17
disclosure 7:4
discovery 150:6
discrepancies 137:11
discrepancy 20:13
  95:25 96:7,15,18
discriminate 184:3
discriminated 171:17
  171:22 172:1
  183:19
discriminating 79:25
discrimination 18:13
  34:21 76:20 77:5

77:10,18 78:17,21
  79:10,17,20,22 80:3
  80:6,12,17,22 81:1
  157:4 163:25 177:4
  178:20 179:22
  181:7 182:18 184:1
  185:11,14
discriminatory
  163:20,22
discuss 102:19,23
  156:9 165:8
discussed 4:1 66:24
  93:6
discussion 103:6,7,10
discussions 173:5
disqualified 190:5
distinction 23:21
  29:22,23 176:13
DISTRICT 1:1,1
Diversity 79:11
division 167:16,17,21
DM 42:7,14,15,16,17
  42:22,23,23 43:13
  43:15,16,17,18,21
  44:10 100:6
dock 146:6
docked 48:18 49:9
  50:3,11 56:16,22
  57:19 58:15,22
  59:18,25 61:12
  62:3,9,16 65:5 68:2
  68:4 144:9 146:23
  156:3,5 172:22
docking 156:2
document 3:23 4:1
  5:17 52:9 62:19
  68:7 78:24 82:12
  83:23 84:22 85:11
  90:1,4,8,25,25
  91:12,13,18 93:3
  94:2,21,21 95:15
  98:14,20 99:14,21
  101:24 104:1
  107:20 109:14
  111:8 112:16
  113:16 117:22
  118:3 121:20 123:1
  123:21 125:5,15
  126:12 128:19
  138:24 139:3,7,12
  140:13 149:4
  152:22 156:13,24

164:2,8,11 165:15
  175:10 177:12
  178:1 179:9,24
  180:17 181:1,9
  182:2,21
documentation 74:8
  74:19 93:25 150:18
documented 75:11
documents 45:25
  46:3,4 49:17 71:4
  98:19,23 99:2
  148:2,4 149:20
  164:14 175:4
Document.pdf 4:22
dogs 152:7
doing 18:7 39:24
  53:3 77:17 126:8
  133:14 141:14
  142:17 152:8
Domingo 4:5,17,19
  4:21 5:5 64:4 96:5
  100:3,20 101:23
  107:6 120:10
  139:19 162:10,12
  162:16,19,19
  175:18
Donovan 189:22,22
door 115:6 116:4
  117:1
doors 115:11
dot 100:1,2,2
Dowdell 151:6,11
  152:1,6,12,16,20
draft 139:12
draw 120:9
drive 126:8
driving 35:2
duly 7:8 189:14
Duncan 1:9 2:3
duties 23:9,25 24:1,7
  24:9,10,19,21 25:3
  25:5,6,9,11,15,17
  25:18 126:21

―――――――――
E
―――――――――

earlier 126:24 129:23
  140:4
easier 52:4 62:23
Eastern 1:1 11:18
  12:10,12,16
education 11:12
effective 104:24

106:10,20 152:15
either 12:18 35:14
  40:11 91:9 135:19
  145:6 183:24
elaborate 14:10
election 31:20 130:24
  137:21
electronic 93:17
  151:24
emphasis 12:1
employed 20:20
  89:11,16,24 152:20
employee 5:17 22:6,7
  29:13 32:2 34:3
  35:1 36:21 41:10
  41:21 50:24 51:2,3
  51:20 54:9 55:24
  56:23 57:10,21
  59:7 65:5 66:6,10
  66:18 95:7,9
  105:20 112:4 113:7
  114:3 124:14
  127:12 155:5
  159:14 189:21
employees 18:20
  20:14 23:13,15
  27:17,19 28:10,16
  29:5 30:17 31:3,11
  32:3,6 33:8,11 56:4
  70:14 89:24 104:13
  104:15 110:18
  141:5,6 142:5,9,10
  153:12,18,22 154:3
  178:16
employee's 51:16
  56:21
employee-relations
  32:9
employment 4:12
  20:15 22:12 38:15
  99:23
encouragement
  156:17
ended 98:6,10
ends 182:9
engage 60:10
engagement 183:24
  184:5
enrollment 15:9
ensued 173:6
ensure 167:8
ensuring 86:10

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

Page 196

entering 114:4
enters 13:3
entire 50:3 56:24,25
   57:11 61:12 85:10
entitled 3:24 82:16
   90:4 164:5
entry 114:1,4 115:5
EO 140:14 161:17
EPD 93:19
equal 15:16 39:3 81:3
   81:7 84:13,15,16,18
   84:25 85:7,24 86:1
   126:17,19
equivalent 93:16,19
era 27:23
essence 141:20
essentially 78:1
established 174:4
estimate 76:11
estimated 112:12
ethics 5:22 6:6,10,13
   6:17,22 76:7,10
   81:23 82:4 156:18
   157:2 166:14
   175:12 180:20,25
   182:4 184:15
events 120:21
eventually 27:7
everybody 18:2
Everybody's 94:14
evidence 7:23 18:23
   19:14 54:14,15
   75:11 118:5 133:25
   134:3 135:19
   183:18,22 189:12
exactly 20:11 91:16
   149:13
Examination 3:2,4,5
   7:10 183:11
examined 7:8
example 16:23 35:1
excerpt 3:17,18,21
exchanged 186:13
exercise 75:23
Exhibit 3:8,9 52:10
   52:12 62:20,25
   63:1 65:9 68:8,10
   68:23 69:1,2,17,20
   78:25 79:2 80:25
   82:13,15 90:2,3,22
   91:19,20,21 92:2
   93:4,6 94:2,6 95:16

95:19 98:15,16
99:15,16 100:11
101:25 102:1 104:2
104:3 107:21,22
109:15,16 111:9,10
112:17,18 113:17
113:18 115:23
117:6,16,16 118:11
120:23,23 121:4,21
121:23 123:2,3,22
123:23 125:6,7,16
125:17 126:13,14
128:20,22 137:7,9
138:25 139:2
152:23,24,24
156:14,18 164:3,4,4
164:12,13,16,16,18
164:22 165:8,16,17
166:4,7 169:12
171:13 175:11,12
177:13,14,18 178:2
178:3 179:10,11,25
180:1,18,19,20
181:10,11,20 182:3
182:4,22,23
exhibits 165:9
exist 94:11,15
existed 80:22
experience 44:7
expired 13:11
explain 20:5 34:18
   42:10 94:10 137:12
   137:15,19 169:19
explained 148:15
explains 141:4
explanation 52:3
   137:24 138:1,3,6,8
   138:10,17 154:7
extend 53:12
extra 17:18
e-mail 4:3,3,5,13,14
   4:16,16 5:1,3,5,7,9
   5:9,10,12,12,14,15
   5:19,20 6:3,3 28:22
   95:17,21,24 96:5,21
   97:12,17 98:16
   107:22,23 108:4
   109:16,25 111:1
   121:25 122:4,19
   123:3,7,9,13,19,23
   125:7,17,21 126:14
   126:24 128:7,11,21

128:22 129:5,22,24
129:25 140:3,21
144:15 145:8
149:17 152:11,25
160:21,24,25 161:4
161:25 165:18,24
166:4
e-mailing 186:10
e-mails 126:24
   144:16 148:1 153:7
   186:13

─────────────

**F**

facilitated 15:15 16:2
facility 27:18
fact 66:24,25 71:3
   99:1 111:4 114:7
   116:25 117:1,11
   119:12,22 122:23
   128:16 134:13
   137:15 143:5
   148:10 176:16
   178:25 179:19
   181:4 182:15
factor 147:2 172:19
factors 143:3 147:6,7
facts 54:14
Fadi 159:12 178:12
fair 49:1 84:4 141:22
fairly 23:6
fairness 133:2
falsified 116:19
familiar 90:9 151:20
far 15:1 57:15 67:22
   74:13 75:10 89:4
   89:10 96:23 135:13
   138:9 146:10
   148:15 150:13
   158:8,11 160:8
   170:2 185:17 188:6
fashion 31:21 167:9
fax 149:20
faxed 149:16
faxing 149:20
February 165:22,24
   167:3
federal 7:21,22 86:21
   86:22 87:1
feed 94:14
feeding 117:23,24
feel 61:1 156:8
feels 178:19

Felicia 1:9 2:3 7:15
Felicia's 40:12
felt 98:3 153:17,22
   163:21
figure 47:23
file 4:7 46:2,9,10
   70:22 71:2 72:20
   72:23 73:5,11 74:2
   74:3,15,19 75:8
   98:24 99:3,7,11,21
   99:22,23 101:13,13
   101:22 108:20,22
   109:2,6,9 111:5
   120:13 129:15
   147:8 170:16 171:3
   174:24 175:5
filed 177:22 181:24
   182:24
files 46:14 74:10
filter 171:5
filtered 167:10
   168:21
final 3:10 43:22
   52:12 112:1
financial 190:12,14
   190:15
find 39:16 49:8 78:20
   88:21 159:21
findings 174:19
fine 18:7 118:8
   138:21
finish 72:1
finished 161:14
firms 86:5
first 5:17 7:8 14:16
   18:17 52:25 57:14
   58:25 65:15 68:22
   76:7 79:10 83:21
   84:10,12,22 86:3,7
   95:1 99:20 113:24
   139:3 140:8 189:14
five 13:21 110:18
   112:13 170:5,7
fix 37:1
fixed 82:9
flight 31:4
flights 9:16
flip 151:1
fluid 37:24 38:21
focus 32:8 137:8
focused 12:19 32:9
   32:10 103:22

folks 28:20 31:7
   43:25
follow 34:23 37:20
   83:4,6,12,14 85:14
   127:7 128:13
   140:20
following 15:12
   18:22 19:2 85:2
follows 7:9 173:8
follow-up 184:21
foregoing 189:4,10
forget 48:11,12
forgot 10:20
form 149:21 156:19
   176:6,9
formal 15:14
format 92:5
formats 92:3
formatting 90:9
former 73:5 161:8
forth 20:8,11 71:1
   148:3 186:10
forward 14:24 15:3
   162:4
forwarded 161:20
   162:7
forwarding 161:23
found 47:24 48:12
   49:23 50:15 78:16
   79:15,21 80:22
   92:16 131:23,25
   187:20
foundation 54:13
   118:7,9 135:19
foundational 133:24
four 48:18 49:9 57:19
   57:22 58:10 68:2,5
   86:16 96:17,20,24
   97:2,3,9 110:21
   111:15 115:18
fourth 86:19
frame 12:5 49:11
   50:10,19
Francis 4:14 107:23
   109:11,21
Franz 1:8 3:3 4:6,10
   4:14,16 5:1,3,7,10
   5:12,15,20 7:7,12
   7:14,24 10:1,3,14
   52:11 65:8 68:9
   79:1 82:14 90:4
   95:17 121:22

Donovan Reporting, PC                                                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

Page 197

128:22 139:1
141:21 148:11
150:4 152:24
177:17 182:4,23
183:13 184:24
189:14
**fraud** 35:9 48:24,25
49:2 53:2,3,19 54:9
55:23 56:7,8 58:16
58:23 59:1,6,12
60:10,20 61:16
62:6,12,18 63:2,4,5
63:18 65:14,20
66:12 67:2,6,11,14
69:6 117:10,13
121:6 122:21,24
133:9,15,23 135:3
135:12 136:4,8
137:3 159:1
**fraudulently** 121:1,9
**free** 79:9,16 156:8
**frequently** 121:12
**front** 36:25 37:14,18
91:8 164:12
**fully** 41:3
**further** 30:2 71:24
117:8 141:3 152:14
156:9 188:15
**F-R-A-N-Z** 7:14

**G**

**GA** 2:13
**Gail** 165:19
**gain** 105:20
**general** 1:12 12:21
42:24 44:6 64:5
77:2,8 100:9
154:24 155:9 161:9
161:13
**generalist** 22:11,17
22:19,25
**generalist/HR** 23:10
23:19
**generalist/manager**
33:7 51:1 70:13
73:22 166:23
**generally** 29:2 80:9
**geographically**
167:15
**Georgia** 1:12 21:2
32:16 189:2,20,20
**getting** 21:15,18

54:10 126:7
**Giustina** 2:11 10:8
17:20,24
**give** 8:13,25 9:2 29:1
29:2 40:8 51:8 64:8
66:9 75:19 80:13
100:12 105:11
128:12
**given** 17:6 53:6,10,22
56:4 61:1 119:6
127:5 138:8,11
160:22 189:12
**giving** 54:9 66:6
128:9,17 181:13
**glad** 90:11
**GM** 43:17,18,21,24
44:11
**go** 8:3 13:6 20:11
25:11 28:15 30:10
36:16 37:6 38:6,8
39:19 40:19 43:18
43:21 45:23 59:4
61:3 69:16 71:23
98:23 99:2,6
115:22 117:4
127:18 133:13
134:14 135:13,16
135:23,24,25 145:7
149:2,19 156:15
159:3 164:14,17
171:8,8
**goals** 88:10
**goes** 114:17
**going** 8:3,5 11:3
18:22 21:23 24:3
24:14 27:8 37:23
38:4,5,6,7 39:14
40:16,24 41:25
42:14 45:8 49:16
64:12,14,15 68:15
70:18 72:14 95:2
97:6 99:11 103:17
107:1,13 113:18
117:5,22 118:23,25
125:13 126:23
132:11,13,17
134:14 135:16
137:20 151:1
159:14 162:1
165:23 169:25
188:16
**good** 8:2 25:13 35:24

39:8,20 40:4,12
47:12 52:3 90:11
134:22 169:11
176:13
**gosh** 18:25
**gotten** 29:11 41:1
43:3 73:18 118:19
**government** 86:21,22
**gradual** 31:24
**graduate** 10:15,17
11:7 12:2,17
**Grand** 11:15,20 12:2
12:6
**gray** 4:10 5:1 83:2
102:2,6,10,23
103:16,19 122:2,5
124:1,19 153:1,9
155:14 156:8
184:10 185:17,18
186:3,17 187:11
**greater** 26:10
**green** 101:1
**grievance** 26:18 30:9
32:13
**group** 80:20 88:7
**grouped** 24:8
**grouping** 77:25
**guess** 13:21 28:14
76:17 88:20 168:12
180:13
**guideline** 82:22,24
83:1,4,7,8,12 85:11
168:2
**Guidelines** 3:19
82:17

**H**

**hand** 179:3
**handed** 52:11 68:9
79:1 82:14 90:3
91:20 93:5 121:22
139:1 165:17
177:14 179:11
180:19 181:11
**handle** 35:7
**handled** 30:1,3,6,9
30:16,18
**handles** 15:6
**handling** 171:22
172:1
**happen** 33:23 36:14
36:25 37:9 52:6

58:6 103:12 169:2
**happened** 21:21
31:18,20,22 36:5
37:8 46:13 51:13
66:8 133:4 146:12
146:17 153:13
154:1 170:4 172:21
**happening** 98:4,7,11
163:22 170:10
**happens** 30:12 41:24
42:18 46:3 169:4,6
**happy** 11:17
**harassment** 81:1
**hard** 48:11
**head** 8:15 10:24 41:7
84:18 106:15
**headers** 92:23
**headings** 94:22
**hear** 11:17 110:17
**heard** 23:20 27:3
150:20
**hearing** 116:22
**held** 167:2
**hell** 152:8
**help** 9:9 35:18 36:10
41:5 45:8 61:9
81:23 82:4 158:20
165:2
**hey** 37:7 88:23
119:20 151:4
160:13 187:19
**high** 10:14,17 11:6,8
76:18
**higher** 17:2 37:6
**hired** 22:15,16
**hiring** 26:1,8,9 89:4
**history** 20:16 28:24
**hold** 20:23 103:2
166:21
**holidays** 163:6
**honest** 14:18
**hope** 18:1
**hot** 76:8,10,19 77:18
78:1 81:24 82:1,3,5
148:18 157:2
166:15 177:5,19
178:3 181:16
183:16 184:1,6,15
184:25 185:1,3,14
**hours** 10:11 48:19
49:9 57:19,22 58:2
58:10,10 68:2,5

95:18 159:10
**housekeeping** 7:19
**Howell** 11:8
**HR** 12:1 14:11 15:4,6
15:11 16:24 17:4
20:21 21:1,5,25
22:16,19,22,25 23:2
23:5,10,12,19 24:17
25:7,8,25 26:24
27:2 28:4,6,8 29:21
30:6,20,20,24 31:7
32:11 34:21 35:16
36:9,20 38:23
39:21 40:5 41:3
44:11 50:25 52:4,5
54:21 68:19 74:23
76:12 81:3 83:17
86:2 98:4 107:12
122:10 140:21
141:4,20 142:14
148:8,10 150:4
154:25 166:22
167:8
**HR-related** 14:12
**HR-wise** 28:3
**Hughes** 46:23
**huh-uh** 8:18 97:20
160:1 161:10
**human** 3:18 12:5,20
12:23 14:8 15:2
20:18,25 22:11
29:14,16 33:6
38:13 70:12 73:22
**hundred** 42:19 43:14
**hung** 26:23
**hurry** 63:14

**I**

**IAB** 2:3
**icky** 58:19
**idea** 8:21 34:4
**identified** 52:9 62:19
68:7 78:24 82:12
90:1 91:18 93:3
95:15 98:14 99:14
101:24 104:1
107:20 109:14
111:8 112:16
113:16 121:20
123:1,21 125:5,15
126:12 128:19
138:24 152:22

Barbara A. Franz                   Rodrigues v Delta Air Lines, Inc.                   December 11, 2014

156:13 164:2
165:15 175:10
177:12 178:1 179:9
179:24 180:17
181:9 182:2,21
**implementation**
84:14,25 87:4
**important** 8:13 9:11
**impression** 39:24
40:9
**improve** 64:9,11
**inappropriate** 51:22
51:24
**incident** 18:24 19:3
26:21 27:4 28:9
29:4 47:6 96:6
143:5,13 145:21,22
151:6,10 175:21
**incidents** 147:3
173:21 174:13
**include** 12:6 103:19
103:21 167:19
**included** 15:7 23:14
119:6,14 122:9
127:3 152:1 167:18
**including** 183:25
184:5
**inconsistencies** 115:2
**incorrect** 111:6,19
**increased** 33:3
**indefinitely** 42:13
**independent** 74:9
155:15 187:14
**INDEX** 3:1,2,8
**indicate** 101:6,7
115:9 122:4 129:6
132:21 153:1
174:21
**indicated** 31:12
33:25 102:13 112:7
113:20 117:6
120:14 121:5
125:25 126:2 137:9
184:13
**indicates** 52:24 63:1
65:13 79:8 84:10
85:11 87:4 96:5
104:18 113:6
162:10,12 169:12
175:17 178:15,18
**indicating** 101:1
**indication** 29:1,2

**individual** 19:13
71:21 101:18
187:18
**individualized** 16:13
**individually** 29:1
**individuals** 22:4
27:10 142:13
155:20
**influence** 37:11,12
39:9,17
**inform** 124:19
**information** 17:17
19:7 45:17,21,23
67:18 72:12 88:3,5
88:5,9,17 100:12,13
100:17,22 139:24
148:17 149:25
150:22 151:23
155:19,20,24
157:22 158:5,18
180:7,11 185:4
186:17,18 187:1,3,5
187:8,21 188:3,5
**informed** 124:23
125:2 140:7
**informing** 142:19
**infraction** 35:4 51:19
69:21 74:6 75:10
**infractions** 114:23
**initially** 24:6
**inquire** 186:4
**inquiry** 151:25 153:9
**instance** 113:12
147:15,16
**instances** 20:2 33:14
33:20 35:20 75:21
147:20
**instruct** 121:8
**instructed** 124:17
**intending** 103:25
**intention** 25:7
**interest** 190:5,12,15
**internal** 4:9 32:22
102:1
**interpretation** 134:3
**interpreted** 85:25
**interrupted** 29:8
**interview** 19:2 20:12
129:21 158:11
171:14
**interviewing** 20:1,2,7
**interviews** 19:18

**intranet** 92:17,18,18
**investigate** 36:2
126:20 177:10
185:19
**investigated** 53:1
63:2,4,18 65:14,20
69:6 80:6,12,16
**investigating** 148:18
**investigation** 15:14
15:19,24 16:14,22
17:12 18:10,11
19:9 26:14 33:17
33:21 40:4 44:18
44:20,25 45:5,24
46:4,9 70:20 73:10
74:10,21 76:8
78:15,16 99:25
100:2 117:8 137:10
141:4,13,18 142:1
142:14,16 143:14
143:16 147:25
148:8,13,14 149:23
149:23 150:14
155:16 157:3,6,14
157:16,19 158:1,3,5
158:16 159:2,15
160:9 162:5 168:14
168:19 174:20
176:2,9,12,16,20
177:8 186:22
187:14 188:2
**investigations** 12:7
13:25 15:9 16:8,16
17:7 18:16 25:9
26:17 46:2 76:11
78:18 80:7,10
157:10,13,22
158:19,21,22
176:23 185:6,10
**investigatory** 45:12
45:15,21,25 72:20
72:23 73:4
**invited** 18:1
**involve** 16:23 39:2,3
**involved** 17:15 28:17
34:16 39:21 44:11
44:13,17 70:15,21
86:20 98:7 101:14
101:18 157:4 159:2
166:9 170:1 178:20
**involvement** 26:3,6,8
26:10 33:7,12,15

70:13 183:14
**involving** 77:11,19
**in-depth** 17:5,11
**in-house** 26:9,11,12
29:15 30:1 184:14
**issue** 28:17 38:2
111:15 116:13,14
116:16 153:3 154:4
178:19
**issued** 42:18 61:11
**issues** 15:6 29:17
35:21
**italics** 141:3

---
**J**

**J** 1:3 98:19
**James** 4:3 5:8
**January** 50:18 68:16
69:21 106:21
123:24 125:8,18
139:4 153:8 169:13
175:16 178:7
179:13 180:22
182:5 187:23
**Jason** 3:10 44:14
52:13 142:12 143:1
148:9
**jazzy** 43:25
**Jerrick** 1:3 4:1,7 5:17
7:16 77:11 80:8
93:7 99:21 126:16
139:18,21 140:15
157:4 159:8 183:16
**job** 23:9 25:3,4,6
50:7 63:20 64:13
**Joel** 1:10 190:21
**Johnny's** 28:23
**join** 17:19
**journal** 69:13 93:10
93:12,13,14,14,16
93:17,19,20,22,23
98:19 129:8,12,14
129:17
**Judicial** 189:19
**jumping** 100:4

---
**K**

**K** 2:11
**keep** 9:18 139:21
181:13
**keeping** 152:5
**Kelley** 5:13,15

126:15,16,17
**Kelly** 2:11 10:8
**kept** 46:1,8,10
**keyed** 104:25
**kin** 189:15
**kind** 14:19 30:4
32:10 37:24 40:24
58:6 61:24 80:25
84:1,4 91:22
104:14 133:21
168:15
**kinds** 29:20 34:12
**Kircher** 6:4 165:19
165:25 166:17,18
167:6,21 168:8
169:12 170:15,19
**Kircher's** 167:12
**knew** 54:15,24 55:3,6
55:7,11 81:20
130:9 163:24
172:17,18 173:17
174:7
**know** 8:2 9:18 11:2
18:25 21:20 23:18
24:24 25:8,8 26:16
28:5 29:23 30:11
31:19,20 33:3 35:6
35:12 37:24,25,25
38:21,25 39:1,4
40:1,3 41:22 42:22
42:23 43:1,9,9,21
46:17,20 47:2,9,21
48:25 49:6,15,16,17
51:12,25 56:15
57:15 58:5,15,22
59:24 60:4,4,7 65:3
66:24 67:17,22
71:19,20,21 72:9,18
73:7,9 76:14,17
80:2,8 83:23 84:16
88:25 89:1 91:16
92:5 93:21,22
94:17 95:1,6 96:18
96:23 97:11 102:9
103:16 104:7
106:21,25 107:12
109:9 110:18
111:18 116:9,11,15
117:3,19 119:16
123:9 125:2 127:15
127:19,20,23
130:12,21 131:1,4

Donovan Reporting, PC                                                      770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

132:1,10,24 135:7
137:17 138:5,14,16
140:1,2,7,17 142:5
142:6 143:12,24
144:6,21 145:14,15
146:15,15 148:5,16
148:21,24 149:1,10
149:11 150:2,3,13
152:13,14 154:11
156:1,2,3,6 158:8
158:12 160:8,14
162:1,2,5,7 163:12
166:14 168:18
169:2,4,9,22 170:2
172:23 173:19
174:12 184:11,17
185:21,22,25 188:1
188:6
**knowledge** 53:11
73:6 80:19 85:7
88:18,20 97:10
108:18,19 110:15
124:15 140:9,11,17
155:12,18,21
176:19,21 177:11
185:20 186:4,8,20
186:24 187:3,9,10
187:15,16
**known** 22:5 54:23
57:20 65:5 79:24
80:5,11 154:15
**knows** 123:20
**Kotula** 96:6,11
100:23 101:7 158:6
171:21
**Kotula's** 157:14
**Kriksciun** 4:3 5:8
97:12,14,15 105:16
125:8
**Kronos** 45:11 72:19
108:10,12,13,21,25
143:8,9 144:3
145:20

**L**

**La** 4:19,21 5:5 44:4,7
64:5 96:5 97:19
98:17 99:2,6
100:21 101:5,19
102:19 103:8,18
109:17 110:25
111:5,11,14 112:19

112:24 117:6,11
119:5 120:14,22
121:8,17 123:25
124:18 127:4,8
128:6,14 129:1,7,22
130:13 137:9,25
140:5,23 157:16
158:6 159:11
162:20 171:16
172:4 178:11
183:15
**labor** 38:15
**lack** 54:13 118:7,9
135:19
**Lance** 151:6,10 152:6
152:12,16
**Langel** 2:11 13:3
17:20,23 18:7
**language** 121:18
**late** 131:18 132:6,11
132:13,17,22
**law** 2:3 15:15 17:21
190:10,13
**laws** 86:11
**lawyer** 17:25
**law-focused** 14:2
**lead** 20:6 51:16 58:6
**leader** 33:15,18,21
35:17 36:16,18
37:23 38:3,4,5,7,8
41:13,16 44:24
45:1 81:2 97:21,23
97:24,25 105:4,7
127:11,16 143:15
170:1
**leaders** 16:2,8,15
17:1,6 104:12
**leadership** 33:22
51:21
**leadership-develop...**
32:10
**leading** 45:24
**leap** 130:4
**learn** 15:5
**leaves** 15:8
**led** 30:4
**LeeAustin** 5:20
152:25 153:9,17
154:23 155:15
161:15
**Leela** 76:7
**left** 25:1 46:13 73:8

89:22 114:23
**legal** 39:2
**letter** 42:17,18 43:12
43:18 51:24,25
52:1
**letting** 130:12 132:10
**let's** 14:15,23 16:9
18:9 20:15 25:1,17
49:14 62:2 69:16
115:5 136:19
**level** 17:1,2 30:10
34:7,10 37:17 38:3
40:6 43:16 51:21
107:1
**levels** 17:12,13 43:19
43:20
**lie** 172:24,25
**limiting** 21:16
**line** 48:3,7 49:19
54:25 55:4,10
72:17 76:8,10,19
77:18 78:1 81:24
81:24 82:1,3,4,5
101:1 105:3 112:25
148:18 154:9 157:2
166:15 177:5,19
178:3 181:16
183:16 184:1,6,15
184:25 185:1,3,14
**lines** 1:5,12 2:12 5:22
6:5,10,12,17,21
94:23
**link** 91:17
**Lisa** 5:5,10 123:24
124:3 125:18 161:6
161:6
**list** 38:20 103:16
110:21 114:23
**listed** 85:5 96:21
**listen** 40:22
**listing** 111:15
**little** 8:4 20:16 21:19
35:2 38:10 45:9
49:15 58:19 79:19
90:10 91:22 112:23
117:5 118:24
119:11 140:3 141:3
163:11 169:19
**local** 29:21 30:20,24
**locally** 29:16 30:3,6
30:10,18 32:5
**located** 21:2 22:1

81:5 124:8,12
127:24 166:25
**location** 27:16 30:13
89:22 152:5 166:24
186:4
**long** 10:9 13:18 20:20
56:11 76:16 106:25
148:23 159:25
162:24 163:2
**longer** 152:16,20
**look** 18:22 19:4 65:8
68:22 107:5 113:21
115:5 147:8 149:19
150:7,23 151:22
156:16 160:18,20
160:22 161:25
162:23,25 165:21
165:22 176:10
178:23,25 179:17
179:19 181:2,4
182:13,15
**looked** 100:24 143:16
143:24 144:13,22
145:16 176:16
177:9
**looking** 63:7 74:3,4,5
74:7 75:8 90:12
184:24 185:13
187:20
**looks** 79:4 90:9,10
92:2 99:17 112:23
129:9 161:1,3
**lot** 28:6 38:14 112:4,9
113:7,13,21 114:1,3
114:5,15 115:16,19
116:21,24,25
159:14
**lots** 33:4 41:2 142:8
**low** 76:19
**lower** 51:4

**M**

**M** 2:7 5:1
**maintained** 13:10
**majority** 49:24 50:12
53:13,18 54:5
62:10
**making** 9:16 35:24
102:12 167:22
168:9
**management** 12:20
36:10,12 37:6

39:12 56:24 58:1,9
74:16 75:24 76:1
**manager** 20:19,21,25
21:1,5,25 22:22
23:2,5,10,19 24:17
36:4 41:22 42:2,25
44:6 45:3 47:5,15
68:20 71:8 72:14
81:3 83:17 86:2
94:11,11,14,16,21
100:9 104:11
154:24 155:9 161:9
161:13
**manager/generalist**
36:21
**manager/HR** 76:13
**manner** 70:4,10
**manual** 3:18,21 15:7
90:13,14,17 91:7
**marathon** 9:16
**March** 15:21,25 94:7
94:17,25 95:2,14
152:15
**mark** 165:9
**marked** 46:2 52:12
65:9 79:2 93:5
95:18 121:23 139:2
164:13
**marks** 130:5
**matter** 171:23 172:2
**MBA** 12:16,19
**mean** 8:19 14:10
27:14 30:8,13
34:18 43:1 45:24
46:3 49:2 59:14
60:4,14 63:7 64:3
82:3 85:13 95:12
96:13 104:10 105:5
105:23 110:16
114:25 115:9
125:10 137:25
138:4 144:3,4
147:5 150:13
155:14,25 159:18
164:21 169:6 186:9
186:12
**meaning** 91:23
131:21
**means** 51:1 92:10,13
95:6 105:6 106:1
**meant** 175:3
**medical** 128:1,3

Donovan Reporting, PC                                                          770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

Page 200

meet 10:3,6,9,12 99:1
  169:7
Melissa 84:19
memo 4:18,20 99:17
  101:13 102:1,5
  103:15,19 111:10
  112:19,22
Memorandum 4:9
memory 100:16
mention 78:4 154:8
mentioned 19:15
  22:3 31:6 39:16
  120:18 126:25
  153:11 183:17
mentions 154:4
  175:23
merged 15:22
merger 14:20,23
  21:20 22:10,20,21
  22:23 23:1 24:15
  25:4 31:13,18
Merriman 26:22
met 107:6
method 81:8
metro 27:8,10,16,24
  28:11,18 29:6 31:1
  31:4 107:1 160:10
MI 2:4,9
Michigan 1:1 11:9,18
  12:10
middle 139:16
military 95:1
million 58:5
mind 59:12 61:6,7,25
  89:19 100:4 162:18
mine 13:12 136:24,25
  166:19
minorities 89:11
minute 49:17 110:11
  112:9 116:6
minutes 110:14,18
  112:13 115:15,18
missing 75:12 174:2
mistake 131:6
misuse 67:16,19
Mohammad 4:4,18
  4:20 5:3,5 44:1
  103:3
moment 98:23
  100:15
months 69:25
morning 8:6 9:24

mouth 10:25 136:1
move 28:6 32:16
moving 44:10 79:19
Moyer 1:10 190:21
MSS 104:9
multiple 125:11
  137:11

## N

Nabors 5:13,15
  126:15,16,17,25
  128:25 130:12
  139:25 140:4
  141:17 148:10
  149:3,4,5 151:13,25
  155:14
name 7:13 81:20,21
  91:3,6 104:7
  105:11 151:12,19
  162:15 175:24
Nash 2:7
nature 94:21
near 84:11
necessarily 16:25
  35:4,11 36:22,23
  41:22 42:3 43:9
  80:10 87:9 90:18
  97:3
necessary 20:3,7 38:6
need 9:17 24:9 34:12
  60:23 62:21 63:8
  84:1 88:23 99:6,7
  150:6 164:10
  174:15
needed 34:8 36:2
  98:4 130:9
needs 37:9
negative 160:1
  161:10
neither 54:22
never 27:3 38:16
  110:17 150:20
  159:17,20,24
new 17:25 22:23
  32:17 38:20 163:14
Nhia 4:14 107:23
nod 8:15 9:4
nodding 9:3
Nods 106:15
nondiscrimination
  84:7
nonverbal 8:25 9:10

non-minority 153:12
  153:20
nooses 26:22
noose-hanging 27:4
normal 99:8,8
normally 110:14
Northwest 14:19
  15:23 21:13 22:5,6
  22:13,16 23:21,22
  24:4 26:6,13,20,25
  27:22 28:2,3,8 30:7
  93:16 95:9
note 99:21,22 101:13
  101:17
noted 74:1 149:7
notes 141:24
notice 3:10,12,15 4:7
  7:20 9:3 52:13
  65:10 68:10,24
  69:1
notified 98:11 131:17
notify 34:8,13 35:5,8
  35:11
notifying 125:21
November 48:11
  49:10 50:13 59:19
  62:10 69:17 96:19
  100:14,18 101:11
  101:11 109:12
  110:2,21 111:6,19
  112:3 113:3,4,22,25
  114:22 115:2,6
  118:13 119:5,13
  120:17 127:3
  133:22 137:18,18
  138:10 139:20
  145:22 173:21,22
  173:24,25
Now's 138:21
number 5:23 6:6,11
  6:13,18,22 32:6
  38:16 86:16 89:10
  95:5,7,7,9 147:3,20
  156:21 159:10
  163:18 169:18
  175:13 178:22
  179:4,7,12,16 180:4
  180:14,15 182:9
numbers 83:25 88:22
  89:3,6,9 178:4
  180:21 182:10

## O

object 54:12
objecting 117:25
objection 54:21 59:5
  60:24 82:21 118:4
  118:6,9 133:25
  134:18
objective 86:8,17
objectives 85:3,12,16
  85:18,22
obligations 86:21
obtain 19:1 175:4
obtained 180:10
obvious 163:20,22
obviously 167:18
occasion 75:13
  120:15
occur 18:12 57:1,7,7
  169:18
occurred 26:21 57:15
  90:20 100:14
  109:25 120:4,21
  130:22 133:3
occurring 149:24
  151:15 169:17
OCGA 190:2,6
odd 92:25
offense 11:2 174:8,10
offered 190:17
office 46:12,14,24
  73:5,11
Offices 1:11,12
official 134:18
off-the-record 173:5
off-the-road 90:25
  91:9
Ogletree 2:7
oh 12:8 18:25 25:22
  28:23 63:13 71:5
  107:25 116:10
  126:4 130:6 141:2
  142:11 144:18
  154:21 159:3
  162:17,18 177:17
  186:14
okay 8:22,23 9:5,14
  9:25 10:25 11:4
  14:25 18:2,3 38:18
  40:15,18,21 45:10
  46:16 56:12,13
  61:4,6,7,23 62:1,21

63:15 70:17 72:3
  73:12,14 82:2,4
  94:9 97:8,22 126:6
  127:22 130:8,11
  134:2,22 141:2
  144:18 145:10
  146:22,25 147:12
  151:2 159:8 169:11
  174:17,18 181:18
once 16:11 19:6
  32:14 41:12 73:19
  146:24
ones 17:16 51:18
  85:17,18,22 92:25
one-sentence 139:17
one-time 143:5,12,22
online 81:14 91:16
on-the-road 90:25
  91:9
open 15:8 176:1
operation 4:11 70:24
  74:5 102:15
operational 34:17
  93:2
operations 38:24
  39:4,12 74:16
  75:14,21 107:17
  122:15
opportunities 64:7,8
opportunity 15:16
  33:4 39:3 63:23
  64:2 81:4,7 84:13
  84:15,17,18,25 85:8
  85:24 86:1 126:18
  126:19
OPS 122:14
option 75:23
order 59:11
orderly 9:23 31:21
organizations 25:12
original 69:25 107:25
  161:4
originally 109:10
Ortiz 131:17 132:4,8
  132:14,15 133:1,6
  133:21 134:25
  135:7 136:7 137:1
  138:18
outside 14:5 29:21
  45:17 72:2 78:10
  86:5 160:9 175:5
  187:7

Barbara A. Franz           Rodriques v Delta Air Lines, Inc.           December 11, 2014

**overlook** 9:9
**overseeing** 25:25
  184:15
**oversight** 23:11
  25:18 120:17
  130:19,22 137:20
  137:23 138:4
**overview** 15:10

**P**

**P** 1:10 190:21
**PACE** 115:24 116:7
**package** 45:15
  114:19
**packet** 45:12
**page** 3:6 4:25 5:25
  68:14,16,22 69:10
  69:12 83:21,24
  84:6 96:4 126:23
  139:16,17 150:24
  151:1
**pages** 189:10
**paid** 54:4,11 56:6
  59:8 66:21 135:16
  136:9,11,11,13
**paper** 63:9 119:7
  128:4
**papers** 128:10
**paragraph** 52:25
  65:15 69:11 79:11
  80:24 84:11 86:19
  96:4 117:7 129:20
  139:17,18 142:11
  154:2
**parentheses** 140:19
**parking** 114:5
**part** 45:5,11,14 48:15
  48:20 49:4,10 67:1
  67:5,24 70:19
  87:25 88:2 102:7
  126:17,21 138:4
  146:12 163:4,5
  174:2
**participant** 16:3
**particular** 19:15 34:7
  34:10 36:5 39:13
  41:20 46:11 51:12
  73:10 74:1 88:20
  89:6 103:15 104:16
  112:22 169:21
  176:6 178:10
  182:12

**parties** 189:16
  190:18
**parts** 30:8 159:19
**party** 161:2 190:11
  190:11,13,14
**paste** 129:22
**patient** 38:11
**pay** 30:13 48:19 49:8
  50:3,11 56:16,22,25
  57:20,21 58:1,11,14
  58:22 59:18,25
  61:12 65:5 68:5
  135:8 144:9 146:6
  146:7,23 156:2
  172:22
**payroll** 26:11 29:18
  29:24 32:1,12
  137:11
**PC** 2:8 189:22,23
**peer** 166:19,20
**peers** 153:20
**people** 23:16 27:6,7
  34:16,19,22 41:2
  80:20 91:17 92:20
  92:24 158:11,11
  160:14 185:8
**perceived** 114:23
**percent** 42:19 43:14
  83:11,14
**Perdue** 165:19
**performance** 3:10,13
  3:15 15:22 40:7
  63:20,22 64:1,2,6,8
  64:9,11,13,17,25
  65:6,10 68:11 69:2
  93:18 127:11,16
**performed** 23:9
  80:10
**period** 21:4 44:2
  108:12 136:11,13
  145:17 162:24
  163:2,8,9,10
**permission** 53:10,12
  54:1,4,9 55:14,17
  55:21 66:3,6,10
  133:7,12,16,22
  134:7 135:1,23
  136:3,8,9,17 137:2
  146:2,6 170:16
**person** 17:18 18:18
  20:8,9 22:5 27:2
  28:5,9 40:5 41:3

46:18 54:21 57:14
  58:9 59:12 75:4
  76:13 80:20 81:17
  83:19 95:8 106:2
  123:18 145:7
  161:14 162:11
  163:21 175:18
  190:8
**personal** 140:9,11,17
**personally** 36:15
**personnel** 3:19,21
  46:1 82:16 90:12
  90:13,16
**person's** 58:1
**perspective** 15:11
**phone** 28:22 123:16
  150:15 185:22
  186:16
**PHR** 13:6,10,14 14:6
**phrase** 64:4 92:25
**phrased** 134:6
**phrasing** 121:9
**physically** 127:23
  166:25
**pick** 27:19
**picking** 9:4
**piece** 61:21 119:7
**pieces** 61:20
**pile** 165:2
**pilots** 31:4
**PL** 41:8,12,20,23
  42:5 43:4,11 44:10
  45:2 47:5,15 71:7
  72:14 131:17
  132:12 133:16
  136:7 137:4
**place** 9:12 14:20
  32:15 34:3,5,9,14
  39:10 42:8 46:19
  49:23 52:1,7 60:8
  74:25 75:6,12,15
  94:1 140:8 144:19
  158:19,21,23
**placed** 129:8 141:7
**Plaintiff** 1:3 2:2
**Plaintiff's** 3:9 52:10
  62:20 68:8 78:25
  82:13 90:2 91:19
  93:4 95:16 98:15
  99:15 101:25 104:2
  107:21 109:15
  111:9 112:17

113:17,18 121:21
  123:2,22,23 125:6
  125:16 126:13
  128:20 138:25
  152:23 156:14
  164:3 165:16
  175:11 177:13
  178:2 179:10,25
  180:18 181:10
  182:3,22
**plan** 30:12,14 61:7
  87:5,6,8,12,15,16
  89:5
**plans** 30:15
**play** 33:11
**please** 7:13 9:18
  35:14,15 109:18
  117:21 135:5
  181:12
**PLLC** 2:3
**Plymouth** 2:4
**PL's** 43:6
**point** 9:1,17 12:9
  13:9 23:2 36:11
  39:1,8 48:16,17
  62:3 65:4 68:20
  84:12 86:20 110:1
  111:23 114:13
  118:12,22 119:3
  129:15,23 130:21
  130:25 131:1,3
  138:7,11,16,19
  158:13 163:12
  171:6
**pointed** 29:23,24,25
**points** 31:23 85:14
  117:7
**policies** 30:21 34:21
  34:23 35:17 85:2
  85:12,15,17,22
  91:17 92:20,24
  93:1,2
**policy** 3:17 15:7 19:4
  19:20 20:10 34:16
  34:17,19 74:7 79:3
  79:5 82:16,19,24,25
  83:15 84:7 85:25
  86:8,9,16,18 90:21
  90:22,22,24 92:15
  103:24
**poor** 65:5
**portion** 173:8

**position** 20:17,23
  32:17,19,23 33:1,2
  67:9,14 107:12
  127:14,20 161:8
  166:21 167:3
**possible** 18:19 35:22
**possibly** 116:20,24
**posting** 32:23
**post-high** 11:11
**post-merger** 29:10
**potential** 19:4
**potentially** 19:5
  35:20 83:9
**practice** 39:6 163:7
**practices** 3:18,21
  90:13,14,16 163:21
  163:22
**practicing** 38:14
**predictable** 92:8,12
**premises** 130:18
**preparation** 13:14
**present** 16:1,6 19:18
  26:17 42:17
**presentation** 16:7
**presented** 43:13,15
**presenter** 16:4
**president** 105:14
**presume** 11:3
**pretty** 31:14,21 50:3
  156:16
**previous** 77:13,22
  97:17 157:10,12
  185:5,6,10
**previously** 174:23
  175:2
**pre-merger** 29:10,11
**primarily** 85:1
**principal** 190:9
**printed** 108:17
**prior** 9:21 10:4 20:23
  21:12 22:6,9 25:3
  29:12 37:15 50:13
  108:18 117:1
**privy** 26:23
**probably** 13:21 16:10
  58:6 81:25 86:14
  145:4 170:8
**probe** 21:19
**problem** 24:23 37:7
  38:12 110:6,10,20
  112:8 117:2 118:13
**problematic** 110:22

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

Page 202

procedure 7:22 34:24
procedures 30:22
proceed 9:23
Proceedings 3:1
  73:15 138:22
  188:23
process 9:19 14:4
  15:22 16:17,20
  17:9 18:9,11,15,17
  26:4,7,15,18 29:10
  30:9 31:14,16
  32:13 37:24 38:22
  39:10 44:9 73:23
  102:8,9 106:22
  163:5 170:17,25
processes 39:22
produced 148:23
  164:11 165:1
  181:14,15
professional 12:24
  17:4 81:3
professionals 16:25
proffered 138:8
program 12:15 84:15
  85:1,8
prohibited 190:2
promotion 32:18
  33:4
prompt 9:1
pronounce 97:13
property 59:9,10,13
  59:14,19 60:3
protected 183:25
  184:5
protocol 99:9
provide 33:22 39:4
  73:24 141:12
  153:25 189:24
  190:7
provided 7:3 45:18
  55:20 73:1 87:13
  100:18 109:1
  138:17 139:24
  143:3 148:17
  155:21 157:22
  158:6 179:5 180:3
  186:19
providing 96:8 174:1
published 81:9
pull 45:17 72:25
  129:12
pulled 95:8,13

115:16,19
punch 57:11 95:25
  96:6 110:3,7 112:5
  115:24
punched 48:14,19
  49:3,9 50:4,11
  53:12,16 55:7,17
  56:1,22,23,24 58:2
  58:9 66:3,10,18
  67:4,23 101:2
  133:13 135:15
  146:22 154:12
  159:9
punches 45:11 72:19
  108:2,6,16,17,21,21
  108:25 109:12,19
  109:20 111:2 143:9
  143:10,25 144:3,23
punching 19:5
purpose 82:5,7 99:10
purposes 7:19
pursuant 7:4,20
  189:17
pursue 11:11
pursuing 11:24
purview 30:25
put 18:5 42:6,13 46:1
  74:16 83:24 103:18
  104:12,19 134:7,15
  135:1,7 136:1,17,19
  137:2
puts 140:19
putting 61:18,19
  116:5
p.m 1:14 138:22,23
  178:7 179:13
  180:22 182:6
  188:23

Q

quarterly 16:10
question 8:22 9:20,21
  10:21 14:19 23:19
  28:12 33:10 37:1,2
  40:23,23 43:2 49:1
  49:7 50:24 57:6
  58:17,24 59:4,4,16
  59:21 60:9,12,12,15
  61:2 64:22 94:10
  98:9 117:20 129:9
  133:4,9,20 134:8,11
  134:14,19,24

136:16,16,18,22,23
  144:20 147:12
  171:20 174:11
questioned 129:21
questions 8:5,7 26:12
  30:17 32:1,4,5,7
  40:13,14,17 60:13
  62:22 74:18 149:9
  171:13 172:13
  173:4,10 183:9
  185:1,15 187:25
  188:13 189:6
question's 21:12
quick 156:15
quite 10:25 13:22
  38:17 89:21
quotation 130:5
quoted 120:14
quote-unquote 85:8

R

R 6:3
race 9:17 10:1 76:20
  77:9,17 78:17,21
  80:12,16 88:11
  152:12 157:3 172:6
  172:19 177:4
  179:22 181:7
  182:18 183:20,24
  184:1,4,11,17
  185:11,14
races 172:10
racial 28:17 29:3,4
  77:5
raising 183:25
ramp 23:15
ran 44:24
range 76:15
rare 39:7
rates 190:17
reach 30:25 31:2,8
reaching 40:4
reaction 57:25
read 63:12 87:21,23
  87:25 88:22,24
  89:1 100:15 106:6
  149:7 168:17 173:2
  173:7 189:8
reader 115:7
reading 63:20 109:24
  120:12 173:14
ready 21:15,19 126:7

reality 130:17
really 22:23 33:23
  35:24 38:19 43:8
  60:6 118:19 137:7
  150:22 151:1
  168:19
reason 42:1 68:4 74:4
  88:17 98:3 102:14
  102:15 105:18
  162:23 163:4
reasons 7:21 56:21
  57:1 123:17,19
  145:25
reassignment 94:17
Rec 105:24
recall 12:8 23:4 28:7
  29:7 44:24 45:7,13
  45:16 47:14,19
  51:18,19 53:6
  71:10,18 72:4,7,21
  72:24 80:23 88:14
  89:18 90:19 91:2
  92:1,3 96:10
  101:10 102:22
  103:1 109:8 111:3
  113:11,14 120:12
  120:20 121:11,14
  121:16 125:4,14
  126:9 128:5 129:16
  129:18 131:9,14
  138:12 141:14
  142:15,17,19 143:6
  144:14,18 151:12
  151:16,17,20 152:9
  152:20 156:10,12
  159:14,23 160:2
  168:11 170:14
  175:2 176:5 187:24
recalling 131:22
receive 14:13 15:18
  47:3,4 64:18 74:11
  87:19 148:1 149:1
  160:17 161:5
  164:15 170:3
  178:22 179:16
  180:25 182:12
received 12:16 14:6
  14:16 15:3,14
  28:19,22 105:4,22
  105:24 106:1
  107:25 108:2,23
  109:7,20 129:25

139:4 141:3 149:1
  149:24 150:2,3,20
  153:10 158:13
  161:6 162:9,22
  187:5 188:5
receiving 147:25
  150:21 176:5
recess 73:15 138:22
recognize 10:23 60:6
recollection 53:9
  77:17,21 78:11
  128:8 129:2
recollections 20:10
recommend 74:14,14
recommendation
  4:12 33:18 44:19
  70:23 75:15,18,22
  76:3 102:7 104:4
  105:25 106:2,9,18
  114:18 118:17
  120:13
recommendations
  33:22 37:19,21
  121:13 125:12
recommended 74:23
  74:24 75:5,5 103:4
  103:8 131:11
recommending 74:5
  99:12 102:16
  105:19 117:12
record 7:13 8:11,12
  9:11,13 13:5 21:24
  46:1 47:1
records 18:25 100:1
  121:1,10 137:11
recruiting 29:19
Redford 2:4
redirect 117:21
reduced 50:20 51:4
  51:17 70:3,9 189:7
reduction 52:6
reference 178:11,12
referenced 117:15
references 175:20
referencing 51:11
referred-to 173:8
referring 54:1 101:4
  140:21 148:6,8,16
  158:24 165:10,11
  173:23,25 174:24
  175:1
reformatted 90:19

Donovan Reporting, PC                                                                    770.499.7499

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

Page 203

91:24
**refresh** 100:15
**regard** 73:25 100:13
  111:2,6 136:5
  142:11 148:3 154:1
**regarding** 3:10,12,15
  4:7 5:17 65:10
  68:11 69:2 95:25
  99:21 102:3 126:15
  144:16 148:9,13
  160:5 188:1
**regular** 92:8,12
**Regulations** 7:5
  189:18 190:4
**related** 16:23 18:24
  19:3 22:24 23:12
  29:18 30:6 157:7
**relationship** 190:5,10
**relative** 88:11
**relatively** 22:23
  156:15
**relocate** 33:1
**relying** 118:2
**remain** 66:3 69:13
**remained** 22:19,25
**remaining** 53:12 56:1
**remember** 45:4
  47:16,18 71:13,15
  78:14 91:10 92:24
  109:23 119:8,9
  120:19,20 125:13
  128:17 131:15
  132:3 138:12 140:5
  142:22 143:7
  144:19 152:11
  169:17,24 170:9,10
  170:12
**remembered** 132:18
**remembrance** 71:16
  89:8,16 111:1
**remove** 49:19 52:21
**removed** 48:2 52:1
  54:25 55:9
**removing** 48:6 154:8
**repeat** 28:12 43:2
  59:21 61:3 64:22
  67:3 98:9
**repeated** 15:25
**rephrase** 61:19

119:18
**replaced** 46:21
**report** 5:23 6:1,6,8
  6:11,13,15,18,20,22
  6:24 81:2 82:6,10
  88:8 89:9 107:25
  108:1 122:5 156:21
  160:5 161:21,24
  162:9,22 164:5
  165:2 177:7,7
  178:3,22 179:4,12
  181:18 182:6,9,13
  182:25
**reported** 89:3 162:16
  175:18 179:13
  180:22 189:5
**reporter** 1:10 7:3 8:8
  9:4 173:7 188:16
  188:19,22 189:1,21
  190:22
**reporting** 5:22 6:6,10
  6:13,17,22 7:6
  80:25 82:8 88:6
  99:25 156:19
  166:15 175:13
  176:6 180:21 181:1
  182:5 189:19,22,23
  189:25 190:8
**reports** 165:3 181:15
  181:16
**represent** 113:19
  189:11
**representation** 32:14
**representative** 26:16
  26:24
**represented** 23:22
  68:1
**representing** 54:14
  57:3 134:4,12
**request** 108:5,18
  145:12 150:6
  157:23 170:18
  171:4 183:14
**requested** 52:20
  109:1 140:20 145:1
  169:23 170:15
  171:3 175:7
**require** 33:1
**requires** 102:10
**reserve** 188:17
**resolved** 82:9
**resource** 12:20,23

14:8 15:2 20:18,25
  22:11 29:14,16
  33:6 70:12 73:22
**resources** 3:18 12:6
  16:21 38:13
**respect** 183:13
**respond** 63:11
  110:25 151:13
  164:23
**responded** 151:18
  160:4,4 167:23
  183:6
**responding** 166:8
  177:19
**response** 9:2,10 30:5
  151:14,25 153:6,8
  157:23 158:14
  164:16,18 165:5
  167:25 169:3 173:3
  173:20 174:13
  177:3,23 179:4,7
  180:3 181:17,24
  182:25 188:10
**responses** 8:14 9:1
**responsibilities** 26:1
  29:14 31:15 73:25
  168:16
**responsibility** 33:3
  167:7,13,22 168:9
**responsible** 25:25
  28:1,2 29:15 30:20
  30:24 84:13 166:14
**results** 33:17
**retaliate** 184:3
**retaliated** 183:23
**retention** 89:5
**retirement** 32:1
**returned** 128:2
**reversed** 76:3,4
**review** 17:14 51:22
  74:2,2 88:15 89:6
  109:2 163:4 167:11
  168:13 169:8
**reviewed** 44:18,21
  45:6,22 88:2
**reviewing** 70:22
  183:14
**reviews** 42:16
**Re-Examination** 3:5
  184:22
**re-quote** 129:19
**RFT** 4:12 98:19,24

99:3 105:3,22
  108:20 110:2 111:5
  122:9,14 174:24
  175:5
**RICHARD** 2:7
**right** 23:24 31:18
  33:10 35:19 36:11
  36:13,17 57:3 59:3
  71:16 72:8 84:11
  91:3,4,6 97:13
  107:8 111:23 115:3
  120:1 126:1 128:12
  132:1 134:17
  138:15 150:5
  164:12 168:19
  170:12 174:11
  187:18 188:22
  189:8
**risk** 39:1
**Road** 2:4 91:11
**robust** 94:13
**Rod** 98:20
**rode** 110:17
**Rodriques** 1:3 4:1,8
  5:17 7:16 76:6
  77:11,19,20,24 78:4
  78:22 80:8 93:7
  94:1 98:8,12 99:22
  100:13 102:3,21,25
  104:5,8,20 108:21
  109:6 110:23
  111:16 113:13,20
  114:14 115:10
  119:4,20 120:16,24
  120:25 121:5
  122:23 124:19,23
  125:10,22 126:16
  127:2 129:7 131:4
  131:16 132:16,22
  133:7,21 134:25
  136:6 137:1,15
  140:15 142:25
  146:18 147:3,18
  152:1 153:11,15
  157:4 159:9,18,20
  163:18 166:9
  171:17,22 172:1
  175:23 178:12
  183:16,17,19 184:4
  185:20 187:6
**Rodriques's** 93:9
  95:25 96:25 100:1

100:25 101:8
  106:10 117:12
  119:10 122:9,14
  129:8 132:9 137:10
  155:16 162:23
  186:5,23 187:14
**role** 21:7 33:6,11
  34:1 35:16 70:12
  70:16 73:21 105:13
  168:20
**role's** 70:18
**rolled** 90:24 91:13
**room** 8:19 9:13 83:9
**roughly** 110:18
**RTS** 48:2,5 49:19
  52:21 55:10 154:9
**rules** 7:5,22,22 30:21
  91:11 118:5 189:18
  190:3
**run** 41:13 42:14
**running** 41:16
  131:18 132:6
**Ryan** 2:11 17:20

──────────────
        **S**
**S** 94:21 173:21
**safe** 17:3 77:16 85:21
**safety** 35:4 64:15
**Saginaw** 11:16
**sake** 134:5
**Sarsour** 4:4,19,21 5:3
  5:5 44:1 97:15
  103:3 111:12
  112:20 123:4,13,25
  124:18 159:2
  171:25 172:8
**satisfactory** 89:10
**saw** 71:4 89:9 91:7
  101:22
**saying** 28:22 40:5
  43:17 49:12 53:24
  63:9 66:8 77:24
  131:4,23 132:1,4
  135:14 141:21,25
  144:9 145:14 150:4
  153:10 160:13
**says** 8:11 48:25 63:25
  65:1 67:21 69:1,5
  79:20 81:2 82:21
  84:12,21,24 85:1
  86:20,24 90:12
  91:8,17 94:9,10,11

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

Page 204

94:16,18,20 99:21
104:9 105:3 112:4
113:25 115:23
117:19 129:25
130:13 139:4,18
141:2,20 142:4,12
148:14 149:5 151:4
159:8,12 162:6,12
162:15 165:24
174:22 177:16
**scale** 30:14
**school** 10:14,18 11:6
11:8,11
**scratched** 119:7
127:4 139:20
**scratching** 128:3,9
140:6
**se** 80:11
**search** 81:20
**seat** 35:3 40:1
**second** 52:24 65:15
69:11,12 84:6 86:4
96:4 104:9 126:23
128:12 139:15
**seconds** 113:8,25
115:6,16 116:5
**secret** 132:11
**section** 16:5
**sections** 84:2,3
**security** 16:24
**see** 8:20 9:13 16:9
17:25 18:23 19:4
41:24 52:14 63:8
65:9,11,16 68:12,16
68:25 69:3,6,11,14
72:19,22 74:6
82:17 83:21,25
84:7 85:3 87:11
88:22 90:5 93:7,22
93:24 95:19 96:1,8
98:20,24 99:18
100:25 104:5
109:18 110:3
111:12 112:5,20
113:8,24 114:1
115:7,25 121:2
122:2,10 123:5
124:1 129:12
137:13 139:5,10,22
141:9 147:10
151:14,24 152:17
153:4 154:5 156:19

156:22 162:14,17
164:6,12,14 165:19
165:23 175:13
178:4,7 179:14
180:23 182:6
**seeing** 71:2 92:1,3
129:16 143:7
**seeking** 102:13
**seemingly** 151:7
**seen** 33:17 52:5,16
57:10 79:5 84:22
87:3,6,8 108:15
114:10 139:7
156:24 160:16
164:8
**self-service** 104:11
**self-study** 13:15
**send** 102:5 109:11,19
123:12,19 142:13
142:14 160:12
170:17
**sending** 102:14,17
125:11 142:15
167:5
**sends** 97:20
**senior** 20:18,21 21:1
83:19 105:4,7
107:9
**sense** 10:21 76:18
93:13 119:12,19
120:4,5,7,9 133:9
164:25
**sent** 74:17 97:22,23
102:10 109:9 111:5
111:25 114:19,24
140:22 141:25
148:2,10,21 149:4,5
149:11,11 174:23
175:2
**sentence** 52:25 65:15
85:6 87:4 99:20,24
**separate** 24:9 30:13
30:14 31:7 157:18
176:2 186:22
**separated** 167:15,16
**Seppings** 84:19
**September** 20:22,24
21:9
**series** 8:5
**service** 23:13,14
25:21 31:10 32:2,3
107:19 124:7

**services** 189:25 190:8
**set** 38:17 62:22 80:7
91:22
**Sheandra** 6:3 165:18
166:11 167:10
169:23 171:5
184:13
**sheet** 83:22 108:1
116:7
**shift** 48:15,20 49:4,10
49:24 50:3,13
53:14,18 54:6
56:24,25 57:11
61:12 62:10 67:1,5
67:24 116:8 119:17
146:12 174:3
**short** 102:20,24
103:4,9
**shortly** 96:19 103:17
165:9
**show** 99:12 103:17
165:14
**showing** 150:1
**SHRM** 13:1,5,17,24
**side** 8:16,16 38:24
39:12 74:16 75:14
75:22
**sideways** 127:21
**sign** 133:7 188:18,20
189:9
**signature** 69:16,25
112:24 188:17
**signed** 69:17,20
99:18
**similar** 25:7,10 49:7
62:21
**sink** 118:18
**site** 92:17
**sitting** 56:20 57:24
58:4,7,13 67:17
77:16 152:19
173:19 174:12
**situation** 18:12 39:14
57:19 58:7,8 146:1
146:10 152:6
158:10 172:15
173:12 186:5
**situations** 80:21
**six** 58:10 77:25 78:8
166:1 169:22 170:3
183:16 184:25
185:13 188:9

**skills** 39:12
**skip** 84:1
**sleep** 49:23,23 135:23
135:24
**sleeping** 53:13,17
54:16,24 55:3,6
**slightly** 49:7
**slip** 115:24 127:5
128:4 130:14
139:21
**small** 139:17
**Smoak** 2:7
**somebody** 144:21
145:14 172:21
**somebody's** 95:9
**somewhat** 29:8
153:25
**sorry** 39:23 61:5
70:25 77:6 147:13
159:3 170:21
173:24 177:16,17
177:18
**sort** 17:24 28:17 29:3
32:22 35:9 120:17
130:19 137:19
176:1 187:13
**sound** 16:19
**sounds** 8:18 37:24
38:1 71:17
**speak** 18:18 19:10
57:8 77:4,12 84:5
87:17 89:25 103:25
119:24 120:3 132:8
146:8 158:9 169:10
174:25
**speaking** 181:21
**special** 13:13
**specialized** 14:8,9
16:13
**specific** 15:18 51:8,19
60:21 75:3,19
78:14,15 113:14
121:11 171:19
185:1,15
**specifically** 15:14
73:9 76:25 109:24
142:17 144:14
148:7 160:23
165:13 168:13
176:11 177:2
185:23
**specifics** 77:12 80:13

80:15 87:18 132:19
151:20 187:24
**speculate** 134:21
148:22
**SPHR** 13:7
**spite** 114:21
**spoke** 129:1 185:23
**spoken** 8:4 104:22
105:6,15,18
**staff** 25:19
**stage** 98:8 111:4
**stages** 44:11,12
**stamped** 150:24
**stand** 124:6 151:7
**standard** 170:17,25
**Standards** 3:19 82:16
**start** 25:14 115:25
116:6,8,15 130:14
153:7
**started** 119:17
134:13 151:4
**starts** 129:20 150:24
154:3
**State** 11:15 189:2
**stated** 189:5
**statement** 18:21
19:12 47:3,9,11
149:22 154:1
**statements** 40:3
44:22 71:5 98:19
163:16 174:22
175:1
**states** 1:1 107:24
110:2
**stating** 7:13 135:6
138:5
**station** 55:15,18,25
66:4,11 105:7
154:13 156:5
**statistical** 88:16,16
**stay** 8:17 24:21 54:4
66:18 133:13
135:15
**stayed** 24:7,11,19
**step** 30:2
**steps** 101:15
**Stewart** 2:8
**stick** 136:19
**stop** 59:3 81:25 94:5
**story** 156:6
**stuck** 89:13,19
**study** 11:23 12:5

Barbara A. Franz                     Rodriques v Delta Air Lines, Inc.                     December 11, 2014

Page 205

**stuff** 75:12 137:21
151:15
**subjects** 14:12
**submitted** 115:25
121:1,9
**subsequent** 70:20
**substance** 170:11
**substantiate** 19:8
101:8
**substantiated** 19:21
**Suite** 2:8
**summary** 44:23 45:1
47:5,8,13,15,17,20
47:22 71:7,8,11,13
71:15,17,19 72:9,13
100:12 101:18,20
101:21 141:4,13
142:1,14,16 147:25
148:8,13,14,20
150:14,14
**supervision** 141:17
**supervisor** 56:11
**supplement** 150:6
**support** 4:22 33:19
74:8 98:20 102:18
105:21 149:22
**supporting** 102:16
**supportive** 74:6
**sure** 8:3 13:12 14:11
40:2 43:23 58:20
58:23 63:12 64:24
66:20 67:4,18
84:19 94:8 119:19
126:5 127:16
136:21 138:2
147:14 167:13,22
168:9,14,17 186:9
**suspended** 104:21
108:6,10 159:9,13
159:25
**suspension** 104:17,19
104:23,25 106:11
106:14,20 130:1
162:24 163:6
**swipe** 110:2,7,12
112:4 113:6 114:7
**swiped** 113:13
114:14 117:1
**swipes** 45:14 72:22
109:4,5,5 113:20
114:10 143:8,9
144:1,4,4,23 145:1

145:12,13,16,19
**sworn** 7:8 189:14
**system** 19:16 52:22
93:18 94:13 104:12

―――――――――――
**T**
**table** 9:21
**take** 8:9 11:2 13:13
13:16 18:6 19:9
25:1 34:3 36:5
42:24 55:12 58:1
71:24 74:25 75:6
75:15 83:20 89:2,3
100:15 107:4,13
110:15 112:12
113:21 133:10
138:20 150:7 151:3
**taken** 1:9 7:20 19:23
21:12 29:21 34:13
43:4 57:12,22
75:18 96:24
**takes** 44:5 56:24
110:11 112:8
**talk** 14:15,23 18:9
20:15 25:15,17
31:21 41:4 49:14
96:18 97:6 132:14
140:22 150:21
158:11
**talked** 29:12 43:7,11
71:1,3,4 140:3
160:13 187:11
**talking** 38:1 52:20
64:19 76:25 77:3
78:8 80:9 130:4
137:20 138:9
140:14 145:22
157:13 161:14
166:5 170:12 177:3
177:6,6 179:6
**talks** 80:25
**tardy** 116:18
**task** 100:25
**teacher** 16:4
**teaching** 38:19
**team** 35:23 167:8,14
167:14
**technically** 14:21
**tell** 10:20 15:2 18:15
23:8 26:5 31:15
47:7,14,17 51:10,15
55:13 66:17 85:17

87:14 100:21,24
116:17 122:20
126:9 128:16,25
133:3 144:8 151:5
158:20 160:24
161:1,2 166:20
169:14,16
**telling** 29:9 128:8
132:12,16
**tells** 140:10
**template** 164:23
165:4,8,11,12 166:1
166:3,8 167:6
174:21 177:19,23
179:3,6 180:2,3,6
181:12,19,20,23
182:24,25 183:5
**templates** 180:7
183:4,6
**ten** 76:16,21
**tend** 8:25
**tends** 97:19
**tension** 29:3
**term** 64:6 74:5 91:5
91:15 102:8 105:24
**terminable** 174:9,20
**terminate** 76:3
**terminated** 79:25
122:24 141:6,8,9
142:5,7,9,11,20
173:20 174:8,13
**terminating** 70:14
**termination** 4:12
26:2 70:21,22,23
73:19,23 74:3,10,14
74:15,24,24 75:5,15
75:23 76:2,7 96:25
99:13 102:16,20,24
103:5,9 104:5
105:19,25 106:3,9
106:19 114:19
117:12 118:18
120:13 122:20
124:20,24 125:3,12
125:23 131:11
183:15
**terminations** 126:21
163:8
**terminology** 27:9
**testified** 7:9 24:7,19
44:5 55:1 61:14
68:3 133:11 135:21

**testify** 55:2 116:18
**testimony** 21:13
24:10 47:10 51:12
64:6 66:2 117:23
117:25 118:11
133:2,10 136:2
**texting** 132:10
**thank** 9:8,15 40:25
52:2 59:15 70:17
118:10 128:23
150:12 162:17
**theft** 16:23 18:12
**thereto** 189:6
**thing** 32:13 78:2
109:4 136:5 143:22
186:21 187:12
**things** 8:3,24 10:24
29:20 30:3,5 31:20
36:8 38:20 48:11
58:5 61:18 75:7
82:11 85:5,14
147:17,21 162:6
**think** 24:3,18 25:12
26:18 37:7 38:10
39:1,8 43:25 44:4
47:8,11 51:22
54:13 57:24 58:8
58:25 62:23 68:3
69:9 91:4,17 95:1
100:10 118:25
120:15 124:4 126:2
140:10 141:22
143:2 159:5 160:7
160:22 161:24
163:17,19 169:21
172:20
**thinking** 10:24 42:12
80:21 135:4
**third** 161:2
**thought** 14:3 41:5
62:17 71:1 77:6
84:3
**thread** 4:3,13,16 5:7
5:9,12,14,19 6:3
**three** 69:24 86:15
115:15
**three-day** 13:16,23
**Thursday** 1:13
**time** 9:9,9 12:4 13:22
21:4 22:1 24:25,25
25:1 26:24 28:6
34:22 35:9,20,25

42:9,11,19 43:14
44:1 48:9,24,24
49:2,11 50:10,19,23
50:25 52:3 53:1,3
53:18 54:8 55:23
56:7,8,18 58:16,23
58:25 59:6,8,11
60:7,10,19 61:10,16
62:6,11,18 63:2,4,5
63:18 65:14,20
66:11 67:2,6,10,14
69:6,12 74:22
75:25 89:22 96:8
100:1 105:9 106:25
107:13 108:22
110:12 116:6,8,15
116:19 117:9,13
119:17 121:1,5,10
122:7,10,17,21,24
128:1 130:14 133:8
133:15,23 134:9
135:1,3,8,9,12
136:4,8,17,19 137:2
137:3,11 145:17,20
146:15 155:4
158:25 159:25
160:18 162:24
163:3 166:18 168:2
168:10 174:8 184:9
185:3
**timely** 167:9,23,25
**times** 21:7 76:16
170:5
**timing** 131:9
**title** 21:6,20 22:9,22
23:2,4 24:12,13,16
68:25,25 84:20
124:4 127:17
**titled** 3:19,21 4:1
**today** 7:18 50:13
56:20 57:24 58:4,7
58:13,15 63:3,14
67:17 68:1 70:2,5
77:16 98:23 103:12
114:11 139:8
150:10 152:19
173:19 174:12
179:7 181:21
**today's** 7:19 10:4
**told** 62:4 64:5 84:4
115:1 119:12,20

Barbara A. Franz      Rodriques v Delta Air Lines, Inc.      December 11, 2014

Page 206

121:17 125:22
126:1,4,5,10 127:1
127:2 132:5 135:14
139:19 140:4,11
143:19 144:7,10,12
144:22 145:15
154:16,17 156:8
160:23 172:22
188:10
**tolerate** 79:21
**Tolerated** 79:20
**tomorrow** 28:23
**top** 152:7
**topic** 34:11 169:22
170:3
**topics** 4:1 34:12
77:22 78:15 93:6
**Torre** 4:19,21 5:5
44:4,7 64:5 97:19
98:17 99:2,6
100:21 101:5,19
102:19 103:8,18
109:17 110:25
111:5,11,14 112:19
117:6,11 119:5
120:14,22 121:8,17
123:25 124:18
127:4,8 128:6,14
129:1,7 130:13
137:9,25 140:5,23
158:6 159:11
162:20 171:16
172:4 178:11
183:15
**Torre's** 96:5 112:24
129:22 157:16
**touch** 141:18
**tough** 58:5
**track** 167:8
**traditional** 32:11
**train** 17:1
**trained** 16:12,15,24
**training** 13:13,16,23
13:24 14:6,8,11,15
15:1,2,5,5,13,15,19
15:24 16:14 17:3,5
26:2
**transaction** 104:9,17
104:19
**transactions** 104:13
104:14
**transcript** 8:20

189:12
**treated** 153:18,19,23
172:5,9 178:16
**treatment** 155:17
171:18
**tricky** 14:19
**true** 36:20 63:21
179:5 189:11
**try** 9:1 35:14,15 37:1
47:23 61:8 64:7,9
82:8 101:8
**trying** 28:14 39:5
52:4 76:18 88:21
119:1 133:3
**turn** 68:14,15 69:10
96:3 137:6 139:15
**turned** 101:1
**turning** 130:14
**Tuyn** 2:7 3:5 8:3,10
10:7 21:11,16
23:18,25 24:3,18
40:12,16,19,22 47:2
54:12 55:1 58:24
60:9,14,19 63:11
64:19 71:23 72:3
73:14 77:23 78:4,7
82:21 117:15,18,24
118:2,7 133:24
134:6,9,17,20
135:18 136:15
138:19 140:13
148:5,12,25 149:10
149:15 150:5,9,13
150:17 159:5
176:22,25 183:10
183:12 184:19
188:14,18
**Tuyn's** 137:8
**two** 10:10 17:22,23
20:14 25:12 61:18
69:24 71:20 86:14
120:15 141:6,7
142:4,6,6,8,10,13
142:20 143:2,13
145:25 148:19
153:2,12,17,22
154:3 157:21
164:13 177:5
**two-and-a-half** 10:11
**two-day** 15:5
**Tyesha** 4:10 5:1
102:2 122:1,20

153:1 154:19
169:13,25 184:10
**type** 32:1,12 77:1,3,6
**types** 32:7 93:1
**typical** 123:12
**typically** 18:21 19:11
34:15 42:16 43:14
163:13 169:17

---

**U**

**uh-huh** 8:18 79:12
113:23 116:1
122:11 133:17
**ultimately** 36:18
109:11 111:18
**unable** 39:11
**unclear** 41:6
**underneath** 94:23
**understand** 8:19 9:7
11:1 28:25 38:10
47:16 50:9 54:20
58:20 62:15 65:19
73:12 77:14 86:14
106:24 127:25
136:21 153:19
174:6 181:13
185:18 186:25
188:4
**understanding** 30:19
41:1,2 53:25 61:15
63:3,6 66:1,7,9
67:25 85:10 116:16
135:22 166:16
**understood** 11:3
62:16 162:19
168:18
**unfair** 155:17
**unfortunately** 13:11
163:5
**union** 23:22 24:14
26:13,16 29:25
31:20 32:14
**UNITED** 1:1
**University** 11:19
**Unknown** 162:16
**unsigned** 118:3
**unsure** 85:22,23
118:12
**unusual** 170:2,4
**updated** 15:12
**use** 86:1,3,4,12,15
121:17

**uses** 64:5
**usual** 190:16
**utilize** 39:11
**utilized** 94:3
**utilizing** 94:5

---

**V**

**Valley** 11:15,16,21
12:2,6
**Value** 79:11
**varies** 33:23
**variety** 123:17,19
**various** 44:11,12
**vary** 70:18
**vast** 49:24 50:12
53:13,17 54:5 62:9
**vein** 78:5
**verbal** 8:13 9:2
**verbalize** 9:6
**versa** 180:15
**versus** 32:10 34:16
34:23 101:18,20
**vice** 105:14 180:15
**view** 17:2
**violated** 19:5,20
20:10 103:24 174:9
**violation** 34:20 40:1
74:7 103:23,23
**violence** 151:9
**volume** 76:18,19
**vote** 32:15
**voting** 120:18 130:23
130:23 131:5,23
132:5,6,23 135:9
136:10 138:9
**VP** 105:4 106:1 107:9
107:16,18,18
**vs** 1:4

---

**W**

**waived** 189:9
**walk** 61:8
**walked** 116:4
**want** 9:18 13:20
24:24 38:23 39:18
39:25 40:8 58:17
60:24 84:2 88:11
110:9 116:17
117:20,23 130:2,3
134:15 135:23,25
150:22 152:7 159:7
**wanted** 14:5 41:4

83:22 99:6 130:7
140:16 151:3 156:9
**wants** 40:19 153:18
**warrant** 58:8
**wasn't** 24:16 40:2
55:7 56:17,19
61:17,20 63:4
67:14 90:18 94:13
106:20 107:3
116:21,23 118:22
119:25 120:10
124:25 130:9,17
132:11 136:15
168:20 174:5,8,12
**way** 9:22 10:24 12:20
16:12 18:5 25:10
28:24 37:8 38:17
41:22 55:6 59:4
66:8 71:12 92:1
108:16 109:22
134:6 136:24
180:11 183:18
186:2
**Wayne** 145:8,13
**ways** 65:4
**week** 163:13
**weeks** 8:20
**weigh** 38:6
**welcome** 100:15
128:24 162:18
**went** 28:20 32:14
49:22 73:20 168:22
168:25
**weren't** 28:1 36:3
50:9 101:14 108:4
126:4 135:7
**we'll** 59:5 96:18
119:1 120:16 137:8
165:9
**we're** 9:12 16:24
17:16 18:22 37:23
38:1,4,6,7 40:3
49:16 58:10 64:19
68:14 87:13 97:6
105:19 117:4
145:22 151:1 177:2
177:6,6
**we've** 23:20 43:7,11
52:20 57:2 58:25
75:9 105:6 171:9
174:4 179:6 181:21
**whereabouts** 101:9

Barbara A. Franz                    Rodriques v Delta Air Lines, Inc.                    December 11, 2014

Page  207

**white** 10:2 83:1 89:24
  153:17,22
**wide** 123:18
**willing** 83:20 103:2
  135:13
**wipe** 62:3
**witness** 20:3,7 21:22
  24:2 40:15,18,21
  117:23 134:21
  148:17 189:13
**witnesses** 8:25 19:3
  19:17,19 20:1,12,13
  23:20 158:10
**witness's** 189:8
**Woodward** 2:9
**word** 24:21 83:20
  136:1 156:17
**work** 27:15 32:11
  53:8,11 54:10
  55:15,18,25 56:5,13
  64:7 65:2 66:4,11
  66:18 67:5 86:2
  88:23 92:14 116:20
  117:5 146:23
  154:13 156:4
  159:11,22 168:13
**worked** 38:13 89:21
  155:1
**working** 9:15 10:23
  14:17 27:24 28:18
  29:5 34:24 48:15
  48:20 49:3,10
  50:12 55:8,25
  56:13 59:15 67:1
  67:24 118:17
  145:13 146:11
  154:13
**workplace** 79:9,16
  151:9
**works** 88:7 152:16
**world** 73:18,20
**worry** 119:13 139:19
**wouldn't** 11:17 17:13
  34:4 35:4 40:10
  85:19 87:17 88:8
  93:15 103:21
  119:14,21 120:6
  128:9 129:14 145:3
  149:8 150:17
  172:24 186:12
**Wow** 66:23
**WPV** 151:7,7

**write** 18:20 101:19
  140:25
**writing** 42:6,13 189:7
**written** 3:15 7:3 8:11
  8:12 18:20 19:12
  47:3,11 50:20,21
  68:10 69:3,20
  113:8 116:23
**wrong** 60:15 115:21
  116:5 159:10
  161:11
**wrote** 101:17

_____
**Y**

**yeah** 14:4 21:14 24:2
  24:18,22 27:13
  28:14 42:13 43:3,5
  46:5,7,22 55:1 57:5
  58:18 59:22 64:4
  65:14 71:25 75:12
  77:15 78:3,6,9,12
  87:24 90:15 96:14
  97:5 98:10 108:1
  115:1 120:5 129:24
  130:2,6 132:2
  136:23 138:21
  144:8 145:10 147:5
  149:2 151:19
  154:18,20,22 156:1
  169:7 170:7 174:16
  174:18 187:11
**year** 12:17 16:11
  52:6 69:24 87:13
  87:19,21,23 151:6
  163:11
**years** 11:20 12:12
  13:22 17:22,23
  38:14,16
**Year's** 163:14
**yesterday** 10:13 49:5
  70:8 139:10 156:25
  160:17
**you-all** 29:15

_____
**Z**

**Zarras** 105:10,12
  106:2,12,13
**Zarras's** 105:13
**Z-A-R-R-A-S** 105:12

_____
**1**

**1** 3:10 52:10,12 63:1

  189:10
**1st** 126:24
**1-10-2013** 5:10
**1-28-2013** 5:18
**1-3-2013** 5:23 6:7
**1-31-2013** 6:23
**1-8-2013** 6:11
**1-9-2013** 5:6,8,20
  6:14,18
**1:14-cv-12707-BA...**
  1:4
**1:44** 1:14 188:23
**10** 1:13 4:5 98:15,16
**10th** 96:19 110:2,21
  111:6,19 112:3
  113:3 125:18
**10.B** 189:18
**10:30** 73:15
**10:43** 73:16
**100** 83:11,14
**101** 4:9
**1030** 2:12
**104** 4:11
**107** 4:13
**109** 4:16
**11** 4:7 7:1 99:15,16
  100:11 113:25
  114:8
**11th** 95:18 101:12
  104:20,23 105:1
  165:22
**11-17** 100:11,12
**11-21-2012** 3:11,13
  3:16
**111** 4:18
**112** 4:20
**113** 4:22
**12** 4:9 94:17,17
  100:12 101:25
  102:1
**12th** 104:21,24
  173:22
**12-11-2012** 4:4
**12-13** 106:7
**12-15-2012** 4:19,21
**12-17-2012** 4:6
**12-18-2012** 4:8,9,14
  4:17 5:2
**12-21-2012** 5:4
**12:22** 138:22
**12:37** 138:23
**12:44** 109:18

**121** 5:1
**123** 5:3,5
**125** 5:7,9
**126** 5:12
**128** 5:14
**13** 4:11 104:2,3
**13th** 95:2,14 107:2
**138** 5:17
**14** 4:13 107:21,22
**14:24** 113:8,13,25
  114:7,15
**14:27** 110:3,7 112:4
  113:7 115:6,13
  116:4
**14:28** 110:3,8 112:5
  115:24 116:6,20
  117:2 119:16
  130:15 133:7 134:9
  135:1,8 136:17,19
  137:2
**15** 4:16 109:15,16
**15th** 68:16 69:21
  111:11 112:19
  151:4
**15-14-37(a)** 190:2
**152** 5:19
**156** 5:22
**159** 6:13 179:12,17
  180:4,15
**16** 4:18 111:9,10
  117:6,16 120:23
  121:4 137:7
**16:19** 130:18 135:2
**164** 6:1
**165** 6:3
**17** 4:20 112:17,18
  115:23 117:16
  118:11 120:23
  137:7,7,9
**17th** 98:17 100:14,18
  101:11 107:6 108:1
  109:12
**175** 6:5
**177** 6:8
**178** 6:10
**179** 6:12,15
**18** 4:22 113:17,18
**18th** 99:16 102:2
  107:24 109:17
  122:1
**180** 6:17
**1800** 95:18

**181** 6:19
**182** 6:21,24
**183** 3:5
**184** 3:5
**19** 5:1 121:21,23
**190** 3:6 189:10
**1997** 10:19

_____
**2**

**2** 3:12 62:20,25 65:9
  68:23 69:1,17
**2-11-2013** 6:4
**2:29** 182:6
**20** 5:3 76:24 123:2,3
**20th** 101:12
**2001** 11:22 12:13
**2003** 12:13,18
**2004** 12:14,18
**2005** 14:20 21:6,8,13
  22:14
**2009** 14:21 15:3
**2010** 15:21,25 16:11
**2012** 44:1 48:11
  49:11 50:10,13
  59:19 62:10 69:18
  95:3,14,18 98:18
  99:17 100:19 102:2
  107:2,24 109:17
  111:11 122:1
  139:20 145:23
  173:21,24,25
**2013** 23:6 24:16
  106:21 123:24
  125:9,18 128:25
  139:4 140:5 151:4
  152:15,16 165:22
  165:24 167:3
  175:17 178:7
  179:13 180:22
  182:6
**2014** 1:13 7:1 20:22
  20:24 21:9 50:19
  68:17 69:22 190:19
**21** 5:5 123:22,23
**21st** 69:18 123:4
**22** 5:7 125:6,7 177:14
**23** 5:9 125:16,17
**24** 5:12 126:13,14
**248.593.6400** 2:10
**25** 5:14 128:20,22
**25447** 2:4
**26** 5:17 138:25 139:2

Donovan Reporting, PC                                                                          770.499.7499

Barbara A. Franz                Rodrigues v Delta Air Lines, Inc.                December 11, 2014

| | | |
|---|---|---|
| **27** 5:19 152:23,24,24 | **5** 3:18 82:13,15 | **981** 2:12 |
| **2745** 190:21 | **5th** 130:14 | **99** 4:7 |
| **28** 5:22 156:14,18 | **52** 3:10 | **995** 6:22 182:10 |
|   164:12,16 | **53** 115:6 116:5 |   183:1 |
| **28th** 139:4 | | |
| **29** 6:1 164:3,4,4,13 | **6** | |
|   164:16,18,22 165:8 | **6** 3:21 90:2,3,22 | |
|   166:4,7 171:13 |   91:21 120:17 | |
| **29th** 190:19 |   133:22 138:10 | |
| | **6th** 137:18 | |
| **3** | **6:08** 178:7 | |
| **3** 3:15 68:8,10 69:2 | **61** 150:24 | |
|   69:20 | **62** 3:12 | |
| **3rd** 175:16 | **660** 6:6 175:13 177:7 | |
| **3-30-2005** 3:22 |   177:24 | |
| **30** 6:3 165:16,17 | **68** 3:15 | |
|   169:12 | | |
| **300** 2:8 | **7** | |
| **30320** 2:13 | **7** 3:4,23 91:19,20 | |
| **31** 6:5 175:11,12 |   92:2,4 | |
| **31st** 182:5 | **7.C** 190:3 | |
| **311** 5:23 156:22 | **716** 6:11 178:4,23 | |
|   160:5,10 162:10 |   179:4,7 | |
|   177:7 180:14 | **78** 3:17 | |
| **313.318.3180** 2:5 | | |
| **32** 6:8 177:13,16,17 | **8** | |
|   177:18 | **8** 4:1 93:4,6 94:2,6 | |
| **33** 6:10 178:2,3 | **8th** 113:4,22,25 | |
| **34** 6:12 179:10,11 |   114:22 115:2,6 | |
| **34977** 2:9 |   118:13 119:6,13 | |
| **35** 6:15 179:25 180:1 |   127:3 128:4,25 | |
| **36** 6:17 180:18,19,20 |   137:17,18 139:20 | |
| **37** 6:19 181:10,11,20 |   140:4 152:15 178:7 | |
| **38** 6:21 182:3,4 | **8-25-2011** 3:20 | |
| **39** 6:24 182:22,23 | **8.B** 7:5 | |
| | **8:53** 1:14 7:2 | |
| **4** | **82** 3:18 | |
| **4** 3:17 78:25 79:2 | | |
|   80:25 | **9** | |
| **4th** 152:15 165:24 | **9** 4:3 95:16,19 | |
| **4-5-2013** 5:13 | **9th** 123:24 125:8 | |
| **4-8-2013** 5:15 |   153:9 179:13 | |
| **4:40** 179:13 |   180:22 | |
| **404.773.6520** 2:13 | **9-11-28(c)** 190:6 | |
| **42** 115:15 | **9:47** 180:22 | |
| **421** 6:18 180:21 | **90** 3:21 | |
|   181:1,25 | **91** 3:23 | |
| **45** 168:3,4 | **93** 4:1 | |
| **48009** 2:9 | **95** 4:3 | |
| **48239** 2:4 | **97** 11:7,22 | |
| | **97-to-2001** 12:4 | |
| **5** | **98** 4:5 | |